1  WULFSBERG REESE COLVIG & FIRSTMAN
   PROFESSIONAL CORPORATION
2  Eric J. Firstman – 111534
   Michael J. Higgins – 151549
3  Kaiser Center
   300 Lakeside Drive, 24th Floor
4  Oakland, CA 94612-3524
   Telephone: (510) 835-9100
5  Facsimile: (510) 451-2170

6  OFFICE OF THE CITY ATTORNEY, CITY OF ALAMEDA
   Teresa L. Highsmith – 155262
7  Alameda City Hall
   2263 Santa Clara Avenue, Rm. 280
8  Alameda, CA 94501
   Telephone: (510) 747-4750
9  Facsimile: (510) 747-4767

10 Attorneys for Defendant
   City of Alameda

11

12          **IN THE UNITED STATES DISTRICT COURT**

13      **IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA**

14              **SAN FRANCISCO DIVISION**

15 VECTREN COMMUNICATIONS              No. C 08-03137 SI
   SERVICES, an Indiana corporation,
16                                     **DECLARATION OF ERIC. J. FIRSTMAN**
                                       **(AND EXHIBITS A, B & C) IN SUPPORT**
17            Plaintiff,               **OF CITY OF ALAMEDA'S MOTION TO**
                                       **DISMISS FED. R. CIV. P. 12(b)(6)**
18 vs.

19 CITY OF ALAMEDA,                    Date:        October 3, 2008
                                       Time:        9 a.m.
20            Defendant.               Courtroom:   10, 19th Floor
                                       Honorable Susan Illston
21

22 I, ERIC J. FIRSTMAN, DECLARE:

23          1.      I am a principal with the firm Wulfsberg Reese Colvig & Firstman, Professional

24 Corporation, attorneys of record for defendant City of Alameda in this action. I have personal

25 knowledge of the matters stated herein.

26          2.      Attached hereto as "Exhibit A" is a true and correct copy of a letter dated August

27 29, 2007, that the City of Alameda received on or about that date from Robert H. Bunzel, attorney

28 for plaintiff Vectren Communications Services, Inc. (The enclosure delivered with the letter is

LAW OFFICES
WULFSBERG REESE COLVIG & FIRSTMAN
PROFESSIONAL CORPORATION
KAISER CENTER
300 LAKESIDE DRIVE, 24TH FLOOR
OAKLAND, CALIFORNIA 94612-3524
TELEPHONE (510) 835-9100

1   included in Exhibit A, hereto.)

2       3.    Attached hereto as "Exhibit B" is a true and correct copy of a letter dated

3   September 28, 2007, that I wrote and had hand delivered on that date to plaintiff's attorney, Mr.

4   Bunzel.  (The enclosures that accompanied the letter, as delivered to Mr. Bunzel, are <u>not</u> included

5   in Exhibit B, hereto.)

6       4.    Attached hereto as "Exhibit C" is a true and correct copy of a letter dated October

7   12, 2007, that I received via facsimile transmission on October 12, 2007, from plaintiff's attorney,

8   Mr. Bunzel.

9       I declare under penalty of perjury that the foregoing is true and correct and that I have

10  executed this declaration on July 21, 2008, in Oakland, California.

11

12                              /S/ Eric J. Firstman

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
WULFSBERG REESE COLVIG & FIRSTMAN
PROFESSIONAL CORPORATION
KAISER CENTER
300 LAKESIDE DRIVE, 24TH FLOOR
OAKLAND, CALIFORNIA 94612-3524
TELEPHONE (510) 835-9100

DECLARATION OF ERIC J. FIRSTMAN IN SUPPORT OF CITY'S MOTION TO DISMISS
1883-002\2218067.1

# EXHIBIT A

# EXHIBIT A

ALAMEDA POWER & TELECOM

AUG 2 9 2007

GM'S OFC

# BARTKOZANKEL
### Bartko·Zankel·Tarrant·Miller

Robert H. Bunzel
rbunzel@bztm.com

*A Professional Corporation*
900 Front Street, Suite 300
San Francisco, CA 94111
p: 415.956.1900
f: 415.956.1152
www.bztm.com

August 29, 2007

<u>VIA HAND DELIVERY</u>

Ms. Leticia Sabiniano
Series 2002A Trustee
Series 2004 Trustee
U.S. Bank National Association
Corporate Trust Services
One California Street, Suite 2250
San Francisco, CA 94111

Mr. Girish Balachandran
General Manager
Alameda Power & Telecom
2000 Grand Street
P.O. Box H
Alameda, CA 94501

Re:    Amended and Restated Series 2002A Telecom System Installment
       Sale Agreement; Notice of Events of Default

Dear Gentlepersons:

This firm represents VCS Communications Services, Inc., an Indiana corporation ("VCS"), with regard to the matters addressed below, and response should be directed to this office. In anticipation of potential litigation, VCS has requested that we notify you, the Secured Parties, of the following Events of Default by Alameda Power & Telecom ("Alameda P&T"). (All capitalized terms shall have the meaning ascribed to them in the documents discussed herein.)

Alameda P&T and VCS entered into a series of agreements related to the construction of the cable broadband telecommunications system in Alameda, California ("Telecom System"), including an Amended and Restated Series 2002A Telecom System Installment Sale Agreement (the "ISA"), an Amended and Restated Series 2002A Telecom System Trust Agreement (the "Trust Agreement"), an Amended and Restated Series 2002A Security Agreement ("Security Agreement"), a Subordination and Intercreditor Agreement, and an Amended and Restated Project Closeout Change Order.

VCS owns 100% of the Series 2002A Certificates issued in connection with the ISA and is subordinate, in certain respects, to Alameda P&T's Series 2004 obligations for the

2188.000/331554.3

Ms. Leticia Sabiniano
Mr. Girish Balachandran
August 29, 2007
Page 2

benefit of noteholders under the Subordination and Intercreditor Agreement. The latter agreement requires notice to all Secured Parties in the event of default, hence this letter.

The ISA obligates Alameda P&T to pay to VCS during its Term, and for the period 2005-2009, all "Net Series 2002A Revenues," defined in the Intercreditor Agreement as the revenues generated by the Telecom System less "Priority Costs" such as taxes payable to the City of Alameda, shortfalls in interest payments owed to the Series 2004 noteholders (we are aware of no such shortfalls given the capitalized interest account established in 2004 to fund such interest payments) and operating expenses that are subject to covenants of Alameda P&T discussed next.

The ISA includes important covenants of Alameda P&T in favor of VCS. Those covenants include promises to operate the Telecom System in an efficient and economical manner, to operate and maintain the Telecom System in accordance with customary standards and practices of similar facilities, and to implement a program of rates and charges. These covenants were in partial consideration for subordination of certain of VCS' rights, and informed and gave meaning to the likelihood that Alameda P&T would indeed earn and pay over to VCS the Net Series 2002A Revenues during the term of the ISA.

Alameda P&T has in numerous ways breached these covenants, constituting Events of Default per §§ 9.1(b) and (h) of the ISA, as well as § 5 of the Security Agreement. VCS has learned of such breaches from a report prepared by CCG Consulting LLC for Alameda P&T (the "Report"). The Report identifies many inappropriate expenses including the employment of large numbers of staff, marketing tactics that do not befit a smaller municipal system, and the over-use of outside vendors, all to the detriment of net revenue generation.

Though the Report is dated December 7, 2006 by Alameda P&T, it was not made known to or disclosed to VCS until it was sent to Liz Witte of VCS in late April 2007 after she noticed a reference to such a report (link unavailable) on Alameda P&T's website and contacted Alameda P&T. It is attached for the benefit of the Series 2002A Trustee and 2004 Trustee, and may be a summary rather than the full report. Indeed, it appears that absent VCS' own efforts, Alameda P&T had no intention of disclosing the Report. VCS has timely and responsibly analyzed the information contained therein, engaged California counsel, and reviewed VCS' legal options.

After such review, VCS believes that Events of Default have occurred and may have been ongoing since 2005. This letter serves as notice to the Secured Parties of Events of Default, namely that Alameda P&T has breached the above described covenants of the ISA, and therefore the Security Agreement, including *each* of the Report's identified deficiencies in Alameda P&T's operation of the Telecom System, as well as the failure to implement the program of rates and charges described at ISA § 6.4. This notice is given to the 2002A Trustee, the Series 2004 Trustee, and Alameda P&T, and counsel for Alameda P&T, as required by § 9(g) of the Subordination and Intercreditor Agreement.

2188.000/331554.3

Ms. Leticia Sabiniano
Mr. Girish Balachandran
August 29, 2007
Page 3


The contractual remedies available to VCS are: (i) to declare all principal components of the unpaid Installment Payments, together with accrued interest at a specified rate to be immediately due and payable; (ii) to take whatever action at law or equity that may appear necessary or desirable to collect the Installment Payments then due or thereafter to become due during the Term or enforce performance and observance of any obligation, agreement or covenant made by Alameda P&T; (iii) to require Alameda P&T to sell the Telecom System and apply the net proceeds to the prepayment of Installment Payments, subject to the Subordination and Intercreditor Agreement and the Series 2004 Security Agreement and all other lawful obligations; and (iv) the rights and remedies of a secured party under the Uniform Commercial Code and as otherwise supplemented by the Security Agreement. VCS is considering its remedial options.

Per the Series 2002A Trust Agreement, VCS assigned its remedial rights under certain conditions to the Series 2002A Trustee, and VCS must in any event obtain the consent of the Series 2004 noteholders and/or the Series 2004 Trustee if it wishes to pursue a sale, transfer or other disposition of the Telecom System.

The ISA provides Alameda P&T a 30-day period to cure the breaches identified herein and in its consultant's Report. This would require Alameda P&T at a minimum to (i) immediately implement the changes recommended in its own consultant's Report, which concluded that the Telecom Division should be generating a cash surplus of $2.5 million dollars within three years if properly operated, (ii) implement the program of rates and charges anticipated in 2004, and (iii) pay to VCS all sums previously scheduled to have been paid by this date under the ISA, and which would have occurred absent breaches of the applicable covenants.

As owner of all of the Series 2002A Certificates, VCS, subject to the cure rights of Alameda P&T, will pursue all available remedies directly.

VCS is willing to meet with the Secured Parties to discuss these matters prior to instituting litigation with respect to the remedies that flow from an uncured breach. The Secured Parties should consult with counsel and contact me.

Thank you for your prompt attention to these matters. We look forward to a prompt response and a fair resolution of these matters.


Very truly yours,

Bartko·Zankel·Tarrant·Miller
*A Professional Corporation*


Robert H. Bunzel

RHB/MAS:cr
Enclosure
cc:    Edsell M. Eady, Jr., Esq. (via hand delivery)

2188.000/331554.3



INTERNET | CABLE TV | POWER | CUSTOMER
SERVICE

ALAMEDA
POWER & TELECOM
*A Department of the City of Alameda*

| Search Site | Newsroom | About Us | Pay Your Bill | Channel Guide | AlamedaNET/WebMail |

---

**NEWSROOM**

**Press Releases**

**News**

**Reports and Studies**

**The Flash**

## Reports and Studies



### Consultant's Report to CCG

The following is a 9 page version of a report on Alameda Power & Telecom
by CCG Consulting LLC, a Beltsville, Md. based firm.

### The Report

December 7, 2006

FROM:
CCG Consulting LLC
7712 Stanmore Drive<
Beltsville, MD 20705

TO:
Ron Stassi
Interim General Manager
Alameda Power & Telecom
2000 Grand St.
Alameda, CA 94501
Re: Analysis of Telecom Operations

Ron:

Per your request, following is my report on my findings concerning the
telecom operations. My task was to analyze the operation with the goal
towards finding ways to make it cash self-sufficient and able to support its
own debt.

The Telecom Division ("Division" or "Company") has not been profitable
since it first launched. Losses have been reducing over the past couple of
years. This is not unusual for a start-up operation in a competitive market
when the launch occurs long before completion of the system, as was the
case for the Division. With construction completed and with the growth of its
subscriber base, losses have been reducing over the past couple of years.
The 2006 fiscal year revenue shortfall was roughly $4 M, and losses for the
2007 fiscal year are projected to be $1.9 M. The Division is headed in the
right direction, with improved net cash flows, but the changes being made
are not yet sufficient to make the Division self-sufficient.

The Telecom Division refinanced in 2004 with a note that requires a balloon
payment due in April 2009. The short-term goal for the Division is to get
profitable enough so that the Division can support operations and its own
debt. The working capital shortfalls in the Division are currently being
funded through interfund transfers from the Electric line of business with the
expectation that this support will end in the next fiscal year.

In the long run the current earnings shortfalls must be eliminated. In fact
the Division will face issues with refinancing without a major improvement in
profitability. If the Division wants to be self-sufficient it must take drastic
steps.

In this report I will first discuss the problems I see in the Telecom Division
today. This will be followed by specific recommendations of changes needed

Media Contact:
Matthew T. McCabe
Alameda Power & Telecom
(510) 748-3911
mmccabe@alamedapt.com

to attain profitability.

• Today's Challenges

My analysis shows that there are a number of different problems contributing to today's losses. Here are the most significant hurdles affecting profitability:

• Large Company Mentality in a Small Company

I found that the Division is using large company solutions for what is essentially a very small cable company. The Division only has 10,000 cable customers. This small size equates to many tiny rural systems.

Since you are small, in order for this Division to be successful you must think small. This is going to be a difficult mental hurdle for the management team. Many of its employees formerly worked for large cable companies and they know the large cable industry and they think in terms of large cable solutions. Making this change requires a real culture change.

Most of my other clients, both municipal and commercial, are also small companies. They are successful because they have found ways to succeed without spending a lot of money on processes and programs.

Let me give some examples of ways that the Division's "big company" mentality translates into operations:

The Division has adopted a marketing strategy that goes head-to-head with Comcast. Comcast markets by flooding customers with literature. Large companies like Comcast are by definition impersonal and mass mailings are the large company approach to getting people's attention. However, your tiny company cannot spend the same kind of marketing dollars as Comcast. Other small cable companies have found more affordable and effective ways to get customers.

The Division uses CSG for its back-office and billing software. CSG is the company that sells software to the largest cable companies, and for a company your size this is a very expensive solution. I recognize that the decision to deploy CSG was made when the service was first launched many years ago. However, I don't know any other small cable companies that use CSG, and the Division needs to look for a small company solution.

The Division decided to deploy doorknockers as a way to get direct marketing to customers. Using doorknockers is a great idea and almost every one of my clients uses them. However, the Division found and hired a professional door knocking firm, such as those used at large cable companies. Such a firm is expensive since it charges a steep commission for success. All my other clients hire temporary local employees, pay no commission, and get the same solution for a lot less cost.

This Division is going to have to embrace thinking small if it is to survive and thrive. While you compete against Comcast, you can't spend and act like Comcast. You have to be nimble and get things done with very little spending. Employees must be nimble and every employee must wear multiple hats, regardless of their job titles. Profitability can be achieved at a tiny cable company and the majority of my other clients are a testament to achieving more, using less. While my other clients are tiny, most of them also compete against one of the big cable firms like Comcast, Charter, Cox or Time Warner. Most of the solutions I am going to recommend are ways of thinking and acting like a small company.

• Salaries

One of the most significant issues is the level of salaries paid in the Telecom

Division. When I compare the Telecom Division to other municipal broadband utilities I have looked at across the country, the salaries in Alameda are 50 percent to 100 percent higher. This is due in a large part to being in the Bay Area where the cost of living is so much higher.

In addition to salaries, the Division has a few more employees than are needed. However, most of the current jobs can be justified by the workload. Since payroll is the largest controllable expense, the Division is faced with a difficult choice: lay off employees and get by with less, or else reduce payroll in some other manner.

The salaries in the Telecom Division are not only high by municipal broadband standards, they are high by industry standards.

Historically, the cable industry is a very stingy employer. The vast majority of employees in the industry make significantly less than comparable industries like the telephone industry. The cable industry also offers significantly fewer benefits than does the City.

The Division faces a major dilemma. If its salaries are too low it cannot attract good employees in the Bay Area. However, if salaries are too high, it cannot sustain the business. In the end, there may not be a reasonable solution to this problem. I am recommending significant changes to personnel levels that will attempt to achieve the financial goals of the Division. In the end, the Division must find a way to get by with fewer people or else fail to be self-sustaining.

• Churn

As had already been identified before my visit, the Division is experiencing significant churn. However, your churn is very similar to the churn experienced by other urban cable TV providers. There are three major components of churn. The largest component of churn is due to households where residents leave the island. The second largest category is customers who are temporarily cut off for payment issues. The third component is customers who leave for lower prices or other dissatisfaction with services.

The Division needs a strategy to reduce churn. Currently you are adding about the same number of customers as you are losing each month, so sales efforts are no longer growing the enterprise and it has reached equilibrium. If the churn rate can be reduced, then over time the overall penetration rate of the Division will increase.

There is a different strategy for each of the three churn components.

First, there is no real issue with non-pay customers. Management reports that almost all of these customers return every month for service -- they don't leave the system just because they are temporarily disconnected.

The Division recently implemented a win-back program to address customers who are leaving because of price or other dissatisfaction. This is an interactive and real-time attempt to talk customers out of leaving the system. When somebody calls to disconnect, they get a call-back to discuss the reasons why they should keep AP&T. Win-back programs at other companies are very effective. The win-backs ought to reduce the churn for customers who are dissatisfied or who are leaving to change to a competitor. I would think over time, based upon my experience with other win-back programs that you can reduce the churn in this category by half by maintaining a strong win-back program.

However, the largest churn category is customers who are moving out of Alameda. The City faces a unique challenge with this group. When Comcast loses a customer to a move, they have a reasonably high expectation that the person moving into the same residence will call them for service. The challenge is to develop a program that will let you talk to new customers

before they move to Alameda. I offer the following suggestions of ways to get to customers who are moving to town. There are certainly other ideas that might also work.

You should implement changes in the call center so that you can make a serious sales pitch to new customers when they call to establish electric service. They need to be sold on also buying cable and data from AP&T.

You should create a referral program with real estate agents. They know who will be moving to Alameda before they get here. A program might pay fees to real estate agents for giving you the contact information for people who are moving to the island.

I know in the past you have tried to make deals with MDU owners with little success. I have a client in Houston who uses a different approach. He pays referral fees to the people who work in the apartment rental offices. Fees would be paid to the agents for any new customer from the apartment that takes your service.

You might want to work out some sort of arrangement with the military to have them include your literature in packages for anybody being transferred to Alameda.

In the end, you can't reduce the number of people who are moving, but you can establish strategies to get to new customers early, before they have chosen Comcast, reducing the effective churn rate. Your minimal goal ought to be to reduce the churn rate by half over a few years.

• Specific Solutions

I see several major areas that can bring about improvements to profitability:

• Improve revenues

• Reduce payroll

• Look for operational efficiencies

If you are to achieve the goal of having the Division be self-sufficient, then you are going to have to implement all of the changes I am recommending. Implementing only some of these changes will improve profitability, but not enough for the Division to become self-sufficient. If for some reason you are unable to achieve any one of the goals I have challenged you with, then you need to look for an alternative way to achieve the same savings. What I am recommending is not the only possible path to profitability. There are other ideas that can also save money.

• Increase Revenues

There are three major ways to increase revenues: issuing periodic rate increases, controlling churn and introducing voice.

• Rate Increases

Revenues in this Division are no higher than in other telecom companies. In fact, the revenues in this Division lag a bit behind the nationwide average. In the most recent annual FCC report on the cable industry the FCC reports the average household spent $68.64 per month on cable services in 2003, $76.48 per month in 2004 and $84.73 per month in 2005. This Division currently has average revenue of $65 per customer per month, significantly behind the nationwide average. Part of this difference can be attributed to the fact that this company is competing by offering lower rates. This

accounts for about $10 of the difference. The rest of the difference is attributable to the characteristics of the customers. This Division still serves a significant number of cable television customers opting to purchase only "Basic" (the lowest priced) service, and other customers have not adopted advanced services quite as rapidly as customers elsewhere. This difference will reduce over time with the FCC mandate to eliminate the analog signal and eventually requiring all customers to receive a digital signal.

The Division competes in a major metropolitan market against the largest cable company in the country. As such, the Division is forced to offer a very wide array of channels. Programming thus represents a very significant percentage of expenses - much higher on a percentage basis than any other of my cable clients.

Even so, I am not recommending that the Division make any changes to programming. I believe the full channel line-up is mandatory to be competitive in this market. However, high programming costs represent a large fixed cost that contributes to the current losses. Any solutions to increase profitability must overcome this unavoidable handicap.

Because the programming costs are such a large component of costs, the Division must increase customer rates over time to offset any increases in programming costs. I would recommend at least a 5% increase in cable rates every year, assuming that

Comcast also raises rates and assuming that programming costs continue to climb as they have in the past. Competition in the market will probably not allow you to raise data or telephone rates. However, as long as programming costs increase,

Comcast will probably be increasing rates and you should as well. Comcast has been raising rates on average by more than 7% per year for many years in a row. If the City raises rates at least 5% per year the City ought to be able to maintain relatively low rates compared to Comcast in surrounding towns. Rate increases are a mandatory part of the solution to get profitable.

• Control Churn

As discussed above, the Division has recently implemented a churn reduction plan using "win-backs" and referrals. These programs should be vigorously maintained and the Division should also consider my other ideas for reducing churn. Most of these ideas address the issue of getting new residents as they first move to Alameda. The Division needs to reduce the effective churn rate in half over a few years.

• Add Voice

Voice is the product that completes the triple play - voice, video and data. We know that Comcast will be introducing voice soon in the market and I think it is mandatory for you to do so as well.

There is a lot of misinformation in the cable industry about voice and many smaller cable companies are afraid of offering it.

Many of the large cable companies have contracted with outside firms such as MCI or Sprint to add voice to their systems.

However, almost every one of my small clients now has a voice product offered on their own switch. Voice is the highest margin product under the triple play. Unlike cable it does not have a huge external cost equivalent to programming costs. Hooking up to the voice network is also cheaper than connecting to the Internet with data.

I believe a reasonable goal for voice would be to strive to get a 50%

penetration (with your existing customers) within five years (25% of the market). It takes a while to launch voice. There are several regulatory and contractual hurdles that must be overcome to get into the business. None of these steps are hard, but they are time consuming. It typically takes 12 to 18 months to launch a voice product from scratch.

If you achieve a penetration of 50% of existing customers (around 25% of the total market) by 2012, the annual voice revenues would be approximately $3.3M. Adding voice is mandatory – without these revenues you cannot achieve sufficient profitability.

There are many details of being in the voice business that can't be included in this sort of paper. I would recommend getting a voice primer as a separate task from this project.

I know that many cable companies are afraid of offering voice. However, I have helped over 100 small businesses launch a voice product, all to great success. Voice can be provided quite economically on a small scale since we need smaller switches to serve fewer people. Many companies consider outsourcing the voice product. However, at your size you are going to be offered one of two unsatisfactory outsourced choices. First, you might be offered true VoIP like Vonage, and you will find this to be of poor quality and lacking carrier-class qualities like good 911 service. You can also buy voice from companies like MCI and Sprint, but they will charge so much that you won't add any profit. Doing it in house can both be practical (since you control the product end-to-end) and profitable.

• Reduce Payroll

This is the most difficult part of my recommendation. As mentioned in my introduction above, payroll expenses are a huge impediment to the profitability of the Division. This is the primary reason you are losing money today. While there are a few extra employees, the primary problem is the high cost of salaries and benefits that are paid today. These high salary costs are out of line considering the industry and the revenue streams being supported.

Cutting payroll drastically is mandatory if you are to obtain profitability. There are only a couple ways to do this. You can either lay people off, transfer people to other operations if you are able to do so, or reduce salaries and benefits across the board (or a combination of these solutions). If you are unable to cut payroll, then the Division will not become self-sustaining. The Division must cut expenses drastically, which always involves painful choices.

• Specific Payroll Reduction Recommendations.

(The) following are specific cuts that I think are mandatory to obtain profitability.

• Eliminate the Studio

The Division currently dedicates two employees to the operation of a studio for local programming. This is a luxury that cable companies many times your size cannot afford. When considering the size of the operational loss, these positions must be eliminated.

There are other ways to achieve good local programming without employees. Many of my other clients do this quite well. As an example, some of them have obtained grants to get cameras for the community and they use the high schools and junior colleges to produce local programming. They also make cameras available for local sports and other events so that a wide variety of true local programming is made available. The solutions my other clients have found are an example of thinking small.

• Eliminate Most Marketing Expense and Staff

The Division currently has a significant marketing budget. The company has been trying to go toe-to-toe with Comcast from a marketing perspective. Considering the size of the operating losses, most of this expense must be eliminated. The marketing is currently composed of three basic types of expenses - salaries and benefits, marketing literature and advertising, and door knockers.

The current door knocking campaign seems to be quite successful. Most of my clients utilize door knockers and that is a very effective way to sell to customers. However, at Alameda, even your door knocking campaign is too expensive since you are using a professional firm that charges a hefty commission for each sale. Because of the financial situation, I am recommending that you adopt a program of home grown door knockers as your primary marketing campaign. I am recommending a force of four permanent part-time (20 hours per week) door knockers. These employees would be paid an hourly rate without benefits and would collect no commissions. A force of four door knockers working the streets of Alameda means you should be able to knock on most doors twice a year. This will allow you to continue to get to non-customers and it gives you the opportunity to get to know and to up-sell to existing customers.

• Reduce Inside Technicians

This is perhaps the hardest recommendation. The existing employees seem quite capable, but with their salaries and benefits they are not affordable. Unfortunately, as the largest group of telecom employees they become the largest consideration for cost reduction. I am recommending eliminating many of these positions. I am not making any specific recommendations on which inside jobs are eliminated, but based upon my experience with a lot of other small companies and the number of customers, I believe you can get by with a much smaller staff in a real bare bones effort.

This will create a very different working environment from the one you have today. The employees that remain are going to have to really take the initiative to keep things running smoothly. I know it can be done by experience with other companies. The only option is to eliminate a lot of positions to lower expenses.

• Reduce Installers

This is another difficult cut. However, your financial situation means you must reduce the staff of installers to around four. You can no longer afford employees plus contractors. The remaining employees are going to have to work extremely hard and smart to visit all of the needed customers each day.

The Division also currently utilizes several temporary installers. I didn't have enough facts to compare the cost of temporary installers to permanent employees, but the company should also strongly consider using mostly external contractors. The benefit loadings at Alameda make any employee extremely expensive to maintain and external employees ought to be less costly.

Many cable companies use only external contractors. The use of external contractors raises issues of control and quality, but with the right training and supervision, some companies have a very good experience with contractors.

These cuts were very difficult for me to recommend. The problem is that drastic cuts are needed to obtain profitability. It is certainly possible that the Division does not believe that it can operate as thinly staffed as I am recommending. However, without implementing these recommendations the Division cannot be self-supporting or profitable. You can't afford to cut staff

for a few years to achieve profitability and then creep back upward in payroll. All of the cuts I am recommending need to be for the long haul viability of the telecom business.

• Look For Operational Efficiencies

Following are some ideas that will bring other savings to the Division. This is not an exhaustive list and the employees should be challenged to find more ways to be efficient over time.

• Wear multiple hats (think Southwest Airlines)

With the drastic reductions in staff that I am recommending, it will become mandatory for all employees to wear multiple hats. By this, I mean that employees must be less focused on job titles than they are willing to step in at any time to help where most needed. With my other small clients it is not unusual to find inside technicians making customer calls, engineers working on marketing or an installer helping with paperwork. If the Division is going to thrive with the cuts I have recommended, then people must work as a team and not think of themselves in silos by job titles. This requires a big mental shift in the way of doing business. However, anything less than total teamwork probably means failure. I have set a very tall task for the remaining employees. But it is also possible that they may find their expanded and diversified roles more rewarding in terms of professional growth and job satisfaction.

• Bring Help Desk In House

For years the Division has been outsourcing the Internet help desk. I think during most of your history that this was the proper economic decision. However, with the growth of this enterprise to current levels, there are now enough cable modem customers to justify bringing this function in-house.

If we create a help desk group it is mandatory that this group take on multiple functions within the Company. This group ought to be able to do at least the following (and maybe more): answer customer's questions about data products, take trouble calls and dispatch repairmen, work as the first layer of customer support for all repairs, maintain the Company's LANs and web page.

If you create a group that can do all of these functions, then there is a significant savings by coming in-house. Bringing these costs in-house eliminates several significant expenses - the external help desk fees, the labor for the traffic group and the open position for a web designer.

I am envisioning this group functioning in the spirit of a new, more efficient Division. These need to be very technical folks with great computer savvy and good communications skills. However, these are entry level positions and have to be priced as such. From a financial perspective these need to stay as low paying jobs, but they are excellent incubators for professional growth.

• Look at Cheaper Billing/Operating Support System (OSS) Solution

This is my one recommendation that is not mandatory immediately, but should still be strongly considered. Currently the Company is using CSG, which is a very expensive solution. If you add telephone to the product mix, CSG will become even more costly. My other municipal clients use a much different solution. Most of them have purchased and capitalized a billing / OSS system.

There are several very good triple play systems available for small companies for between $500,000 and $700,000. Most similar businesses to yours have purchased such systems when they first launched the business

with bond money. Such systems require a significant upfront cost, but have much lower ongoing costs. Currently you don't have the cash flow to afford a new billing system. However, if you float a new bond you should take a serious look at this. I project a new billing system like the one used by other small companies would save around $200,000 per year over the long-haul.

• Eliminate Overflow Customer Service

You currently have an overflow customer service firm. This was originally designed to answer calls after hours, but it currently is taking a lot of calls during the day time (on some days it is taking a majority of the calls). Now that you have combined the electric and telecom customer service group, you need to have the new combined group step up and answer the calls that are coming in. My analysis shows that you now have sufficient staff to answer the calls and you need to implement procedures and processes that get the work done with your existing group.

I am recommending that trouble calls go to the new help desk group. This should relieve some small volume of calls from the customer service group. If customers can be routed by computer to the right group, customers will get better help and both groups will not waste time with unnecessary calls.

• Conclusion

My projections show that if you can really implement all of these changes, the Division has the opportunity to change from a cash shortage of $1.9M in the current fiscal year to a $2.5M cash surplus within three years. Your eventual potential cash surplus can eventually be even higher. This would be a drastic and welcome turnaround for the Company. The question that must be asked is if this is enough improvement. In the end, the cash flow should be able to support a new bond issue.

I would defer to your financing team, but my quick analysis shows that this new revenue will put the Division on the path towards supporting some portion of its own bond payments. Today the Division is not even covering direct operating costs, but with all of these changes you will cover all costs, capital improvements and be able to apply any excess cash towards bond payments. It's possible that these changes still might not create enough positive cash flow to fully pay for the bonds, which is something your financing team will need to examine. If these changes do not generate sufficient available cash, then the next step towards efficiency would be to look at additional cost cutting through such steps as outsourcing some or all functions.

There seems to be a lot more benefit to operating the Telecom Division than in shutting it down. However, the City has some very hard choices to make. The changes I've recommended to get the Division to a cash-positive position are not easy changes. They will drastically change the way this business is operated. The new enterprise will be stripped down and may seem to be constantly shorthanded compared to the electric line of business sharing some of the same facilities. If you have any questions regarding the proposal or need additional information, I can be reached at (202) 255-7689.

Doug Dawson

President

CCG Consulting, LLC.

# EXHIBIT B

# EXHIBIT B

LAW OFFICES

**WULFSBERG REESE
COLVIG & FIRSTMAN**

PROFESSIONAL CORPORATION

H. JAMES WULFSBERG
CHARLES W. REESE
TIMOTHY A. COLVIG
ERIC J. FIRSTMAN
GREGORY R. AKER
TERRI ANN KIM
DAVID A. ROSENTHAL
STEPHEN L. CALI
MARK A. STUMP
WILLIAM L. DARBY
KRIS A. COX
MICHAEL W. BARNES
DAVID DARROCH
MICHAEL J. HIGGINS
DAVID J. HYNDMAN
JEFFREY R. WARD
DEIRDRE JOAN COX
KAREN L. MOORE
PATRICIA S. ITAMOTO

KAISER CENTER
300 LAKESIDE DRIVE, 24TH FLOOR
OAKLAND, CALIFORNIA 94612-3524

TELEPHONE (510) 835-9100
FACSIMILE
(510) 451-2170
(510) 451-2575
www.wulfslaw.com

1883-002

FILE NUMBER_____

September 28, 2007

**VIA HAND DELIVERY**

Mr. Robert K. Bunzel, Esq.
Bartko Zankel Tarrant Miller
900 Front St. Suite 300
San Francisco, CA 94111

      Re:     Amended and Restated Series 2002A Telecom System Installment Sale
             Agreement; Response to Your August 29, 2007 Letter Re "Events of Default"

Dear Mr. Bunzel:

      This firm represents the City of Alameda, and its utility department Alameda Power &
Telecom ("AP&T"), in response to your letter of August 29, 2007 and its false assertions that
AP&T has defaulted on its obligations owed to your client, VCS Communications Services, Inc.
("Vectren"), under the terms of various agreements executed in 2002 and 2004. Please note that
we are copying U.S. Bank National Association, Trustee for the Series 2002A and 2004
obligations under these agreements, with this response.

      Read closely, your letter relies almost entirely upon a December 7, 2006 report from
CCG Consulting, about which there is a considerable public record of its receipt, evaluation and
implementation, all of which your letter ignores and mischaracterizes. Your allegations of
default rely entirely on a baseless characterization of the CCG report as somehow finding fault
with AP&T's past operation of the Telecom System during its construction and transition to full
operations (which the CCG report does not do) and as setting forth a list of feasible options that
AP&T can legally implement (which the CCG report also does not do). In fact, since 2004,
Vectren has received periodic written and telephonic reports, and had access to complete
information about all financial aspects of the Telecom System and its transition to full operations
-- areas in which Vectren held itself out as an expert.

      Your letter also contains significant misstatements of the terms of the 2002 and 2004
agreements. Most glaringly, your letter fails to mention (let alone address) the key term of these
agreements: Section 4.2 of the 2002A Installment Sale Agreement, where Vectren agreed that its
*sole recourse* for repayment would be "Net Series 2002A Revenues," as defined therein.

Robert K. Bunzel, Esq.
September 28, 2007
Page 2

In fact, the true purpose of your letter was communicated quite clearly the day before it was sent, on August 28, 2007, when Vectren senior management telephoned AP&T to request a personal meeting at the AP&T offices to discuss Vectren's "position on its loans." From your letter's flimsy pretext (its mischaracterization of the CCG report) and omission of key contract terms, Vectren's true intent in requesting these negotiations is now really quite clear -- it wants to negotiate away the key "non-recourse" term of the 2002 and 2004 agreements and receive money it has neither earned nor has anyone ever agreed to pay, using your letter as "a basis" of such negotiations.

Vectren's position that it has "loans" outstanding with AP&T is likewise false. The 2002 and 2004 agreements are installment purchase agreements under which installment payments may be payable under the conditions and subject to the limitations of those agreements, and what is purchased under those agreements is defined therein as "Purchased Rights", meaning Vectren's right to operate and manage the system and receive a management fee for doing so. Those rights had been coupled with Vectren's obligation to complete the construction of the system in a proper manner – an obligation assumed and performed by AP&T. To date, all of the facts show clearly that the Purchased Rights have had no discernable value, and that the release of Vectren from obligations assumed by AP&T had unimaginably immense value to Vectren, amounting to an enormous windfall for Vectren when compared to the stated purchase price for the Purchased Rights.

Please be advised that the allegations in your letter are demonstrably false and the assertion of default is totally without merit. In fact, to the contrary, it is Vectren that now has repudiated the 2002 and 2004 agreements and breached the covenant of good faith and fair dealing implied by law into those agreements, for the following reasons.

First, as Vectren well knows, AP&T timely completed the Telecom System at great cost, meeting all deadlines in the 2002 and 2004 agreements. AP&T then implemented orderly reductions in staff and operating costs following completion, and has exceeded all applicable standards to timely and properly transition the Telecom System to full operations and ultimate profitability. This has been a highly public process and documented in numerous budgets and reports provided to Vectren.

The CCG Consulting Report (cited in your letter) was commissioned by the City in the first budget period following construction completion, for the express purpose of securing recommendations for future operation of the completed system that Vectren designed. The CCG report is a forward looking report on the completed system and lists a menu of options for consideration (many of which were already underway, for example, reducing marketing costs and workforce levels). The CCG report is very critical of certain aspects of the Vectren design, such as the billing system, that Vectren installed under its contract. The CCG report is in no manner a commentary on *AP&T's* past operations of the system during the construction and build-out phase, and it is highly unlikely that Vectren – being an expert in these types of systems -- harbors a good faith belief otherwise.

Robert K. Bunzel, Esq.
September 28, 2007
Page 3

Since the receipt of the CCG report, AP&T has evaluated and continued to implement its feasible recommendations in a systematic and highly public manner, with detailed public reports on this process published as early as March 2007 as well several "town hall" meetings where the public asked questions of CCG (Doug Dawson) directly. The public record flatly contradicts your letter's suggestion that AP&T has somehow sought to suppress this report or has not taken action on its recommendations, and it was -- at best -- highly irresponsible and reckless of Vectren to make these demonstrably false allegations; worse, it was a libelous statement as communicated to the Series 2004 Note trustee, the consequences of which are yet to come.

Second, the legal assertions made in your letter about the 2002 and 2004 agreements are incorrect and misleading, and your letter's failure to address Section 4.2 of the 2002A Installment Sale Agreement is nothing less than *flat-out astonishing*. Section 4.2 was one of the central deal points of the 2002 and 2004 agreements, in each case the subject of protracted and vigorous negotiations that resulted in its becoming the essential basis for AP&T's agreement to grant Vectren broad and valuable releases from liability for design and construction defects. Simply put, Vectren stood by its system, agreed to look to that system for repayment, and AP&T accepted that commitment as it committed itself to the timely completion of the system. As with the true facts of performance, Vectren had no good faith basis to have omitted discussion of this deal point in your letter.

Third, since Vectren has now chosen to repudiate the 2002 and 2004 agreements by purporting to look past net revenues for repayment, please be advised that AP&T reserves its rights to declare Vectren in breach of the agreements and to assert a failure of consideration, resulting in a waiver of the benefits of the releases, which leaves AP&T free to seek the general, special and consequential damages caused by defects in Vectren's design, construction and representations. (We also note that, as a matter of law, even under the prior releases, Vectren is not released from any potential willful misconduct, negligent misrepresentation or gross negligence.)

From this summary, it should be very clear to Vectren that AP&T has no interest in renegotiating the 2002 and 2004 agreements, including but not limited to, Section 4.2 of the 2002A Installment Sale Agreement. While we assume that Vectren is fully aware of the foregoing, because you chose to co-address your letter to the 2004 Note Trustee and purported to invoke contractual remedies, we are compelled to respond in further detail below.

## SUPPLIED MATERIALS

We include with this response a binder containing pertinent documents and public records, all well known to Vectren, that flatly contradict the many unfounded assertions in your letter about AP&T having defaulted in its obligations under the terms of various agreements referenced in your letter. The supplied materials include the following:

1883-002\2186724.3

Robert K. Bunzel, Esq.
September 28, 2007
Page 4

- A copy of the 2002A Installment Sale Agreement (with a red-arrow tag to its Section 4.2, and we encourage your professional attention to this section.)
- A copy of the June 28, 2005 Project Notice of Completion, documenting AP&T's timely completion of the Telecom System.
- A copy of an AP&T's 2006 Report on the Telecom System's Projected/Actual Revenue, which is a public document and always available to Vectren.
- A copy of a Board letter dated January 23, 2006, titled "Strategic Staffing Plan and Authorizing Additional Funds for Retirement Incentive for Employees in Designated Positions", documenting the staff reduction program discussed in this letter, and is a public document and always available to Vectren.
- A copy of a November 15, 2006 City of Alameda Memorandum from Ronald Stassi to Debra Kurita, City Manager, Re: "Operational Review of Interfund Advances and Budgets", which is a public document and always available to Vectren.
- A March 14, 2007 report to the Board, titled "Internal Control Structure", which documents AP&T's actions on the CCG report discussed in this letter, and is a public document and always available to Vectren.
- A 16 April 2007 Administrative Report "Implementation of the CCG Consulting L.L.C. Report, 'An Analysis of Telecom Operations:' Alameda Power & Telecom." This document also documents AP&T's actions on the CCG report discussed in this letter, and is a public document and always available to Vectren.
- A copy of AP&T's 16 April 2007 Actions on "An Analysis of Telecom Operations". This document also documents AP&T's actions on the CCG report discussed in this letter, and is a public document and always available to Vectren.
- Quarterly Reports to Vectren.

## SECTION 4.2 OF THE INSTALLMENT SALE AGREEMENT

Notably, while your letter makes the contention of breach of various terms of the 2002 and 2004 agreements, your letter conspicuously omits any reference to Section 4.2 of the 2002A Installment Sale Agreement that states:

**Section 4.2 Special Obligation of Alameda P&T.** "(a) Net Series 2002A Revenues only. Alameda P&T's obligation to pay the Installment Payments shall be a special obligation limited solely to Net Series 2002A Revenues. *Under no circumstances* shall Alameda P&T be required to advance any moneys derived from any source of income other than the Net Series 2002A Revenues and other sources specifically identified herein for the payment of the Installment Payments, nor shall any other funds or property of Alameda P&T be liable for the payment of the Installment Payments." (Emphasis added)

Also, the 2002 and 2004 agreements have no exceptions or "loopholes" to this term. For example, the Intercreditor Agreement (to which other agreements are subordinate), at its Section 9(b), expressly limits Vectren's rights to exercise remedies in the event of a default to the Net Series 2002A Revenues remedy.

1883-002\2186724.3

Robert K. Bunzel, Esq.
September 28, 2007
Page 5

Since inception of the agreements between AP&T and Vectren for close out of the Vectren contract, it has always been a basic term of the agreement that Vectren would look *solely* to Net Series 2002A Revenues for payment. This fundamental business deal was central to AP&T's releasing Vectren from liability for construction defects and committing itself to the completion of the system. Essentially, Vectren was obliged to stand by its system and its profitability. That was and is a central term of the deal. Any other interpretation would be absurdly lopsided in Vectren's favor (even more so than what has ensued in the aftermath of those agreements.)

## AP&T HAS OPERATED THE TELECOM SYSTEM REASONABLY AND FOLLOWED ALL COVENANTS IN THE 2002 AND 2004 AGREEMENTS

There have been no "Events of Default" as alleged in your letter. AP&T has met all covenants in the 2002 and 2004 agreements, including the covenants to complete, operate and maintain the Telecom System in accordance with customary standards and practices applicable to similar facilities. We call your attention to the following facts with which Vectren is fully familiar.

### *AP&T Met the June 2005 Completion Date.*

The 2002 and 2004 agreements required that AP&T complete the Telecom System by June 2005, which AP&T did, as evidenced by its June 28, 2005 Notice of Completion it provided to Vectren and the Series 2004 Trustee, included in the documents that accompany this letter. We also note that AP&T was able to do so only with extraordinary measures to overcome defects and deficiencies in Vectren's system.

We point out that, in meeting this completion date, AP&T incurred extraordinary costs above and exceeding anything even remotely foreseeable at the time of the original 1999 Vectren contract, at the time of the 2002 agreements, or even at the time of the 2004 agreements. We invite your review of the Ronald Stassi's November 15, 2006 report to Debra Kurita, City Manager, on the exact subject of AP&T's significant subsidies of the telecom system since fiscal year 2000, documenting significant operating and capital subsidies, over and above the amounts Vectren represented the City would incur in building and operating the Telecom System and the amounts funded in the 2004 transactions. These excess expenses are also documented in AP&T's periodic financial statements and in the attached Board reports. These costs include operating subsidies, capital expenses, head end retrofitting and correction of defective work.

Note that AP&T incurred these expenses to complete the Telecom System, all in fulfillment of its obligation to Vectren and the Series 2004 noteholders that AP&T complete the system. Although the Telecom System was completed later than originally anticipated, due entirely to Vectren's delay and the necessity for AP&T to take over the work, and redo work already done, these efforts by AP&T have made it possible to envision plausibly that the system will no longer require AP&T interfund subsidies in the next fiscal year.

Robert K. Bunzel, Esq.
September 28, 2007
Page 6

We include in the binder of supporting documentation the following publicly available information documenting these expenditures and the Telecom System's fiscal operations. We invite your review of the annual reports and annual budgets, including the fiscal year 2008 budget. All of this information demonstrates that the City has complied with its covenants, has completed the system, and is operating the system toward profitability.

### *AP&T Operated the Telecom System Prudently During Its Build Out.*

Up until the June 2005 completion and during the six months following that completion, the City operated the Telecom System under a well known and established business plan for completing the system and attracting new subscribers to the system as areas (nodes) became available. This included marketing, the entire process of signing up new subscribers, installing laterals, and all the usual and customary steps to place a new system into operation, as well as responding to competitive challenges presented by Comcast. Indeed, all of this is well known to Vectren, due to its vaunted expertise in this area. Indeed, portions of the AP&T business plans were prepared by or on behalf of Vectren or were subject to Vectren's approval.

AP&T's business plan for this effort was clearly described in its Annual Budgets for each fiscal year, which are a matter of public record, and the adoption of which was a public process. The Telecom System's marketing budgets were and remain a matter of public record, were obviously clearly appropriate and were never commented on by Vectren during the system build out and new subscriber enrollment stage.

Regarding the marketing budget referenced in your letter, it has steadily declined since 2005, reflecting the fact of system completion and the processing the initial sign up of new subscribers. There is still a base level of marketing required, as Vectren well knows, in order to meet the unrelenting and continuing competition from Comcast. AP&T estimates the Telecom System has lost over 500 subscribers to Comcast in the last year, demonstrating the continuing acute need for marketing the system.

We include in the binder of supporting documentation the following publicly available information that documents this business plan and its administration, including Annual Budgets for fiscal years 2005 and 2006 and associated audited financial reports. This material documents this rational shift in spending and expenditures.

### *AP&T Has Conducted An Orderly Transition to Completed Telecom System Operations.*

Immediately upon completion of the system, after the surge of new customers associated with system completion and customer sign ups, the City began planning to transition to a new business plan and operation. Thus, the City began reducing staff in late 2005 and, as part of the next fiscal year's budget process, commissioned the CCG Consulting Report to consider further post-completion adjustments.

Robert K. Bunzel, Esq.
September 28, 2007
Page 7

We invite your review of the enclosed Board memoranda, on Retirement Incentives for Employees in Designated Positions, dated January 23, 2006, which documents AP&T's "Golden Handshake" program to begin the process of reducing costs. The point of such measures is to work toward the overall goal of Telecom System operating at a "breakeven" point by 2008.

These publicly available documents demonstrate the City's orderly, prudent and reasonable transition from construction and build out to full operations, including phased reductions in staff and operating expenses and appropriate research and planning for the new system operation.

### AP&T Commissioned, Received and Acted Upon the CCG Consulting Report.

AP&T engaged CCG in June 2006, following competitive negotiations with several firms, consistent with the development of the 2006 Budget and as a direct part of the 2006 budget process (which was a public process). CCG is a sole proprietorship operated by Mr. Doug Dawson.

The City received the CCG Consulting Report in September 2006 and promptly began evaluating its recommendations and implementing those feasible for AP&T and for a California City such as the City of Alameda

In this regard, we invite your review of the enclosed March 14, 2007 report titled "Internal Control Structure," which reports to the Board on the CCG Consulting Report and documents AP&T's systematic evaluation and implementation efforts for all feasible elements of the CCG Consulting Report. We also invite your review of the follow up reports dated April 16, 2007, also supplied with this letter.

These reports are a matter of public record, have at all times been available to Vectren, and fly in the face of the irresponsible allegations contained in your letter of August 29, 2007, which suggest AP&T – a government entity subject to open meeting and records laws – sought to suppress the CCG report and failed to take action on its recommendations. It was at a minimum reckless for Vectren to make this kind of allegation in a communication to the Trustee for the holders of $33,000,000 in Series 2004 Notes.

Further, as a review of the CCG Consulting Report makes clear, it is a forward looking report of the potential alternative methods that APT could evaluate to streamline its operations. It does not report or comment on AP&T's historical operations, costs or administration. Nor does it offer any legal opinions or considerations on the legality of a California city implementing some of the recommendations or the feasibility of doing so in a competitive climate such as that faced by AP&T vis-à-vis Comcast.

1883-002\2186724.3

Robert K. Bunzel, Esq.
September 28, 2007
Page 8

The CCG Consulting Report has no application to AP&T's operations during the previous time periods of construction, build out, enrollment of subscribers, or the staff reduction and cost reduction efforts that began following completion of construction. The contentions in your letter to the contrary are unfounded, reckless and defamatory.

### AP&T Is Prohibited from Implementing Several Major Elements of the CCG Consulting Report, Without Which CCG's Predicted Results Are by Their Terms Invalid.

It should be noted that AP&T cannot implement several of the recommended CCG changes and conditions for profitability, each and every one of which CCG states are essential to the achievement of anticipated results.

The first recommendation that AP&T cannot implement is to reduce salaries, which are mandated by the City's union contracts. CCG made calculations based on mid-west, rural and Gulf Coast labor costs, not union labor costs in Alameda. Labor is nearly 30% of AP&T operating costs for the Telecom System. As Mr. Stassi's November 2006 report shows, salary costs comprised $2,960,061 of AP&T's fiscal year 2005 operating budget, all of which was paid under union contracts except for the salary of the non-union supervising General Manager.

The second recommendation is to reduce marketing expenses, which the City has attempted to do, but with a direct resulting loss of customers to Comcast. As noted, Comcast is in direct competition with AP&T and has adopted a very aggressive pricing program in Alameda, offering significantly lower prices in Alameda than for the same services in adjacent Oakland and surrounding areas, as it is able to do under a completely different resource and cost structure.

The third recommendation is to reduce programming expenses, which the City cannot do, as programming is an expense based on outside vendor negotiations. AP&T is a system with 10,000 subscribers while Comcast is a system with 26 million subscribers; their bargaining positions with outside vendors are not remotely comparable. If AP&T reduces or eliminates available programming, this action will reduce the City's competitive position vis-à-vis Comcast.

A fourth CCG recommendation is to add voice services as a revenue enhancement. This capability, however, was never part of the Vectren supplied system; indeed, Vectren insisted on the right to veto any such addition to the system. The City has determined that adding voice services will cost significantly more to implement than originally estimated, due to the back office cost and equipment purchasing cost. The City, at this time, must work to stabilize the system's financial performance prior to making further investments beyond the scope of the system.

Finally, CCG suggests increasing rates, without any examination of customer tolerance or competitive conditions. Unfortunately, CCG appears not to have recognized that with Comcast's direct competition, if AP&T increases rates, it will lose even more customers – and revenues. Increasing rates is not feasible or responsible at this point in the competitive process.

Robert K. Bunzel, Esq.
September 28, 2007
Page 9

## RESERVATION OF RIGHTS

As stated above, the covenant of Vectren in Section 4.2 of the 2002A Installment Sale Agreement, was and is central to the underlying transaction. By sending your August 29, 2007 letter and seeking remedies inconsistent with this covenant, Vectren has apparently repudiated its agreements with the City and breached the covenant of good faith and fair dealing, and has caused a failure of consideration for the releases of liability that AP&T had previously issued. While these prior releases did not and could not extend to Vectren's willful misconduct, gross negligence, negligent or intentional misrepresentations made in the 1999, 2002 and 2004 transactions, the releases would otherwise extend to simple breaches of contract warranties and negligent design, the benefits of which Vectren has now waived.

Since the 1999 transaction, the simple fact is that AP&T has lost significant amounts in excess of what Vectren now claims, and the City has incurred substantial expenses because of Vectren's actions. Much of this cost resulted from Vectren's inadequate performance or reckless or willful misrepresentation of cost of work. AP&T reserves its rights to recover all costs and expenses resulting from errors, omissions, breaches, misrepresentations and concealments by Vectren and its agents, affiliates and subcontractors, as well as false and defamatory statements made by or on behalf of Vectren to others.

## CONCLUSION

The 2002 and 2004 agreements contain essential and vigorously negotiated covenants, as partially described in your letter, and all of which have been performed by AP&T, as demonstrated by the following well documented facts:

1. AP&T has made significant capital investments to make this system function as intended, overcoming numerous difficulties caused by Vectren.

2. AP&T has operated the Telecom System pursuant to a reasonable business plan during system build out, that included the necessary marketing expenses to establish the new customer base, negotiate contracts, install laterals from the main lines, all of which were and are necessary to establish a customer base and the system in normal operation.

3. AP&T promptly recognized, evaluated and began the transition to a new business model upon completion of construction and completing the initial surge in new customer recognition and administration.

We again call your attention to the fact that Vectren, as a purported expert in these systems, at all times was aware of these facts or easily could have made itself aware of these facts. AP&T has an impeccable record of responding to Vectren's requests for information.

Robert K. Bunzel, Esq.
September 28, 2007
Page 10

Regarding the report prepared by CCG Consulting, it does not identify any inappropriate expenses. The report is not a historical report but a forward looking report. This report sets forth recommendations, some recognized as difficult to implement, for system operation following the completion of construction. AP&T promptly evaluated the report and has taken steps to implement those recommendations that are feasible for a municipal system. AP&T reiterates, however, that feasible steps do not include non-union labor, rate increases, or reducing programming or marketing costs in the current competitive climate with Comcast, as none of these alternatives is prudent or possible for AP&T.

AP&T also points out that Vectren received unexpectedly valuable releases and limits of liability for its work on the design and construction of the system, and in exchange, agreed to a very limited right to payment for the Purchased Rights under the 2002A Installment Sale Agreement. In view of the repudiation and position asserted by Vectren, AP&T reserves its position as to breach and that the consideration for these releases has now failed and Vectren has waived the protections of the releases and faces substantial liability to the City and AP&T.

Finally, AP&T advises Vectren that your August 29, 2007 letter is a public document that casts AP&T in an extremely unfavorable light based upon false and misleading statements and innuendo. Your letter affects the interests of many stakeholders other than Vectren. In order to mitigate any detrimental reliance others may place on the letter, we and our client stand ready to help remedy this unfortunate situation if and when your client causes you to retract your letter and its unfounded allegations.

Very truly yours,

WULFSBERG REESE COLVIG & FIRSTMAN
PROFESSIONAL CORPORATION

ERIC J. FIRSTMAN

cc:    Teresa Highsmith
        Girish Balachandran
        Robert Orbeta
        Leticia Sabiniano

1883-002\2186724.3

# EXHIBIT C

EXHIBIT C



**BARTKOZANKEL**
Bartko·Zankel·Torrant·Miller | Lovitt & Hannan, Inc. of Counsel

A Professional Corporation
900 Front Street, Suite 300
San Francisco, CA 94111
p: 415.956.1500
f: 415.956.1152
www.bzfm.com

Our File: 2188.000

October 12, 2007

<u>VIA FACSIMILE</u>

Eric J. Firstman, Esq.
Wulfsberg Reese Colvig & Firstman
300 Lakeside Drive, 24th Floor
Oakland, CA 94612-3524

       Re:      Amended and Restated Series 2002A Telecom System
                <u>Installment Sale Agreement</u>

Dear Mr. Firstman:

      I have your lengthy letter of September 28, 2007, with attachments, in response to my letter on behalf of VCS Communications Services, Inc. ("VCS") that had provided contractual notice of Events of Default. While argumentative, your letter on behalf of Alameda Power & Telecom ("AP&T") does confirm that your client disputes it is in default of the Amended and Restated Series 2002A Telecom System Installment Sale Agreement, and that it has not and will not be curing any default. The August 29 notice letter is a prerequisite to perfection of contractual remedies affecting multiple parties, and is not withdrawn as your letter requests.

      The repeated assumption in your letter that your client could permissibly fail to observe performance covenants with impunity, provided no "net revenue" is produced, is neither the law nor consistent with the parties' expectations and agreements. Letter writing is not the forum to rebut the errors and innuendoes in your letter, but I did want to respond briefly to two points you made.

      First, AP&T and the Series 2004 Trustee should realize that VCS is in no way repudiating the Amended and Restated Series 2002A Telecom System Installment Sale Agreement ("ISA") nor any related agreements, as your letter repeatedly and erroneously states. Rather, VCS asserts AP&T has defaulted on specified performance covenants in the ISA (and is now in breach of contract given absence of cure). Therefore, VCS is relying on and affirming the agreements, including the remedial provisions for uncured breach in the ISA. Neither the three contract remedies at § 9.2 of the ISA, nor any position of VCS, promotes rescission or any other remedy inconsistent with standing on the contract.

      Second, the repeated argument in your letter that VCS' notice of default letter was defamatory or improper is unfounded and contrary to law. The August 29 letter was expressly

2188.000/334610.1

Eric J. Firstman, Esq.
October 12, 2007
Page 2

written "in anticipation of potential litigation," as noted in its first paragraph.  It was sent to AP&T and US Bank as Trustee of the 2004 Series as a prerequisite to a breach of contract claim pursuant to the terms of the Subordination and Intercreditor Agreement, and the Trustee as a Secured Party is surely a party related to potential litigation as confirmed by the requirements for notice.  The August 29 letter is entirely privileged and any tort claim such as your letter adumbrates would be readily dismissed at AP&T's expense.

       All this being said, the purpose at the end of my August 29 letter, and the reason for my client's call to your client in advance of the letter, was to suggest that a resolution of the dispute and avoidance of litigation should be considered now that AP&T is aware of the nature of VCS's claims.  Let me know if your client is willing to discuss resolution of the disputes prior to litigation being filed.  Please advise within the next two weeks if your client is agreeable to a meeting of principals subject to Cal. Evid. Code § 1152 *et seq*.

       Very truly yours,

Bartko·Zankel·Tarrant·Miller
A Professional Corporation

Robert H. Bunzel

RHB/bjs
cc:    U.S. Bank National Association (via facsimile)

2188.000/334610.1

# FACSIMILE COVER

## BARTKOZANKEL
Bartko•Zankel•Tarrant•Miller 1 Lovitt & Hannan, Inc. of Counsel

*A Professional Corporation*
900 Front Street, Suite 300
San Francisco, CA 94111
p: 415.956.1900
f: 415.956.1152
www.bztm.com

**DATE: October 12, 2007**

| | | | |
|---|---|---|---|
| **TO:** | **Eric J. Firstman, Esq.** | **FAX:** | (510) 451-2575 |
| | Wulfsberg Reese Colvig & Firstman | **PHONE:** | (510) 451-2170 |
| **TO:** | **Ms. Karen Lei** | **FAX:** | (415) 273-4590 |
| | U.S. Bank National Association | **PHONE:** | (415) 273-4500 |
| | Corporate Trust Services | | |

**FROM:**    Robert H. Bunzel

**User ID:**  1119                **Our File No.:**        2188.000

Sending 2 pages (including fax cover sheet). Original document will not follow by mail.

If there are any problems with this transmission, please call BartkoZankel office services at (415) 291-4573 or (415) 291-4574.

NOTICE: The information contained in this communication is intended only for the use of the addressee and may be confidential, attorney-client privileged, or exempt from disclosure under applicable law. Unauthorized use, disclosure or copying is strictly prohibited, and may be unlawful. If you have received this communication in error or you have not received all pages, please call the sender immediately at (415) 291-4573 or (415) 291-4574.