1  Robert H. Bunzel, State Bar No. 99395
   C. Griffith Towle, State Bar No. 146401
2  BARTKO, ZANKEL, TARRANT & MILLER
   A Professional Corporation
3  900 Front Street, Suite 300
   San Francisco, California 94111
4  Telephone: (415) 956-1900
   Facsimile: (415) 956-1152
5
   Attorneys for Plaintiff
6  VECTREN COMMUNICATIONS SERVICES, INC.

7

8              UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10                SAN FRANCISCO DIVISION

11

12  VECTREN COMMUNICATIONS SERVICES, )      No. C 08-3137 SI
    INC., an Indiana corporation,          )
13                                         )  **STIPULATION AND [PROPOSED]**
                  Plaintiff,                )  **ORDER GRANTING LEAVE TO**
14                                         )  **AMEND COMPLAINT**
             v.                            )
15                                         )
                                           )
16  CITY OF ALAMEDA, acting by and through )
    Alameda Power & Telecom,               )  Judge:            Hon. Susan Illston
17                                         )  Complaint Filed:  June 30, 2008
                  Defendant.               )  Trial Date:       February 8, 2010
18  _____ )

19  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

20          PLEASE TAKE NOTICE THAT plaintiff Vectren Communications Services, Inc.

21  ("VCS") and defendant Alameda Power & Telecom ("City") stipulate that pursuant to

22  Fed.R.Civ.Proc., Rule 15, VCS may file that First Amended and Supplemental Complaint For

23  ///

24  ///

25  ///

26  ///

27  ///

28
                                    -1-

2188.000/407643.1                          STIPULATION AND [PROPOSED] ORDER GRANTING
                                                 LEAVE TO AMEND COMPLAINT
                                                      Case No. C 08-3137 SI

1    Breach of Contract, Declaratory Relief, and Accounting, attached hereto as Exhibit A. City shall

2    have twenty (20) days after the same is filed to respond as permitted by the Federal Rules. The

3    July 30, 2009 fact discovery cut-off currently in effect for this case shall be extended to August 30,

4    2009 with respect to new matter in the First Amended and Supplemental Complaint.

5    SO STIPULATED.

6    DATED: March 10, 2009

7

8

                                           BARTKO, ZANKEL, TARRANT & MILLER
                                           A Professional Corporation

9

10

                                           By    /s/ Robert H. Bunzel
                                                     Robert H. Bunzel

11

                                                     Attorneys for Plaintiff
                                           VECTREN COMMUNICATIONS SERVICES, INC.

12

13    DATED: March 10, 2009

14

15                                            WULFSBERG REESE COLVIG & FIRSTMAN

16

                                           By    /s/ Gregory R. Aker

17

                                                     Gregory R. Aker
                                                     Attorneys for Defendant

18                                            CITY OF ALAMEDA, acting by and through
                                           Alameda Power & Telecom

19

20    IT IS SO ORDERED.

21    DATED: _____, 2009

22

23

24

                                                     Hon. Susan Illston
                                       United States District Court Judge

25

26

27

28

BARTKOZANKEL
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

STIPULATION AND [PROPOSED] ORDER GRANTING
LEAVE TO AMEND COMPLAINT
Case No. C 08-3137 SI

# EXHIBIT A

Robert H. Bunzel, State Bar No. 99395
C. Griffith Towle, State Bar No. 146401
BARTKO, ZANKEL, TARRANT & MILLER
A Professional Corporation
900 Front Street, Suite 300
San Francisco, California 94111
Telephone: (415) 956-1900
Facsimile: (415) 956-1152

Attorneys for Plaintiff
VECTREN COMMUNICATIONS SERVICES, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| VECTREN COMMUNICATIONS SERVICES, INC., an Indiana corporation,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF ALAMEDA, acting by and through Alameda Power & Telecom,<br><br>Defendant. | No. C 08-3137 SI<br><br>**FIRST AMENDED AND SUPPLEMENTAL COMPLAINT FOR BREACH OF CONTRACT, DECLARATORY RELIEF, AND ACCOUNTING**<br><br>Judge: Hon. Susan Illston<br>Complaint Filed: June 30, 2008<br>Trial Date: February 8, 2010 |

**Nature of Action**

1.　Plaintiff Vectren Communications Services, Inc. (VCS) seeks money damages against the City of Alameda, acting by and through a department of the City known as Alameda Power & Telecom (Alameda P&T or the City), a declaration that all operative agreements between the parties remain in full force and effect, contrary to Alameda P&T's assertions that certain agreements have been repudiated, and an accounting.

2.　In 1999, Alameda P&T and SIGCORP Communications Services, Inc. (later renamed VCS) entered into a contract for VCS to construct and manage a hybrid fiber coaxial telecommunications system (the Telecom System) in the City of Alameda, for which Alameda

-1-

Robert H. Bunzel, State Bar No. 99395
C. Griffith Towle, State Bar No. 146401
BARTKO, ZANKEL, TARRANT & MILLER
A Professional Corporation
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

P&T agreed to pay substantial construction and management fees to VCS. After construction commenced, the parties by 2002 agreed that Alameda P&T would complete the construction and manage the Telecom System. To compensate VCS for the rights and income it was foregoing, Alameda P&T agreed to pay VCS a total of $6.3 million (plus interest) in scheduled annual installments payable from net revenues of the Telecom System through June 2009, and secured by an interest in Telecom System net revenues in favor of VCS, subject to various priorities and conditions, until paid. In 2004, when Alameda P&T needed additional funding to complete and operate the Telecom System, VCS substantially subordinated its payment rights to the holders of the new financing, subject to performance and rate covenants fortifying the parties' expectations that net revenues would be earned.

3. Alameda P&T has failed to perform the performance and rate covenants, causing the Telecom System to generate little or no disclosed net revenues. In August 2007, VCS notified Alameda P&T that it was in default of these covenants, and provided Alameda P&T 30 days to cure the defaults, or otherwise all sums owed with default interest to VCS would be immediately due per the parties' agreements. Alameda P&T in September 2007 denied it was in default and hence would not cure the defaults. Alameda P&T has incongruously asserted that VCS's notice of default has worked a repudiation of the parties' agreements, and this suit follows unsuccessful efforts to resolve the dispute preceded by written demand from VCS that litigation would ensue. This action was filed because Alameda P&T, despite requests, refused to express any willingness to toll these claims and preserve the status quo as the parties address a business resolution. The claims are hereby supplemented and amended because on November 21, 2008, the City of Alameda transferred the Telecom System to Comcast of Alameda, Inc. (Comcast) without the consent of VCS, causing a further breach of contract.

### Parties, Jurisdiction, Intradistrict Assignment and Venue

4. Plaintiff is an Indiana corporation formerly known as SIGCORP Communications Services, Inc.

-2-

5. Defendant City of Alameda, acting by and through Alameda P&T, a department of the City of Alameda, is a charter city and municipal organization existing under its charter and the Constitution and laws of the State of California.

6. Alameda P&T is subject to the oversight of the City of Alameda's Public Utilities Board, consisting of Commissioners appointed by the Alameda City Council with the City Manager as an *ex-officio* member.

7. Jurisdiction is conferred by 28 U.S.C. § 1332 (diversity) in that (i) VCS is incorporated under the laws of and has it primary place of business in the State of Indiana, (ii) Alameda P&T is a citizen of the State of California for jurisdictional purposes, and (iii) the amount in controversy exceeds $75,000, exclusive of interest and costs.

8. Venue of this action lies in this Court because (i) the agreements at issue were executed here or were to be performed in this District, (ii) the defendant is resident in this District, and (iii) the acts or omissions giving rise to VCS's claims occurred in this District.

9. Assignment to the San Francisco Division of this Court is appropriate in that the acts or omissions giving rise to VCS's claims occurred in Alameda County.

### General Allegations

10. In June 1999, VCS under its prior name SIGCORP Communications Services, Inc. and Alameda P&T contracted for the construction and management of the Telecom System. VCS was to be compensated, in part, by fees for the construction and management of the Telecom System.

11. Alameda P&T arranged financing for construction and development of the Telecom System through a transaction with Alameda Public Improvement Corporation (APIC) and the issuance of Certificates of Participation known as the Series 2000B Financing.

### The 2002A Installment Sale Agreement

12. Construction related activities such as planning the Telecom System commenced in 1999. In late 2001 and early 2002, the parties entered into a Series 2002A Installment Sale Agreement and ancillary agreements, which provided for Alameda P&T, rather

BARTKOZANKEL

900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

-3-

than VCS, to complete construction of and to manage the Telecom System, subject to buy-out of VCS's rights in consideration for payments by Alameda P&T to VCS scheduled to occur over a period of years through June 2009, in the sum of $6.3 million plus interest.

13.    Alameda P&T's obligation to pay VCS such sums was memorialized in a second transaction with APIC and resulted in the issuance of additional Certificates of Participation known as the Series 2002A Certificates, of which issue VCS holds 100% such that VCS has standing to sue thereon.

14.    Under the Series 2002A Installment Sale Agreement, payments to VCS were to be made only from Telecom System net revenues, defined as Net Series 2002A Revenues in the Series 2002A Installment Sale Agreement.  Thus, Alameda P&T was obligated to make payments to VCS from a fund of positive revenue to be generated by the Telecom System in the future.

## The Amended and Restated Series 2002A Installment Sale Agreement

15.    In 2004, the Series 2000B Financing for the Telecom System matured, and new financing was required to pay off the certificate holders of the Series 2000B Financing and to finance completion of construction and to pay for initial operation of the Telecom System.

16.    Pursuant to a Memorandum of Understanding dated March 18, 2004 (MOU) that was conditioned on new bond financing being issued by May 31, 2004, VCS and Alameda P&T determined to restate and amend the Series 2002A Installment Sale Agreement, with new terms that were to include a release of VCS "from any claims for latent defects," and a rate covenant to require Alameda P&T "to maintain and adjust rates as may be necessary, together with any cost containments, to enable it to realize Net Series 2002A Revenues sufficient to pay the [VCS] Series 2002A Certificates on or before June 1, 2009."   The MOU also required VCS to be substantially subordinated to Alameda P&T's repayment "obligation" to holders of the new 2004 financing.

17.    Thereafter and pursuant to an Indenture of Trust dated April 21, 2004, Alameda P&T entered into a third transaction with APIC pursuant to which Alameda P&T issued

-4-

FIRST AMENDED AND SUPPLEMENTAL COMPLAINT
Case No. C 08-3137-SI

BARTKO ZANKEL
Bartko Zankel Tarrant & Miller, A Professional Corporation
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

approximately $33 million in revenue bond participation notes known as the 2004 Notes that mature on June 1, 2009.

18.     In March-April 2004, VCS and Alameda P&T executed several amended and restated agreements and addenda, including an Agreement to Amend and Restate  dated as of March 30, 2004, and an Amended and Restated Series 2002A Installment Sale Agreement dated as of April 1, 2004 (the IS Agreement), the performance of which is the principal subject of this action.

19.     The IS Agreement requires Alameda P&T to pay VCS $6.3 million plus interest by June 1, 2009, pursuant to a schedule attached as Exhibit B to the IS Agreement.  The payments to VCS are scheduled to be made by May 1 of each year, commencing May 1, 2005 and continuing through May 1, 2009 (the VCS Payments).

20.     Under the IS Agreement, payments to VCS, as in the 2002 agreement, were to be made only from Telecom System net revenues, also defined as Net Series 2002A Revenues, such that Alameda P&T reaffirmed its obligation to make payments to VCS from a fund of positive revenue to be generated by the Telecom System in the future.

21.     The IS Agreement at § 4.2(b) provides that Alameda P&T's obligation to make the VCS Payments from the Net Series 2002A Revenues is "absolute and unconditional and shall not be subject to any defense or any right of set-off, counterclaims or recoupment arising out of any breach of VCS."

22.     Subordination of the VCS Payments to the 2004 Notes was memorialized in a Subordination and Intercreditor Agreement between VCS, Alameda P&T and the Trustee for the future holders of the 2004 Notes, dated as of April 21, 2004.

23.     Consistent with the MOU, and in connection with the IS Agreement and the afore-mentioned Subordination and Intercreditor Agreement, the parties also entered into related agreements dated April 21, 2004, including: (i) a Release Agreement that fully released VCS, and its affiliates and parent corporation, including for any latent or other construction defect claims related to the Telecom System; (ii) a Discharge and Termination of Put Option that discharged a

-5-

FIRST AMENDED AND SUPPLEMENTAL COMPLAINT
Case No. C 08-3137-SI

1    prior put option by which the Trustee with respect to the 2000B Certificates could have caused

2    VCS to purchase the Telecom System; (iii) an Amended and Restated Series 2002A Security

3    Agreement that provided VCS a subordinated security interest in Telecom System net revenues;

4    (iv) a Discharge and Termination of Guarantee that discharged any obligation of VCS's parent

5    corporation pursuant to a Guarantee Agreement dated as of December 1, 2000; (v) an Amended

6    and Restated Trust Agreement, which at § 13.08 provides that the owner of "all of the Outstanding

7    2002A Certificates [VCS]" may pursue damages remedies directly against Alameda P&T; and

8    (vi) an Amended and Restated Project Closeout Change Order.

9            24.     The agreements described in paragraphs 18-23 above are part of

10    substantially the same transaction, and are to be construed together pursuant to Cal. Civ. Code

11    § 1642.

12            25.     In agreeing to make the VCS Payments out of a future fund -- the Net Series

13    2002A Revenues -- Alameda P&T was obligated to take all acts reasonably necessary to bring

14    such net revenues into existence pursuant to the standards set forth in the IS Agreement and related

15    agreements, consistent with the parties' contractual expectations.

16            26.     The IS Agreement includes material performance related covenants

17    burdening Alameda P&T, by which Alameda P&T covenanted and agreed that it would:

18          "[O]perate the Telecom System in an efficient and economical
            manner and operate, maintain and preserve the Telecom System in
19          good repair and working order." IS Agreement, § 2.1(g).

20                                 * * * *

21          "[O]perate and maintain, or cause to be operated and maintained, the
            Telecom System in accordance with customary standards and
22          practices applicable to similar facilities." IS Agreement, § 6.4.

23            27.     The Definition of Net Series 2002A Revenue in the April 21, 2004

24    Subordination and Intercreditor Agreement, at § 1, p. 4 further confirms that these performance

25    covenants permit "no greater" expenditures than are "customarily paid" in the "ordinary course of

26    comparable municipally owned and operated cable systems in comparable locations."

27

28

BARTKO ZANKEL
Bartko Zankel Tarrant & Miller, A Professional Corporation
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

-6-

FIRST AMENDED AND SUPPLEMENTAL COMPLAINT
Case No. C 08-3137-SI

28.     The IS Agreement also includes a material rate covenant that did not exist in the 2002 agreements, and for which VCS provided substantial new consideration in the exchange of promises and terms in the 2004 agreements.   Alameda P&T covenanted and agreed that it would:

> "prescribe, revise and collect such rates and charges for the services of the Telecom System from time to time, which, . . . shall produce Telecom System Revenues to provide Net Series 2002A Revenues sufficient for the payment of all unpaid Series 2002A Certificates, plus accrued interest with respect thereto, at or prior to May 1, 2009." IS Agreement, § 6.4.

29.     Alameda P&T represented in a contemporaneous prospectus known as a Preliminary Official Statement Dated March 31, 2004, and issued to prospective buyers of the 2004 Notes, that it intended to increase Telecom System cable TV rates through 2009.  As set forth in this prospectus, such rates in 2005 were to increase by 5%, rates in 2006 were to increase by 8.5%, rates in 2007 were to increase by 20%, rates in 2008 were to increase by 18%, and rates in 2009 were to increase by 10.4%.   Further, this prospectus contained a pro forma financial statement on behalf of Alameda P&T that set forth the expectation that Net Series 2002 Revenues would be $2,188,930 in 2007; $4,618,657 in 2008; and $5,049,749 in 2009.  The prospectus was published to VCS, consistent with the parties' intent and expectations at the time of the IS Agreement, and the prospectus stated Alameda P&T "intends" that by June 2009, rates "will have been adjusted and costs will have been managed" so as to "make installment payments" to VCS, and so as to provide a positive revenue history to support refinancing of the 2004 Notes by June 2009.  Instead, Alameda P&T has made no Telecom System rate increases for internet services, and has made only substantially lower rate increases for cable TV than the parties expected in 2004.

### Alameda P&T's Breaches of the IS Agreement

30.     Pursuant to § 9.1(b) of the IS Agreement, an event of default arises under the IS Agreement if Alameda P&T fails "to observe and perform any covenant, condition or agreement," 30 days after written notice of default is given to Alameda P&T by VCS.

-7-

BARTKO ZANKEL
Bartko Zankel Tarrant Miller & Nunn & Petersen, Inc. A Law Firm
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

31.     Alameda P&T's defaults under the IS Agreement arise by failing to operate and maintain the Telecom System in an efficient and economical manner in accordance with customary standards and practices applicable to similar facilities. Alameda P&T has failed to operate the system in a manner consistent with similar municipally owned and operated cable systems and to operate the Telecom System efficiently and economically, so as to generate net revenues. Practices of Alameda P&T that are contrary to the covenants and contractual expectations of the parties include: (i) expenses incurred by Alameda P&T in operating the Telecom System have been disproportionately high compared to other municipal service providers and compared to industry standards as a whole; (ii) Alameda P&T has failed to develop and implement a telephone (voice) service component, unlike other comparable telecom systems, which would have allowed Alameda P&T to compete and increase revenues substantially; (iii) Alameda P&T failed to maintain adequate gross margins in its video (television) component, unlike gross margins common to other municipal cable TV service providers; (iv) Alameda P&T incurred wasteful expense in external internet service provider (website) expenses of approximately $400,000 per year for several years, with no beneficial effect on increasing revenues; (v) sales and marketing expenses were unnecessarily high; and (vi) administrative/general costs have been extraordinarily inflated reflecting unusual and non-customary retirement expense charged against net revenue. As a result of these uncured failures to operate the system efficiently and economically and in accordance with customary standards and practices applicable to similar facilities, Alameda P&T has breached the performance covenants in the IS Agreement.

32.     Alameda P&T has also defaulted under the IS Agreement by failing to prescribe, revise and collect such rates and charges for the services of the Telecom System, which, after allowances for contingencies, errors in estimates, effects of cost management and changing competitive conditions, would generate Net Series 2002A Revenues. Alameda P&T failed to raise rates as described in the IS Agreement rate covenant and as represented in the 2004 prospectus that expressed the parties' contemporaneous expectations, instead keeping rates at a level which, when

-8-

BARTKO ZANKEL
Bartko Zankel Tarrant & Miller A Professional Corporation
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

1    the excessive costs of the operation are considered along with Alameda P&T's failure to add

2    competitive voice services, led to virtually no disclosed Net Series 2002A Revenues being

3    generated to date.  As a result of these uncured failures to prescribe appropriate rates for the

4    Telecom System, Alameda P&T has breached the rate covenant in the IS Agreement.

5           33.    Alameda P&T was also required pursuant to § 6.4 of the IS Agreement to

6    consult with VCS regarding the sufficiency of Telecom System rates and cost management, yet

7    Alameda P&T failed to do so despite VCS's offers to assist.

8           34.    Recently, after its mismanagement of the Telecom System was reported to

9    the Public Utilities Board in December 2006, Alameda P&T has reduced certain Telecom System

10   operating expenses and twice increased certain Cable TV rates without material negative economic

11   effect, thus confirming that Alameda P&T's excessive cost structure and low rates have not been

12   and are not justifiable.

13          35.    Alameda P&T in 2008 marketed the Telecom System for sale, and has

14   incorrectly asserted that VCS's security interest and related rights in Telecom System net revenues

15   would not survive a present sale of the Telecom System, mischaracterizing VCS's August 29,

16   2007 Notice of Default letter described in paragraph 44 below as somehow authorization for a sale

17   that Alameda P&T claims would extinguish VCS's rights.   VCS denies that a sale would

18   extinguish its rights and has taken no steps to block any sale, in this action or otherwise.   On

19   November 21, 2008 the City of Alameda sold the Telecom System to Comcast. Section 8.2 of the

20   IS Agreement provides:

21       …except as provided in Section 6.3 or under any Series 2004 Document,
         Alameda P&T may not sell, substitute or otherwise convey the
22       Telecom System during the Term of this Installment Sale Agreement
         or as long as any Series 2002A Certificate is Outstanding.
23

24   As of the date of the sale, the Series 2002A Certificates in favor of VCS were unpaid and

25   outstanding, and the sale occurred during the term of the IS Agreement.

26          36.    The November 21, 2008 sale was not made pursuant to § 6.3 of the IS

27   Agreement (permitted equipment installations). Nor was the sale made "under any Series 2004

28   Documents" since (i) the Trustee for the 2004 Notes did not notice a default or proceed with the

-9-

BARTKO ZANKEL
Bartko Zankel Tarrant Miller Lendt & Pearson, Inc. A Law Corporation
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

sale as remedy for default, and (ii) § 10.2 of the Series 2004 Installment Sale Agreement clarifies that no sale of the Telecom System can occur while any 2004 Notes are "Outstanding." Outstanding in reference to the 2004 Notes is defined in the Series 2004 Installment Sale Agreement to mean all of the theretofore issued 2004 Notes, except those notes (a) canceled, or (b) paid or defeased "by payment of which funds in the necessary amount shall have theretofore been deposited with the Trustee" for the 2004 Notes, or (c) replaced. None of these exceptions apply and the City proceeded to sell the Telecom System contrary to the terms of the parties' agreements

37.     VCS in 2004 did not bargain for or agree to a right of the City to decide to sell the Telecom System for economic expediency, subject only to the consent of the holders of the 2004 Notes. Such a construction is in bad faith and renders the obligations to VCS illusory. In 2008, the Telecom System was either earning Series 2002A Net Revenues, or would have earned the same, payable to VCS, absent the improper costs and expenses associated with a sale, and the loss of the Telecom System to generate revenues to pay VCS. The City's 2008 Comprehensive Annual Financial Report, with Auditor's Opinion dated December 8, 2008 and published electronically thereafter, states at p. 35:

> As a result of the subsequent sale of the telecommunications system, there will no longer be telecommunications system net revenues available for payments (see Note 14.)

That same Report at p. 61 states that for 2008 there was "$502,395" of positive "Net Revenue Available for Debt Service, Renewals, Replacements and Additions," establishing that the Telecom System when sold was generating net revenues. The sale has injured VCS by depriving it of net revenues payable in 2008, 2009 and thereafter until the obligations to VCS were to be paid in full as required by the parties' agreement.

38.     This Court's construction of the parties' rights in the event of sale is reasonably required, and the sale to Comcast, without VCS's consent, works a further breach of contract in derogation of VCS's rights as a secured creditor and constitutes a fraudulent transfer.

39.     In late May 2008, VCS was informed by its trustee that Alameda P&T earned Net Series 2002A Revenues for the period May 1, 2007 through April 30, 2008 and would

-10-

BARTKO ZANKEL
Bartko Zankel Tarrant & Miller, A Professional Law Corporation
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

be transferring $38,665.04 to U.S. Bank to apply toward the $1,582,905.10 installment payment owed for the same period -- the first payment made to VCS since $155,000 was paid to VCS in 2004.

40.    VCS asserts that Alameda P&T breached the performance and rate covenants of the IS Agreement, and § 8.2 of the IS Agreement by selling the Telecom System in clear disregard of VCS's secured rights.  VCS has a contractual right under the IS Agreement to inspect Alameda P&T's books and records pertaining to the Telecom System, and  Alameda P&T is contractually obligated to account for all net revenues in accordance with generally accepted accounting principles.  Subsequent to this action being filed, VCS has received some, but not all, requested accounting records from Alameda P&T, and has yet to receive all calculations of Net Series 2002A Revenues.  VCS will in this action confirm whether  Alameda P&T has accurately accounted for the same under the IS Agreement per the definition of Net Series 2002A Revenues at p. 4 of the parties' April 21, 2004 Subordination and Intercreditor Agreement, including whether all 2004, 2005 and 2006 "miscellaneous" and "credits to surplus" revenues were properly accounted for, and with respect to Alameda Point Telephone revenues which Alameda P&T states in the 2008 Annual Report at p. 56 are for some reason "no longer grouped with Telecom".

41.    The aforementioned uncured defaults and breaches by Alameda P&T have proximately caused Alameda P&T to not make the VCS Payments to VCS.  The president of the Public Utilities Board that oversees Alameda P&T, has publicly stated that the Telecom System itself is of "high reliability and cost competitiveness," such that failure to generate positive revenue is a function of operational mismanagement and a breach of contract.  VCS has had no construction or management responsibility for the Telecom System since April 2002.

42.    In the event of an uncured event of default under the IS Agreement, VCS may exercise its contractual remedies that include:  (i) declaring all principal sums owed to VCS, together with accrued default interest, immediately due and payable; and (ii) to take whatever action at law or equity is necessary or desirable to collect such payments.  A third remedy, forcing

BARTKO ZANKEL
Bartko Zankel Tarrant Miller & Bunshoft, PC, of Counsel
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

a sale of the Telecom System, requires consent of the Trustee of the 2004 Notes, and is not sought by this action and was never authorized by VCS.

### Notice and Perfection of Claim

43.     In 2006, Alameda P&T commissioned reports prepared by CCG Consulting, LLC concerning the Telecom System.  One abbreviated version of a CCG report, dated December 7, 2006, details significant shortcomings in Alameda P&T's operation, management and rates for the Telecom System.  Among other strong statements, the CCG Report noted that (i) Telecom System revenues lag behind the nationwide average, (ii) 5% per annum rate increases were recommended, (iii) voice services should be added to compete with Comcast, (iv) Alameda P&T salaries are "high by municipal broadband standards," and (v) implementation of the recommended changes would generate substantial net revenues.

44.     In January 2007, a CCG representative presented to the City of Alameda's Public Utilities Board the rationale for adding voice services to the Telecom System, which has still not been implemented.

45.     VCS did not become aware of the December 7, 2006 CCG Report until spring 2007, and prior thereto VCS understood from Alameda P&T progress reports that the parties' 2004 goals of achieving $6.3 million or more in net revenues before June 2009 so as to make the VCS Payments remained feasible.

46.     Moreover, the April 21, 2004 Restated and Amended Trust Agreement between the parties provides at § 13.05 that "no delay" by VCS as "owner" of the Series 2002A Certificates in exercising "any right or power arising upon the happening of any Event of Default shall impair any such right or power."  Moreover, the uncured defaults and breaches by Alameda P&T are continuing.

47.     VCS conducted an analysis of the facts, and on August 29, 2007, VCS sent to Alameda P&T a written Notice of Event of Default letter (the Notice of Default),  demanding that Alameda P&T cure the defaults or be in breach of the performance covenants and the rate covenant in the IS Agreement.

-12-

48.     The Notice of Default was expressly issued "in anticipation of potential litigation" and advised that absent cure by Alameda P&T within 30 days, VCS "will pursue all available remedies directly," and that VCS was willing to meet "to discuss these matters prior to instituting litigation with respect to the remedies that flow from an uncured breach."

49.     In response, counsel for Alameda P&T on September 28, 2007, denied in writing that Alameda P&T had defaulted on its obligations. Further, in that letter, Alameda P&T incorrectly asserted that VCS in issuing the Notice of Default had repudiated its agreements with Alameda P&T, including alleged waiver of releases entered into in 2004. No statement of warning was made in that letter or subsequently by Alameda P&T that VCS had six months to commence litigation, as is expressly required by Government Code § 913 in order to trigger a six month deadline.

50.     On October 12, 2007, VCS sent to Alameda P&T's counsel a second letter, confirming that Alameda P&T "disputes it is in default" of the IS Agreement, and that Alameda P&T has essentially advised it "has not and will not be curing any default." That letter concludes: "let me know if your client is willing to discuss resolution of the disputes prior to litigation being filed."

51.     The parties exchanged substantial information thereafter regarding investigation of VCS's claim and potential settlement, and the parties met January 15, 2008, at which time no resolution was reached. The letters of August 29 and October 12 satisfy Government Claims Act requirements of placing Alameda P&T on full notice that litigation might ensue if it did not perform the breached IS Agreement, thus facilitating investigation of the dispute and potential settlement without trial. *See* Cal. Govt. Code § 905, *et seq.*, *City of Stockton v. Superior Court*, 42 Cal.4th 730 (December 3, 2007).

52.     The marketing and sale of the Telecom System was conceived unilaterally by the City well before VCS's August 29, 2007 letter, and implemented to serve its own economic interests after mismanagement of the Telecom System was revealed in the CCG Report. The City determined it was more expedient to sell the Telecom System than to responsibly work with its

-13-

FIRST AMENDED AND SUPPLEMENTAL COMPLAINT
Case No. C 08-3137-SI

creditors to reschedule net revenue obligations to VCS and the holders of the 2004 Notes and to improve the Telecom System consistent with the expectations of the parties in 2004. The 2004 agreements concerning Alameda P&T, VCS and the Trustee for the 2004 Notes were not intended to permit the City to put the Telecom System and its related assets up for sale for self-serving economic reasons without the consent of VCS as a secured creditor. The sale to Comcast was not authorized by the 2004 agreements nor was a sale authorized by VCS.

53.     Rather, the parties' 2004 Subordination and Intercreditor Agreement at § 5(a) provides that only a refinancing of the 2004 Notes "closed and funded not more than 15 days prior to the maturity date" of the 2004 Notes (June 1, 2009) would cause Alameda P&T's obligations to VCS "to be fully paid and discharged." This did not occur. This contractually timed refinancing of the $33 million 2004 Notes could only occur if there were a history of substantial positive net revenue over a period of years preceding June 1, 2009, which revenues would have been paid to VCS. Thus, VCS was protected in the event of substantially inadequate net revenues by continuance of Alameda P&T's obligations to VCS after June 1, 2009. Moreover, § 5(b) of the 2004 Subordination and Intercreditor Agreement provides:

> In the event Alameda P&T fails to complete the refinancing of the Telecom System as contemplated by Section 5(a), the Secured Parties' [including VCS] rights with respect to the collateral shall continue to be governed by the other provisions of this Agreement, including without limitation, Sections 6, 7 and 8.

54.     On April 30, 2008, May 14, 2008 and June 23, 2008 VCS in writing advised Alameda P&T that any sale of the Telecom System required VCS's consent, which had not been provided, and that an unconsented sale was (i) a breach of contract under § 8.2 of the IS Agreement, and (ii) that VCS's security rights in Telecom System net revenues would survive any such sale.

55.     On November 18, 2008, upon learning that the City Council of the City of Alameda was meeting to approve the Telecom System sale to Comcast, VCS issued a further written notice of default, advising that "[a]ssuming the agreement with Comcast is approved and effected without obtaining VCS's consent, please consider this letter a further notice of breach

-14-

pursuant to pursuant to § 9.1(b) of the [IS Agreement]." VCS's November 18, 2008 letter was copied to all persons required to receive notice of such default under the parties' agreements. The November 18, 2008 letter satisfies any Government Claims Act requirement in placing Alameda P&T on full notice that amended claims in this litigation might ensue if it sold the Telecom System without the consent of VCS, inviting investigation of the dispute and potential settlement without trial.

56. Alameda P&T failed within 30 days to cure the defaults set forth in VCS's August 29, 2007 Notice of Default, and failed to seek VCS's consent to the Comcast sale within 30 days following such sale. Accordingly, pursuant to § 9.2(a) of the IS Agreement, all principal and interest related to the VCS Payments are immediately due and payable. This sum is approximately $9.4 million through December 31, 2008, including interest at the default rate of 9% per annum pursuant to § 4.1(g) of the IS Agreement.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract)

57. Plaintiff adopts and realleges paragraphs 1 through - 56 of this Complaint.

58. Plaintiff has performed all conditions, covenants and promises in accordance with the terms and conditions of the IS Agreement.

59. Alameda P&T has breached the IS Agreement by failing to perform the performance covenants and rate covenant of the IS Agreement, and by selling the Telecom System in breach of § 8.2 of the IS Agreement.

60. Alameda P&T's conduct in selling the Telecom System in derogation of the interests of VCS is a breach of the covenant of good faith and fair dealing that is read into the IS Agreement and related agreements between the parties.

61. VCS has demanded that Alameda P&T perform its obligations under the IS Agreement, but defendant has failed and refuses to do so.

62. As a direct and proximate result of Alameda P&T's multiple breaches of the IS Agreement and failure to abide by its terms, VCS has suffered damages in an amount to be

-15-

BARTKO ZANKEL
Bartko Zankel Tarrant & Miller, A Professional Corporation
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

determined according to proof at trial, though approximating $9.4 million at December 31, 2008, and subject to further interest according to proof thereafter.

WHEREFORE, VCS prays for relief as hereinafter set forth.

## SECOND CLAIM FOR RELIEF

### (Declaratory Relief)

63. Plaintiff adopts and realleges paragraphs 1 through 60 of this Complaint.

64. An actual controversy has arisen and now exists between the parties relating to the IS Agreement and related agreements as described above.

65. In response to VCS's Notice of Default, Alameda P&T has claimed that by giving such notice, VCS has repudiated the IS Agreement and related agreements described at paragraphs 19-24, above. VCS disputes such assertion, and alleges that all relief sought by the Notice of Default and this action are dependent on and fully subject to the IS Agreement and other agreements of the parties entered into in connection therewith.

66. Simply, if VCS cannot establish that Alameda P&T has breached the IS Agreement and thereby caused damages to VCS, then VCS understands it will take nothing by way of damages in this action. No rescission, equitable claim other than for declaratory relief, or fraud claim is made hereby or previously.

67. Given Alameda P&T's improper and illogical assertions of repudiation, VCS seeks a declaratory judgment from this Court that all of the parties' operative agreements, as amended in writings signed by the parties, are in full force and effect. Further, this Court's declaratory judgment construing the disputed rights of VCS under the IS Agreement and related agreements described at paragraphs 18-23, following the sale of the Telecom System to Comcast on November 21, 2008, is reasonably required.

68. While the Trustee for the 2004 Notes is a party to several of the VCS/Alameda P&T agreements at issue in this action, VCS makes no claims against such Trustee and does not believe the Trustee is a necessary party under this declaratory relief claim,

-16-

69.     Absent this Court's declaratory judgment, a multiplicity of actions and conflicting claims between the parties are likely.

## **THIRD CLAIM FOR RELIEF**

### **(Accounting)**

70.     Plaintiff adopts and realleges paragraphs 1 through 67 of this Complaint.

71.     Alameda P&T is obligated by the provisions of the IS Agreement to account for Net Revenues, so as to accurately calculate Net Series 2002A Revenues from which the VCS payments are payable to VCS as provided in the IS Agreement.

72.     The financial statements of Alameda P&T related to the Telecom System's costs raise unresolved questions regarding the bases and accounting for Net Series 2002A Revenues, including but not limited to:

(a)     Allocation of operating revenues, including service charges to Alameda P&T's telecom division;

(b)     Calculation and detail of miscellaneous service revenue;

(c)     Calculation and detail of administrative transfer expense;

(d)     Calculation and detail of joint costs, including severance, retirement, and benefit costs, between the Alameda P&T electric and telecom divisions;

(e)     Calculation and detail of additional administrative costs for employee benefits commencing 2006;

(f)     Calculation and detail of ISP expense;

(g)     Calculation and detail of capitalized labor charges 2005-2007 and YTD 2008;

(h)     Whether and why the management fee amortization is included in net revenue calculation;

BARTKOZANKEL
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

-17-

(i)   Calculation and detail of return on restricted investments 2005 to 2007, YTD 2008;

(j)   Detail of debt related charges and interest payable 2005 to 2007, YTD 2008 and how and why included in the net revenue calculation;

(k)   Calculation and detail of plant leased to others expense and other deductions;

(l)   Calculation and detail of miscellaneous non-operating income including why did it stop in 2007;

(m)   Propriety of a 4% interest on inter-fund advances accrued on the interfund advance line of the balance sheet;

(n)   Calculation and detail  of current liabilities on the balance sheet for Certificate of Participation and BANS;

(o)   Calculation and detail for materials and supplies inventory for 2005-2007, YTD 2008; and

(p)   Calculation and detail of all expenses associated with marketing the Telecom System for sale and in the sale of the Telecom System to Comcast.

73.   The true and proper amount of Net Revenues and therefore Net Series 2002A Revenues is unknown to VCS and cannot be ascertained without an accounting, and the accuracy of the amounts declared to be owed to VCS by Alameda P&T in each of the years installment payments were owed cannot be verified without an accounting.

74.   An accounting of all proceeds related to the sale of the Telecom System transferred by Alameda P&T to Comcast is reasonably required.

WHEREFORE, VCS prays for relief as follows.

-18-

FIRST AMENDED AND SUPPLEMENTAL COMPLAINT
Case No. C 08-3137-SI

**PRAYER**

1. As to the First Claim for Relief, judgment against Alameda P&T for money damages according to proof at trial;

2. As to the Second Claim for Relief, a declaratory judgment that VCS has not repudiated the IS Agreement, that all of the parties' operative agreements remain in full force and effect, and what effect sale of the Telecom System to Comcast has on the parties' rights under such agreements;

3. As to the Third Claim for Relief, an accounting of Net Revenues and Net Series 2002A Revenues between VCS and Alameda P&T;

4. For payment over to VCS of the amount due from Alameda P&T as a result of the accounting and default interest on that amount from and after such dates as provided for in the IS Agreement.

5. That VCS be awarded costs of this action; and

6. That VCS be awarded such other and further relief as this Court deems proper.

DATED: March __, 2009

        BARTKO, ZANKEL, TARRANT & MILLER
        A Professional Corporation


        By _____
           Robert H. Bunzel
           Attorneys for Plaintiff
        VECTREN COMMUNICATIONS SERVICES, INC.

BARTKO ZANKEL
Bartko, Zankel, Tarrant & Miller, A Professional Corporation
900 Front Street, Suite 300
San Francisco, CA 94111
Phone (415) 956-1900 • Fax (415) 956-1152

-19-

FIRST AMENDED AND SUPPLEMENTAL COMPLAINT
Case No. C 08-3137-SI