IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

VECTREN COMMUNICATIONS SERVICES,  No. C 08-3137 SI

    Plaintiff,

   v.

CITY OF ALAMEDA,

    Defendant.

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

On August 14, 2009, the Court heard argument on the parties' motions for summary judgment. For the reasons set forth below, the Court DENIES plaintiff's motion for partial summary judgment and GRANTS in part and DENIES in part defendant's motion for summary judgment.

**BACKGROUND**

This case arises out of a failed venture between the City of Alameda, operating through Alameda Power & Telecom ("Alameda P&T") and Vectren Communication Services ("Vectren") regarding a municipal telecommunications system operated by Alameda P&T since 2002. Alameda's telecom system provided both cable TV and high speed internet service, and it never provided telephone (voice) service.

The Alameda telecom system was engineered, constructed, and, until 2002, operated by Vectren under a Construction Agreement entered into between Alameda P&T and Vectren's predecessor Sigcorp, in June 1999. Under the terms of that agreement, Vectren agreed to design and build the telecom system for $14.8 million, and to manage the system for five years in exchange for a management fee of ten percent of the system's revenues plus expenses and a potential bonus. Vectren

began operating the system in 2001.

In early 2002, the City and Vectren agreed to terminate their relationship. Under the terms of a Project Closeout Change Order and related documents, the City agreed to complete construction of the telecom system itself, in accordance with the scope of work and the plans and specifications set forth in the Construction Agreement. The City agreed to buy out Vectren's right to manage the system, in exchange for installment payments totaling no more than $6.3 million plus interest. This obligation was documented by an Installment Sale Agreement ("ISA"), which forms the basis for Vectren's contractual claims in this case.[1] Under the ISA, Alameda P&T agreed to pay Vectren five annual Installment Payments of approximately $1.6 million each, beginning in May 2005 and terminating in May 2009, with interest accruing at five percent.

Under the ISA, Vectren would be paid only if the telecom system made money. Section 4.1 of the ISA states that "the Installment Payments shall be payable solely from Net Series 2002A Revenues." 2002 ISA § 4.1(a). Section 4.2 states "Alameda P&T's obligation to pay the Installment Payments shall be special obligation limited solely to Net Series 2002A Revenues. Under no circumstances shall Alameda P&T be required to advance any moneys derived from any source of income other than the Net Series 2002A Revenues and other sources specifically identified herein for the payment of the Installment Payments, nor shall any other funds or property of Alameda P&T be liable for the payment of the Installment Payments." *Id*. § 4.2(a).

Following Vectren's departure in early 2002, the City resumed construction of the remaining portions of the telecom system and assumed all responsibility for telecom system operations. The City completed the telecom system in 2005.

In 2004, as the original construction financing for the telecom system was approaching the end of its term, the City explored various options for replacement financing. The City eventually decided to issue to private investors $33 million in revenue bond anticipation notes (the "Notes"). During that process, the City and Vectren agreed to amend and restate their 2002 ISA, carrying forward the same $6.3 million-plus-interest installment payment obligation, with minor revisions to other contract terms.

---

[1] The parties entered into the ISA in 2002, and then amended and restated the ISA in 2004. This order refers to the 2002 ISA and the 2004 ISA.

As with the 2002 ISA, the 2004 ISA provides that payment to Vectren is to made solely from net telecom revenues. *See* 2004 ISA, §§ 4.1, 4.2.

The 2004 ISA and related contracts detailed the parties' relative priorities with respect to payment. Vectren agreed that its interests would be subordinate to those of the Note holders. Under the revised arrangement, documented by a Subordination and Intercreditor Agreement ("Intercreditor Agreement"), Vectren would stand first in line to receive net telecom revenues, if there were any, prior to May 31, 2009, while Note holders would stand second in line. Intercreditor Agt. § 6(a). Upon a refinance or sale of the telecom system, however, the proceeds would be applied first to the Notes, and then second to Vectren's Installment Payments. *Id.* § 6(b).

The Alameda telecom system experienced serious financial problems. In early 2008, with the maturity of the 2004 Notes approaching, the City began investigating options for refinancing the Notes, continued operation of the system beyond June 2009 when the Notes became due, and sale of the system to another operator. For a variety of reasons, the City decided the best option was to sell the system. In 2008, the City sold the system to Comcast.

In June 2008 Vectren filed this lawsuit against the City, alleging claims for breach of contract and breach of the covenant of good faith and fair dealing, declaratory relief, and accounting. Vectren alleges that the City breached the ISA in two main ways. First, Vectren alleges that the City failed to perform the performance covenants of the ISA, and instead mismanaged the Telecom System by, *inter alia*, having inflated labor costs and failing to install voice capability to be competitive with Comcast and other telecom providers. Second, Vectren alleges that the City breached the ISA by selling the Telecom System to Comcast.

**LEGAL STANDARD**

Summary adjudication is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

In a motion for summary judgment, "[if] the moving party for summary judgment meets its

3

1  initial burden of identifying for the court those portions of the materials on file that it believes
2  demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so
3  that the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts
4  showing that there is a genuine issue for trial." *See T.W. Elec. Service, Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving party. *See T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

### I. Statute of limitations

The City contends that Vectren's claims of mismanagement are barred by the statute of limitations because they accrued no later than March 2004 when Vectren concluded that the City was not managing the telecom system "efficiently." Before Vectren signed the 2004 ISA, Vectren analyzed the City's subordination proposal. The City relies on two documents from February and March of 2004 that Vectren employees created in connection with their internal analysis. The first is a February 25, 2004 memorandum from Vectren's president, Steve Oschman, to Carl Chapman, the president of Vectren's corporate parent, in which Oschman concluded, *inter alia*, that: (1) a reduction in Alameda P&T's operating and maintenance costs is "unlikely, given the cash burn" the system showed in recent financial reports; (2) Alameda P&T's "overhead appears exorbitant for a comparable system anywhere"; (3) "We believe they are overstaffed for a comparable operation and further believe their salary costs are way out of line, even accounting for the high-cost of the SF area"; (4) "Unfortunately, our experience with [Alameda P&T] has been that they have never been able to manage this system efficiently and . . . there is no reason to suspect that this will change going forward"; and (5) there is

4

"little hope that we will ever see any 'Net System Revenues' . . . from this operation." Elder Decl. Ex. J ¶¶ 3-4 (tab 11). The City also relies on a subsequent email from Mr. Oschman, dated March 2, 2004, in which he states that Vectren should obtain data from other municipal telecom systems to support "a battle in court with APT on operating costs." Elder Decl. Ex. K (tab 12). Mr. Oschman also concluded that the data needed to be gleaned from publicly-available sources to enable Vectren to "publish it or use it in court." *Id*. The City argues that the February 25, 2004 memorandum and the March 2, 2004 email demonstrate that by March 2004, Vectren had concluded that the City has mismanaged the telecom system, eliminating Vectren's ability to receive installment payments, and that Vectren was planning litigation against the City based on that claim.

Vectren raises a number of arguments in opposition. Most persuasively, Vectren contends that its claim for breach of contract could not have accrued in 2004 because the first installment payment was not due in 2004, and thus there was no damage at that time. The parties agree that under the terms of the 2004 ISA, the first installment payment was due in May 2005, and the City's attorney acknowledged at the hearing that both the City and Vectren expected that the first installment payment would not be made until 2007. *See also* Chapman Decl. Ex. H (email from Juelle Ann Boyer of Alameda P&T to Carl Chapman and Steve Oscher of Vectren with payment schedule showing first installment payment to be made in 2007). Thus, even if Vectren had concerns in 2004 that the City was not running the telecom system efficiently, it had not yet been damaged by any mismanagement. *See Cleveland v. Internet Specialities West, Inc.*, 171 Cal. App. 4th 24, 31-32 (2009).

The City asserts that even though neither party expected that Vectren would be paid any money until 2007, Vectren could have invoked its rights as early as 2004 under the contract's acceleration clause. However, the fact that Vectren could have done so does not mean that Vectren was obligated to do so. A trier of fact could conclude, based on the evidence submitted, that Vectren was not damaged under the parties' contract until 2007, when the first installment payment was not made as contemplated. Accordingly, the City has not demonstrated that it is entitled to summary judgment on this basis.[2]

---

[2] The parties disagree whether a 2 or 4 year statute of limitations applies. If Vectren's claims accrued in 2007, this dispute is irrelevant. Vectren has submitted evidence in support of its contention that the parties intended for Section 9 of the ISA to contain all of the requirements for perfecting and

5

## II. Adding voice capability

The City moves for summary judgment on plaintiff's claims to the extent Vectren alleges that the City breached its contracts with Vectren by not adding voice service to the telecom system. The City argues that it did not breach either the contract or the covenant of good faith and fair dealing because the ISA did not require Vectren to add voice service, but instead gave the City the "sole discretion" to "install or permit to be installed other items of equipment or other personal property in or upon the Telecom System," 2004 ISA § 6.3, and provided the City with the "right," but not the obligation, to make "additions, modifications and improvements" to the Telecom System. *Id.* § 6.2.

Vectren responds that there are at least triable issues of fact as to whether the City breached the covenant of good faith and fair dealing by not adding voice service to the telecom system. Vectren has submitted evidence showing that by August 2006, the City had been informed by its own consultant that adding voice service was "mandatory" to maintain a competitive position in light of the fact that Comcast was offering the "triple play" of voice, cable TV and broadband internet. Vectren contends that the nature of the parties' contingent payment agreement, coupled with the performance and rate covenants in the ISA, established an "implied obligation to use reasonable diligence in performing the act upon which payment was contingent" making it "reasonable to imply that [the City] by agreeing to pay from a certain fund obligated itself to do those acts which would bring the fund into existence." *Eastwood Homes, Inc. v. KP Hudson*, 161 Cal. App. 2d 532, 541 (1958). Vectren also relies on cases holding that "[w]here a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing." *Kendall v. Ernest Pestana, Inc.*, 40 Cal. 3d 488, 500 (1985).

The covenant of good faith and fair dealing is "read into contracts in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied

---

presenting a claim for breach of the ISA or its covenants. The Court finds there are issues of fact both as to when Vectren's claim accrued, and the parties' understandings about Section 9 such that summary judgment is inappropriate. Relatedly, because the Court finds that there are issues of fact as to when Vectren's claim accrued, the Court does not grant the City's motion to reduce Vectren's damages by a minimum of $3.2, which is the amount due from the unpaid 2005 and 2006 installment payments. If, as Vectren contends, the parties understood that the 2005 and 2006 payments would be rolled over to subsequent years, the City was not in breach of the contract in 2005 and 2006 with respect to those payments.

to the contract's purpose." *Carma Developers California, Inc v. Marathon Development California, Inc.*, 2 Cal.4th 342, 373, (1992). For example, covenants to use "good faith" or "best efforts" to generate profits for a licensor are "routinely implied where the licensor grants exclusive promotional or licensing rights in exchange for a percentage of profits or royalties," even though the licensee does not expressly promise to do anything. *See Third Story Music, Inc. v. Waits*, 41 Cal. App. 4th 798, 805 (1995). However, an implied covenant will not be read into a contract to prohibit a party from doing something that is expressly permitted by the agreement. *Carma Developers*, 2 Cal.4th at 374. "Thus, although it has been said the implied covenant finds 'particular application in situations where one party is invested with a discretionary power affecting the rights of another' if the express purpose of the contract is to grant unfettered discretion, and the contract is otherwise supported by adequate consideration, then the conduct is, by definition, within the reasonable expectation of the parties and 'can never violate an implied covenant of good faith and fair dealing.'" *Cry Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1120-21 (quoting *Carma Developers*, 2 Cal. 4th at 376).

In *Cry Wolf v. Walt Disney Pictures and Television*, an author entered into a written purchase agreement granting Disney the right to exploit the "Roger Rabbit" characters in a wide variety of contexts. *Id*. at 1112. Under the agreement, Disney was under no obligation to exercise its rights: "Purchaser [Disney] shall not be under any obligation to exercise any of the rights granted to Purchaser hereunder; and any and all said rights may be assigned by Purchaser, and/or licenses may be granted by Purchaser with respect thereto, as Purchaser may see fit." *Id*. at 1121 n.7. In exchange, Disney agreed to give the author 2.5% of any motion picture net profits, and 5% of the "gross receipts" derived from the exploitation of the Roger Rabbit characters. *Id*. at 1112-13. The author claimed that Disney breached the implied covenant of good faith and fair dealing by negotiating promotional agreements for which it received no monetary consideration, thus reducing the percentage of "gross receipts" to which the author was entitled. The Court of Appeal rejected that claim:

> [T]he 1983 Agreement afforded Disney the unlimited discretion to grant (or not grant) to third parties licenses to exploit the Roger Rabbit characters. Cry Wolf's complaint that Disney's failure to receive monetary consideration in some (but not all) of its promotional agreements is unfair or unjust because it prevented him from receiving royalties in some circumstances is quite simply beside the point. "It is not enough to say that without the proposed implied covenant, the contract would be improvident or unwise or would operate unjustly. Parties have the right to make such agreements. . . .

7

>[Cry Wolf] was free to accept or reject the bargain offered and cannot look to the courts to amend the terms that prove unsatisfactory."

*Id.* at 1122 (quoting *Third Story Music*, 41 Cal. App. 4th at 809); *see also Third Story Music*, 41 Cal. App. 4th at 808 ("[C]ourts are not at liberty to imply a covenant directly at odds with a contract's express grant of discretionary power except in those relatively rare instances when reading the provision literally would, contrary to the parties' clear intention, result in an unenforceable, illusory agreement.").

In *Third Story Music*, the parties had an agreement under which Warner Communications agreed to manufacture, sell, distribute, and advertise the works of Tom Waits, but the agreement also stated that Warner "may at our election refrain from any or all of the foregoing." *Id.* at 801. The plaintiff sued for breach of the implied covenant of good faith and fair dealing, claiming that Warner had impeded the plaintiff from receiving the benefits of the contract (a percentage of royalties) by allowing lucrative deals to fall apart. The Court of Appeal concluded as a matter of law that because the there was consideration for the agreement, and the agreement gave Warner discretionary power and expressly allowed Warner to refrain from marketing the Waits recordings, Warner had no duty of good faith in exercising its discretion. *Id.* at 808-09.

Here, the 2004 ISA does not obligate the City to expand the telecom system to add voice services, and Vectren does not contend that there is any express language in the 2004 ISA mandating the addition of voice services. To the contrary, the 2004 ISA states that the City's obligation to construct and complete the system was limited to the scope of work detailed in the original 1999 Construction Agreement between the City and Vectren, which defines the telecom system as including "cable television, high-speed Internet access, public access studio, and metropolitan area network." In addition, Vectren does not contend that there was insufficient consideration under the 2004 ISA.

Instead, as with the plaintiffs in *Cry Wolf* and *Third Story Music*, Vectren contends that the City breached its implied duty of good faith by not adding voice service because the failure to add voice service decreased the telecom system's profitability, and thus diminished Vectren's benefits under the 2004 ISA. However, as in *Cry Wolf* and *Third Story Music*, the 2004 ISA conferred complete discretion on the City to decide whether to make any additions or modifications to the system: "Alameda P&T may at any time and from time to time, in its sole discretion and at its own expense, install or permit to be

8

installed other items of equipment or other personal property in or upon the Telecom System." 2004 ISA § 6.3; *see also* § 6.2 (the City "shall, at its own expense, have the right to make additions, modifications and improvements to the Telecom System . . . ."). These sections permit the City to decide whether and how to modify the telecom system, and whether to install other equipment in the system. In light of the complete absence of any language in the ISA requiring the addition of voice service, and the discretionary language in Sections 6.2 and 6.3, there is no breach. "[Implied] terms cannot vary the express terms of a contract; if the defendant did what it was expressly given the right to do, there can be no breach." *Cry Wolf*, 162 Cal. App. 4th at 1120.

At the hearing, Vectren raised the new argument that only Section 6.2 of the ISA applies to the addition of voice service because that section addresses modification of the telecom system; according to Vectren, Section 6.3, which contains the language "sole discretion," does not apply to the question of adding voice service because Section 6.3 only addresses installation of Alameda P&T's equipment. However, even if the Court's analysis were restricted to Section 6.2 the Court would reach the same result because nothing in § 6.2 can be read to imply a covenant to add voice services. In addition, although Section 6.2 does not contain the words "sole discretion," Section 6.2 nonetheless confers on the City a similar discretionary "right" to decide whether and how to modify the telecom system.

### III. Mismanagement due to high labor costs

Vectren alleges that the City failed to operate the Telecom System efficiently and economically because, *inter alia*, Alameda P&T labor costs were too high. Vectren alleges that the City should have taken a number of steps such as reducing salaries and benefits, requiring employees to "wear multiple hats, regardless of job titles," laid off employees, and/or transferred employees to other divisions. The City argues that because every Alameda P&T employee (with the exception of the general manager) is a member of one of three unions, the City must abide by Memoranda of Understanding between the City and each union regarding salaries, benefits, work hours, job classifications, and reduction in force. The City's motion for summary judgment seeks an order stating that Vectren cannot base a claim of mismanagement based upon the City's compliance with its labor agreements.

Vectren does not argue that the City should have breached the MOUs in order to reduce labor

9

1 costs. Instead, Vectren argues that the three relevant labor agreements (1) include provisions for
2 discharge and layoffs, (2) do not mandate a specific employee headcount, and (3) include provisions for
3 renegotiation of certain benefits, and thus that the City could have reduced labor costs within the
4 confines of the MOU.[3]

5 The Court GRANTS the City's motion as follows: Vectren may not base its mismanagement
6 claim on actions that would have required the City to breach any of the MOUs. However, Vectren may
7 pursue a mismanagement claim to the extent that there are acts Vectren contends that the City could
8 have taken to reduce labor costs – such as renegotiating benefits, or offering "golden handshakes" – that
9 were permitted under the MOUs or otherwise not inconsistent with the MOUs.

## IV. The sale of the system

Both parties move for summary judgment on the question of whether the City's sale of the telecom system was a breach of the 2004 ISA. Vectren relies on language in the 2004 ISA stating that the telecom system "shall not" or "will not" be sold, while the City relies on provisions in the 2004 ISA and the Intercreditor Agreement which set forth how to divide the proceeds of a sale. Both parties contend that the language of the contract is clear and unambiguous, yet they reach opposite conclusions about what the contract means.

Vectren chiefly relies on two provisions in the 2004 ISA. The first provision is Section 6.4, "Operation; Rate Covenant," which provides in relevant part,

> Alameda P&T covenants that the Telecom System *will not* be mortgaged or otherwise encumbered, *sold*, leased (except as otherwise permitted pursuant to Section 8.2 of this Installment Sale Agreement or under any Series 2004 Document), pledged or any lien or charge placed thereon or on any portion thereof (other than Permitted Encumbrances). The Telecom System Revenue Fund or any other funds pledged or otherwise made available to secure payment of the Installment Payments *shall not* be mortgaged, encumbered, *sold*, leased, pledged, any charge placed thereon, or disposed of or used *except as authorized by the terms of this Installment Sale Agreement, the Intercreditor Agreement and the Series 2002A Trust Agreement*. Alameda P&T further covenants that it will not enter into any agreement which impairs the rights of VCS or the Series 2002A Certificate Owners with respect to the Net Series 2002A Revenues. *If any substantial part of the Telecom System is sold*, then (subject to the provisions of any Series 2004 Document) the payment therefor shall be placed in the appropriate funds

---

[3] As the City correctly notes, Vectren does not cite any evidence supporting its position that salaries could be cut under the MOUs,

10

and, to the extent such payment constitutes Net Series 2002A Revenues, used to prepay the Installment Payments . . . .

2004 ISA § 6.4 (emphasis added).

The next section is Section 8.2, "Assignment, Sale and Disposition by Alameda P&T," which states,

> (a) This Installment Sale Agreement may not be assigned by Alameda P&T, and, *except as provided in* Section 6.3[4] or under any Series 2004 Document, Alameda P&T *may not sell*, substitute or otherwise convey the Telecom System during the Term of this Installment Sale Agreement, or as long as any Series 2002A Certificate is Outstanding. The obligation to make Installment Payments and any obligation under Section 5.3 of this Installment Sale Agreement shall not be extinguished by any sale or conveyance of the Telecom System to the extent that the proceeds of such sale are not applied to the payment or prepayment of Installment Payments under this Installment Sale Agreement.

*Id*. § 8.2 (emphasis added).

Vectren argues that under Section 8.2, only two circumstances permit a sale, neither of which occurred here. First, the Comcast sale was not made pursuant to Section 6.3 ("Installation of Alameda P&T's Equipment").[5] Second, Vectren argues that the sale was not made "under any series 2004 Document." Rather, in direct contravention of Section 8.2, the sale occurred during the term of the ISA and while the Series 2002A Certificates in favor of Vectren were unpaid and outstanding.

The City argues that Sections 6.4 and 8.2 must be read together with Section 4.2 and the Intercreditor Agreement. Section 4.2(a), provides,

> <u>Net Series 2002A Revenues only</u>. Alameda P&T's obligation to pay the Installment Payments shall be a special obligation limited solely to Net Series 2002A Revenues. Under no circumstances shall Alameda P&T be required to advance any moneys derived from any source of income other than the Net Series 2002A Revenues and other sources specifically identified herein for the payment of the Installment Payments, nor shall any other funds or property of Alameda P&T be liable for the payment of the Installment Payments.

§ 4.2(a). The City argues that Section 4.2 provides an unequivocal and absolute limit of the "obligation

---

[4] The City contends that this is a typographical error and should read "6.4" because Section 6.3 does not address the subject of a sale at all, while Section 6.4 does. In addition, the City notes that the corresponding Section 8.2 in the 2002 ISA referenced Section 6.4. Vectren responds in its papers that this is not a typographical error, and that "the reference to § 6.3 (equipment installation) is sensible since AP&T may have been required to assign or hypothecate a portion of the Telecom System in installing physical equipment." Vectren Oppo. at 17 n.7. Vectren contends that even if Section 6.4 were intended, nothing in that section "authorizes" a sale, and instead that section only prescribes what should happen "*if*" any substantial part of the Telecom System is sold.

[5] As noted above, Vectren also argues that the sale was not made pursuant to Section 6.4.

11

to make Installment Payments" referenced in Section 8.2. Under the City's interpretation, (1) Section 6.4 contemplates a sale; (2) Section 8.2 specifically identifies 6.4 [actually 6.3] as contemplating a sale, thus reinforcing the interpretation that a sale under Section 6.4 is permitted; and (3) Section 8.2 identifies only "the obligation to make Installment Payments" as remaining after a sale, which is defined by Section 4.2(a) as an "obligation limited solely to Net Series 2002A Revenues." The City also argues that the sale was "under a Series 2004 Document": the Intercreditor Agreement that the parties entered into simultaneously with the 2004 ISA. Section 6 of the Intercreditor Agreement contemplates a sale of the telecom system because it specifies the manner in which sales proceeds are to be distributed. Section 6 states that if any substantial part of the telecom system is sold, the proceeds from the sale are to be applied "(i) first to the Series 2004 Notes until indefeasibly paid in full; then (ii) second, to the Series 2002A Certificates [held by Vectren] until indefeasibly paid in full . . . ."

As a general principle, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Cal. Civ. Code § 1636. "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." *Id.* at § 1638. "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." *Id.* at §1641. "Whether a contract provision is ambiguous is a question of law. If it is, ordinarily summary judgment is improper because differing views of the intent of parties will raise genuine issues of material fact." *Maffei v. Northern Ins. Co. of New York*, 12 F.3d 892, 898 (9th Cir. 1993).

Despite the parties' contentions that the meaning of the contract is clear and unambiguous – albeit to opposite ends – the Court disagrees and concludes that it is ambiguous whether the 2004 ISA prohibited the City's sale of the system to Comcast. The 2004 ISA and the Intercreditor Agreement, interpreted as a whole, both appear to prohibit a sale through the repeated use of phrases such as "the Telecom System will not . . . be sold," and also to contemplate a sale by specifying how the proceeds of a sale are to be divided. Unfortunately for the present purposes, what is missing from the contract is a description of the circumstances under which the telecom system could be sold. At the hearing, Vectren's counsel argued that a default was the only circumstance under which a sale could lawfully

12

occur under the contract. Vectren may be correct; however, the contract does not contain any explicit language to that effect. On the other hand, the City contends that a sale is permitted under the terms of Section 6 of the Intercreditor Agreement. However, that Section does not set forth the conditions under which a sale is permissible, but simply lays out how the proceeds of a sale are to be divided.

Accordingly, the Court concludes that on this record, summary judgment is inappropriate. The Court must determine the intent of the parties with regard to whether and under what circumstances a sale of the system was permitted under the contract, and that inquiry will require extrinsic evidence. *See Maffei*, 12 F.3d at 898.

## V. Damages

The City raises a number of arguments about Vectren's damages, including the overarching contention that Vectren suffered no damages because the system was never profitable. The City contends that it is entitled to summary judgment on all of Vectren's claims on that ground alone. The Court finds that there are numerous factual questions as to whether the system could have become profitable if it had not been sold.

The City also contends that Vectren's damages claim is foreclosed by Section 4.2 of the 2004 ISA, which provides that Vectren was to be paid only out of net telecom revenues. The City argues that Vectren does not have any damages because "whatever net telecom revenues existed have been paid to VCS . . . nor is there any dispute that no future net telecom revenues will come into existence, the telecom system having been sold to Comcast and the sale proceeds applied as provided by the Installment Sale Agreement." However, the City's argument assumes both that the sale of the system was not a breach of the contract, and that the City was not in breach of its performance covenants (which affected the net revenues).

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby DENIES plaintiff's motion for summary judgment and GRANTS in part and DENIES in part defendant's motion for summary judgment. (Docket Nos. 65 & 68). The Court does not rule on the parties' evidentiary

13

objections because the Court did not rely on any of the evidence at issue in order to resolve the summary judgment motions.

**IT IS SO ORDERED.**

Dated: August 18, 2009

SUSAN ILLSTON
United States District Judge