United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: NUVEEN FUNDS/CITY OF
ALAMEDA SECURITIES LITIGATION,

And related actions.

_____/

No. C 08-4575 SI, C 09-1437 SI

**ORDER RE: SUMMARY JUDGMENT
MOTIONS**

Now before the Court are defendants' motions for summary judgment, as well as defendants' motions to exclude certain evidence and experts. For the reasons set forth below, the motions are GRANTED IN PART and DENIED IN PART.

**BACKGROUND**

These securities fraud cases arise out of defendant City of Alameda's issuance in 2004 of Revenue Bond Anticipation Notes to finance the completion of its cable television and internet system (the "System"). Plaintiffs are two groups of investors who bought Notes. Plaintiff Bernard Osher Trust ("Osher") purchased approximately $8.9 million in face value of Notes, beginning in April 2004 and continuing to June 2006. The Nuveen plaintiffs (Nuveen Municipal High Income Opportunity Fund, the Nuveen Municipal Trust for the Nuveen High Yield Municipal Bond Fund, and Pacific Specialty Insurance Company, collectively "Nuveen"), purchased $17,750,000 in face value of the Notes at issuance, and continued to purchase and bid on Notes through 2006, ultimately holding $20,550,000 in face value of the Notes.

The System was operated by Alameda Power & Telecom ("APT"), a department of the City. Initially, the City contracted with an outside telecom vendor, Vectren Communications Services, Inc.

("Vectren") to design, construct and manage the System.  In 2000, APT, Vectren and Citibank entered into a short-term financing transaction whereby Citibank lent $16 million to APT, due in May 2004, for construction of the System.  The Citibank debt was secured by a corporate guarantee from Vectren.  In 2002, when the System was partially constructed, the City agreed to pay Vectren $6.3 million out of the net profits of the System, if any, in exchange for Vectren relinquishing its rights to construct and operate the System.  Under the terms of the City's agreements with Vectren, if the City failed to repay the Citibank loan, Vectren would have the right to take over the System.

In April 2003, APT hired defendant Stone & Youngberg ("S&Y"), a municipal bond underwriter, to facilitate a refinancing of the $16 million Citibank loan, while raising additional funding to complete construction of the System; this financing was the Notes.  The Investment Banking Agreement between APT and S&Y provides, *inter alia*, that "the Investment Banker [S&Y] will work with the Utility [APT] to create the most feasible and efficient structure to meet the Utility objectives and market requirements."  Docket No. 180-12, Ex. 24 at SY 026524 in C 08-4575 SI.  The agreement also states that S&Y would work with APT and others "in evaluating and recommending program parameters," and that S&Y would "direct preparation of an official statement."  *Id.*  With regard to the sale of the Notes, the Agreement states,

> At the designated time for sale of the Bonds, the Investment Banker will submit an offer to the Utility to purchase the Bonds and enter into a purchase contract, subject to resolutions, the official statement, and all other necessary documents, approvals, and proceedings governing such Bonds having been determined by bond counsel, the Utility, and the Investment Banker to be satisfactory in all respects for financing purposes.  It is intended that, once purchased, the Bonds will be re-offered to the public on the basis of an immediate "bona fide public offering."

*Id.* at SY 026525.

At S&Y's suggestion, the City hired a consultant to issue a "feasibility report" for the proposed refinancing.  Uptown Services was the lowest bidder, and agreed to do the work for a flat fee of $25,000.  The parties dispute whether Uptown was qualified to perform the feasibility study, and whether S&Y was entitled to rely on Uptown's study as part of S&Y's due diligence.  The parties devote a significant amount of their papers presenting differing accounts of the preparation of the Official Statement ("OS").  Plaintiffs allege that based upon the System's historical operations, APT and S&Y had extensive information before them showing that the System had never met projections, and that the System was

never going to be successful.  Plaintiffs claim that despite this information, APT, Uptown, and S&Y prepared an OS that contained inflated and wildly optimistic – and unrealistic – projections that were necessary in order to sell the Notes.  Plaintiffs claim that a number of APT documents, including a contemporaneous 2005-2009 APT Business Plan adopted by the Public Utilities Board in March 2004 just several weeks before the OS was finalized, demonstrate the falsity of the OS projections.

Plaintiffs also claim that the Uptown feasibility study was fatally flawed – and therefore that defendants' reliance on it was at a minimum reckless – because, *inter alia*, one of the two "benchmark" telecom systems that Uptown used as a comparable to evaluate the APT System was the City of Palo Alto's telecom system.  At the time, the City of Palo Alto's telecom system was also in development, and Uptown was working for the City of Palo Alto to validate that city's telecom business plan.  Docket No. 181-9, Ex. 40 in C 08-4575 SI.  Nuveen argues "Uptown used the **totally untested** projections it was 'validating' for AP&T to 'validate' the business plan it was preparing for Palo Alto, and then used the **totally untested** projections it was doing for Palo Alto to 'validate' the forecasts and assumptions provided by AP&T.  This is total nonsense.  How can any competent feasibility consultant use its own totally untested work product to validate anything?  Nonetheless, this is exactly what Uptown did and neither AP&T nor Stone & Youngberg had anything to say about it."  Docket No. 179 at 27:2-7 in C 08-4575 SI.[1]

Defendants hotly dispute plaintiffs' characterization of the preparation of the OS, and assert that there was a reasonable basis for the projections contained in the OS.  Defendants also assert that it was reasonable for them to rely on the Uptown feasibility study, and S&Y argues that it conducted extensive due diligence.  Defendants emphasize that plaintiffs are sophisticated investors, and that the OS repeatedly disclosed the risks associated with the Notes.

Due to the high risk nature of the Notes, the offering was limited to institutional purchasers and to individual investors who certified in writing their experience and sophistication in financial matters

---

[1] Plaintiffs have also submitted, *inter alia*, a June 6, 2003 email from APT Manager Juelle-Ann Boyer to Dave Stockton of Uptown Services, on which Anna Van Degna of S&Y was copied, stating that "We are continuing to review and develop the remaining metrics.  Some are a matter of research and others will be 'Creative Writing 101.'" Docket No. 181-9, Ex. 41 in C 08-4575.  Alameda objects to this document on the grounds of lacks foundation and lacks personal knowledge.  The Court OVERRULES Alameda's objections to this document.

United States District Court
For the Northern District of California

and ability to bear the risk of economic loss.  In addition, the Notes carried a yield of 7.25 percent, or 4 percent higher than a typical tax-free municipal bond in 2004.  Docket No. 60 in C 09-1437 SI (OS at CITY 000493)[2].  The coupon payments were fully capitalized (pre-funded from the proceeds of the Notes) at the time of issuance.  *Id.* at CITY 000505.  The Notes were offered in denominations of $250,000, and they were "unrated" by any rating agency.  *Id.* at CITY 000503, CITY 000528.  The Notes had a term of five years, maturing in June 2009.  *Id.* at CITY 000493.

The Notes were secured by three sources of repayment: (1) proceeds of a potential 2009 refinance; (2) net revenues generated by the System[3]; and (3) the net proceeds of any sale of the System.  *Id.* at CITY 000504.  The OS explained that a refinancing could be secured only by the System's revenues, and that APT had no obligation to repay the Notes if revenues were insufficient.  *Id.* at CITY 000493 ("[N]o revenues or assets of Alameda P&T other than those of the Telecom System (*i.e.*, no revenues or assets of Alameda P&T related to its electric utility facilities . . .) are pledged to the payment of the Notes or any obligation securing the Notes."); *see also id.* at CITY 000494 ("Security for the Notes" section).  The OS also stated that a refinancing would only be feasible if, *inter alia*, APT completed building the System, expanded its customer base, and generated sufficient revenues to support a refinancing in 2009.  *Id.* at CITY 000493.

The System never achieved the subscriber projections contained in the OS.  By June 2008, APT determined that refinancing of the Notes would not be possible and announced that the System would be sold.  In November 2008, the System was sold to APT's primary competitor, Comcast, for approximately $15 million.  Alameda paid all of the net proceeds of the sale to the noteholders.  It is the difference between the plaintiffs' pro rata share of the $33 million par value and the approximately $15 million received by the noteholders for which plaintiffs sue.[4]

---

[2]  All citations to the OS are to the OS found at this docket number.

[3]  An Intercreditor Agreement between the Noteholders and Vectren gave the Noteholders the right to post-June 2009 net revenues and pre-June 2009 net revenues in excess of the $6.2 million needed to pay Vectren's 2002 Certificates of Participation.  Docket No. 163-1, Ex C.

[4]  Nuveen received $10,105,111 and Osher received $4,401,103 towards the principal of the Notes.  Sosa Report Ex.5-6 (Docket No. 165-1 in C 08-4575 SI).  Nuveen and Osher also received payments from the capitalized interest at the time of the sale.  Nuveen received $679,947 from the

United States District Court

For the Northern District of California

On October 1, 2008, Alameda filed a declaratory relief action against Nuveen.  Nuveen's first amended counterclaim alleges the following claims:  (1) Section 10b-5 of the Securities Exchange Act of 1934, against both defendants[5], (2) Section 20(a) of the Securities Exchange Act of 1934, asserted in the alternative against the City, (3) California Corporate Securities Act §§ 24500 and 25500, against both defendants, (4) California Corporate Securities Act §§ 25504.1, against both defendants, (5) Illinois Securities Act, against both defendants, (6) common law fraud, against S&Y, (7) aiding and abetting common law fraud, against S&Y, (8) and negligent misrepresentation, against S&Y.

On April 1, 2009, Osher filed this lawsuit.  Osher's first amended complaint alleges the following claims: (1) Section 10b-5 of the Securities Exchange Act of 1934, against both defendants, (2) Section 20(a) of the Securities Exchange Act of 1934, asserted in the alternative against the City, (3) California Corporate Securities Act §§ 24500 and 25500, against both defendants, (4) California Corporate Securities Act § 25504.1, against both defendants, (5) common law fraud, against S&Y, (6) aiding and abetting common law fraud, against S&Y, negligent misrepresentation, against S&Y, and (7) breach of fiduciary duty, against S&Y.

## LEGAL STANDARDS

### I.    Summary judgment

Summary adjudication is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In a motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so that the non- moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." *See T.W. Elec. Service, Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630

---

capitalized interest, and Osher received $296,038. *Id*., Ex. 3-6.

[5]  This order refers to Nuveen and Osher as plaintiffs, and Alameda and Stone & Youngberg as defendants.

(9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving party. *See T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence presented by the parties must be admissible. *See* Fed. R. Civ. P. 56(c)(4). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp*., 594 F.2d 730, 738 (9th Cir. 1979).

## II.    Motion to exclude expert testimony

Federal Rule of Evidence 702 provides that expert testimony is admissible if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Expert testimony under Rule 702 must be both relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 589 (1993). When considering evidence proffered under Rule 702, the trial court must act as a "gatekeeper" by making a preliminary determination that the expert's proposed testimony is reliable. *Elsayed Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1063 (9th Cir. 2002), *amended by* 319 F.3d 1073 (9th Cir. 2003).

As a guide for assessing the scientific validity of expert testimony, the Supreme Court provided a nonexhaustive list of factors that courts may consider: (1) whether the theory or technique is generally accepted within a relevant scientific community, (2) whether the theory or technique has been subjected to peer review and publication, (3) the known or potential rate of error, and (4) whether the theory or technique can be tested. *Daubert*, 509 U.S. at 593-94; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). The Ninth Circuit also has indicated that independent research, rather than research conducted for the purposes of litigation, carries with it the indicia of reliability. *See Daubert v. Merrell Dow Pharmaceuticals, Inc*., 43 F.3d 1311, 1317 (9th Cir. 1995) ("*Daubert* II"). In particular, using independent, pre-existing research "provides objective proof that the research comports with the dictates of good science" and is less likely "to have been biased by the promise of remuneration." *Id*. If the testimony is not based on "pre-litigation" research or if the expert's research has not been subjected to

**United States District Court**
For the Northern District of California

1   peer review, then the expert must explain precisely how he went about reaching his conclusions and

2   point to some objective source – a learned treatise, the policy statement of a professional association,

3   a published article in a reputable scientific journal or the like – to show that he has followed the

4   scientific method, as it is practiced by (at least) a recognized minority of scientists in his field.  *Id.* at

5   1318-19 (*citing United States v. Rincon*, 28 F.3d 921, 924 (9th Cir. 1994)); *see also Lust v. Merrell Dow*

6   *Pharmaceuticals, Inc.*, 89 F.3d 594, 597 (9th Cir. 1996).  The proponent of the evidence must prove its

7   admissibility by a preponderance of proof.  *See Daubert*, 509 U.S. at 593 n.10.

8

9                                        **DISCUSSION**

10  **I.      Defendants' motions for summary judgment on plaintiffs' 10b-5 claims**

11          The elements of a claim under Rule 10b-5 are (1) material misrepresentation or omission of a

12  material fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, or

13  transaction causation, (5) economic loss, and (6) loss causation.  *In re Daou Systems, Inc.*, 411 F.3d

14  1006, 1114 (9th Cir. 2005).  Defendants move for summary judgment against the Nuveen and Osher

15  plaintiffs' 10b-5 claims on the grounds that plaintiffs cannot establish loss causation, materiality, or

16  scienter.

17          Loss causation is the causal connection between the defendant's material misrepresentation and

18  the plaintiff's loss.  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1062 (9th Cir.

19  2008) (citing *Broudo v. Dura Pharmaceuticals, Inc.*, 544 U.S. 336, 342 (2005)).  "A plaintiff bears the

20  burden of proving that a defendant's alleged unlawful act 'caused the loss for which the plaintiff seeks

21  to recover damages.'"  *In re Gilead Sciences Sec. Litig*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting

22  15 U.S.C. § 78u-4(b)(4)).   Put another way, "[t]o establish loss causation, 'the plaintiff must

23  demonstrate a causal connection between the deceptive acts that form the basis for the claim of

24  securities fraud and the injury suffered by the plaintiff.'"  *Id.* (citing *In re Daou*, 411 F.3d at 1025); *see*

25  *also Metzler*, 540 F.3d at 1063 (the plaintiff must show that "the practices that the plaintiff contends are

26  fraudulent were revealed to the market and caused the resulting losses") (discussing *Daou*).  "The

27  misrepresentation need not be the sole reason for the decline in value of the securities, but it must be

28  a 'substantial cause.'"  *Gilead*, 536 F.3d at 1055 (citing *Daou*, 411 F.3d at 1025).  In *In re Oracle*

*Corporation Securities Litigation*, 627 F.3d 376 (9th Cir. 2010), the Ninth Circuit rejected the argument that loss causation could be demonstrated by showing that the market reacted to the purported "impact" of the alleged fraud – in that case, an earnings miss – rather than to the fraudulent acts themselves. *Oracle*, 627 F.3d at 392.      Defendants argue that plaintiffs cannot establish loss causation because the "corrective disclosure" that plaintiffs identify does not reveal any alleged fraud.  Plaintiffs' expert, David Sosa, testified that "[t]he curative disclosure was the notification by Alameda and Stone & Youngberg to noteholders that the system would have to be sold and would be sold at a substantial discount to the value of the outstanding principal for these on the anticipation notes."  Sosa Depo. at 78:7-13 (Docket No. 165-2 in C 08-4575 SI).  Sosa further testified that "at the latest, the curative disclosure occurred on the 19th of June, 2008."  *Id.* at 78:23-79:1.  Defendants contend that this loss causation theory is deficient because the June 19, 2008 disclosure about the decision to sell the system to Comcast and the sale price did not reveal anything about the allegedly fraudulent practices, namely the inflated projections contained in the OS.[6]  Instead of the market reacting to the disclosure of the allegedly fraudulent acts or practices and causing plaintiffs' loss, as is required to demonstrate loss causation, defendants argue that here plaintiffs' loss was caused by the price paid for the System when APT was forced the liquidate the assets underlying the Notes.  Defendants cite Sosa's testimony on this point:

> Q:      With regard to the price that Comcast paid for the system at the sale of the system, is it your opinion that the price was related to the defendants' fraud, alleged fraud?
>
> A:      No.  That was the market price of the system.

Sosa Depo. at 232:12-16.  Defendants argue that plaintiffs have not linked the loss that they suffered – which was caused by the price Comcast paid – to defendants' alleged fraud.  Defendants argue that it was not simply the sale of the System to Comcast that caused plaintiffs' loss, because if Comcast had paid $33 million for the System instead of $15 million, plaintiffs would not have suffered any loss.

---

[6] S&Y has separately moved to strike the expert report of Mr. Sosa on numerous grounds.  The Court addresses this motion *infra*.  However, to the extent that the motion to strike relates to Mr. Sosa's opinion about loss causation, the Court addresses the parties' arguments about Mr. Sosa's damages opinion in this section of the order.

Thus, defendants argue, plaintiffs must be able to link the price paid to the

alleged fraud, and they cannot do so.

Relatedly, S&Y moves to strike Mr. Sosa's opinion regarding loss causation as irrelevant and unreliable. Sosa's expert report concludes that defendants' alleged fraud is responsible for 100% of plaintiffs' investment losses. In his report, Sosa assumes "that S&Y and AP&T misled Plaintiffs about the expected operating and financing performance of the [System], and that S&Y and AP&T misled Nuveen about the market value of the [System]." Sosa Report ¶ 6 (Docket No. 165-1 in C 08-4575 SI). Although Sosa does not identify any specific misrepresentations or omissions, Sosa cites plaintiffs' other experts' reports to support his assumptions that the projections contained in the OS were misleading and that defendants misled Nuveen about the market value of the System. *See id.* ¶¶ 26-28 (discussing Rosston and Garfunkel reports). Sosa then opines that the truth of defendants' alleged fraudulent conduct was revealed by a corrective disclosure, and that this disclosure resulted in a loss in value of the Notes:

> 44.   The last trade of the BANs that I am aware of was reported on May 1, 2008 "at a slight premium." Consistent with observed market prices through May 2008, Ms. Garfunkel concludes that if the OS projections had been truthful, investors reasonably could have expected that AP&T would be able to refinance the BANs at maturity. Therefore, although trading in the BANs was limited, I conclude that the market value of the BANs before the truth was revealed was par.
>
> . . .
>
> 46.   Before the disclosure, the market value of the BANs was par. I am aware of no confounding news, unrelated to the fraud, around the time of the system sale that would have caused the price of the BANs to decline. Thus the inflation in the market price of the BANs, immediately prior to the disclosure, is equal to the decline in the value of the BANs from par to the amount recovered in the sale, and the entire decline in value of the BANs from the market price of par to a price based on the sale of the system was caused by the fraud. Using constant dollar back-casting, the inflation at the time of each purchase is equal to the difference between par and the proceeds received from the sale of the system.

Sosa Report ¶¶ 44, 46. Although Sosa's report does not identify the "corrective disclosure" that restored the Notes inflated price to the "true" price absent defendants' fraud, as noted *supra*, at his deposition Sosa testified that the corrective disclosure was the notice that the System would be sold. Sosa Depo. at 78:7-13.

S&Y contends that Sosa's opinion regarding loss causation should be excluded because he did

United States District Court
For the Northern District of California

not perform any meaningful analysis to support his conclusion that defendants' alleged fraud is responsible for 100% of plaintiffs' losses.  Sosa's report does not disclose what, if any, analysis Sosa performed in order to reach his conclusion.  However, at his deposition, Sosa acknowledged that he did not perform any computations or statistical analysis to determine whether there was a causal relationship between the corrective disclosure and the supposed decline in the value of the Notes.  Sosa Depo. at 223:20-224:9.  Sosa also testified that he did not perform any calculations of the market price of the System at any point prior to the sale to Comcast because "that would be irrelevant for purposes of calculating damages, given the timing of the corrective disclosure." *Id*. at 233:2-6.  However, Sosa also admitted that the value of the System might have been different at other points in time prior to 2008. *Id*. at 232:12-233:1.  Sosa testified that the statement in his report that he was aware of "no confounding news, unrelated to the fraud, around the time of the system sale that would have caused the price of the BANs to decline," referred to the fact that he "looked at" the performance of some bond indices at the time period between May 1, 2008 and June 19, 2008.  *Id*. at 79:2-80:6.  Sosa testified that he looked at "a series of indices for both municipal bonds of varying durations, as well as high-yield indices," but that he could not remember the names of any indices.  *Id*. at 83:7-15.  Sosa did not perform any statistical analysis using data from these indices, and instead "looked at the change in yield over this time period for these different indices and determined [by doing arithmetic] that the change in the yield was very minor."  *Id*. at 102:12-103:10.  S&Y argues that even if Sosa could show that the price of the Notes declined as a result of the notice of the sale (which S&Y contends he has not), Sosa performed no meaningful analysis to determine what proportion of plaintiffs' losses is attributable to defendants' alleged fraud.  S&Y notes that Sosa concedes that the System had to be sold because of the poor performance of the System, *id*. at 94:17-24, 231:12-25, and yet Sosa did not attempt to quantify how much of the System's decrease in value was attributable to its poor performance, or other factors such as competition from Comcast.

Plaintiffs respond that defendants' view of the law is too narrow because it would isolate from liability any issuer or underwriter who "was smart enough to prevent the specific steps they took to accomplish their fraud from becoming public."  Docket No. 174 at 27:12-15 in C 08-4575 SI.  Plaintiffs advance a number of arguments about why the Court should not apply the loss causation analysis as set

forth in *Oracle* and other Ninth Circuit precedent.  Plaintiffs argue that *Oracle* and the other loss causation cases cited by defendants involved efficient markets with many thousands of stock trades every day, and thus the plaintiffs in those cases could reasonably be required to demonstrate a direct temporal link between the trading price of the stock and the revelation of fraud.  In contrast, in the Notes "market" there were 18 trades since January 31, 2005, all of which occurred prior to the sale of the System to Comcast in November 2008.  Docket No. 175-1 in C 08-4575 SI.  Plaintiffs contend that such a scarcity of trades makes it impossible to establish a temporal link between the "trading price" of the Notes and the release of information about the sale of the System.  In the same vein, plaintiffs argue that because the market for the Notes was inefficient, Sosa could not perform an "event study."

Plaintiffs also rely on the statement in *In re Charles Schwab Securities Litigation*, 257 F.R.D. 534 (N.D. Cal. 2009), that "a plaintiff may establish loss causation by alleging that 'the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered;' that defendants' 'misstatements and omissions concealed the price-volatility risk (or some other risk) that materialized and played some part in diminishing the market value of' the security."  *Schwab*, 257 F.R.D. at 547 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173, 177 (2d Cir. 2005) (emphasis in original). Plaintiffs assert that under the "materialization of the risk" approach to loss causation recognized in *Schwab*, a plaintiff may establish loss causation by showing that the defendant's conduct concealed or caused the plaintiff to misapprehend a risk that later materialized, causing a decline in the value of the subject security. Plaintiffs argue that they have shown loss causation because plaintiffs' experts Rosston and Garfunkel opine that the Notes were doomed to fail from the very beginning and, but for defendants' misrepresentations and omissions, there would have been no market for the Notes.  Docket No. 176-1 in C 08-4575 SI (Garfunkel Report), Docket No. 178-1 in C 08-4575 SI (Rosston Report). Plaintiffs assert that Sosa logically concluded that the risk defendants had concealed materialized in June of 2008 when APT announced that Comcast would be purchasing the system for approximately half of what plaintiffs had been led to believe it was worth.

The Court concludes that plaintiffs have failed to raise a triable issue of fact as to loss causation, and that Sosa's opinion on loss causation should be excluded as unsupported and unreliable.  The Court agrees with S&Y that Sosa's opinion is fatally flawed because he did not perform any investigation or

analysis to support his conclusion that plaintiffs' losses were caused by defendants' fraud.  The Court agrees with plaintiffs that a traditional event study is not feasible, given the type of "market" here in which there were very few trades.  However, Sosa could have determined the "true value" of the Notes (or the System) at the time when plaintiffs purchased the Notes, thus calculating the fraud "premium" that plaintiffs paid.  He did not, despite the fact that plaintiffs' expert Gregory Rosston opines at length about the proper method of valuing a cable system.  *See* Rosston Report ¶¶ 14-26 (Docket No. 178-1 in C 08-4575 SI).[7]  Nor did Sosa analyze or attempt to calculate the loss in value, if any, of the System that was caused by non-fraudulent factors, including the aggressive competition by Comcast.  Instead, Sosa simply assumes that the purchase price that plaintiffs paid for the Notes was the "true value" of the System, and that the sale in 2008 is the fraud-free transaction that removed the fraudulent inflation from the Notes.  However, the Supreme Court has held that plaintiffs may not establish loss causation simply by demonstrating that they sold a security for less than they paid for it.  *See Dura*, 544 U.S. at 342-43 ("When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.").

"[L]oss causation is not adequately pled unless a plaintiff alleges that the market learned of and reacted to the practices the plaintiff contends are fraudulent. . . . [I]n order to establish loss causation, the market must learn of and react to those particular practices themselves." *Oracle*, 627 F.3d at 392.  In *Metzler*, the Ninth Circuit affirmed dismissal of a complaint based on the plaintiff's inability to prove that the curative disclosure revealed the allegedly fraudulent practices:

> Here, Metzler relies on the June 24 Financial Times story disclosing the DOE investigation at the Bryman campus and the August 2 earnings announcement.  In doing so, Metzler fails to adequately plead loss causation.  The [complaint] does not allege that the June 24 and August 2 announcements disclosed – or even suggested – to the market that Corinthian was manipulating student enrollment figures company-wide in order to procure excess federal funding, which is the fraudulent activity that Metzler contends forced down the stock that caused its losses.  Neither the June 24 Financial Times story nor the August 2 press release regarding earnings can be reasonably read to reveal widespread financial aid manipulation by Corinthian, and the [complaint] does not

---

[7] Rosston also does not offer an opinion about the "true" value of the System at the time plaintiffs purchased the Notes.

1    otherwise adequately plead that these releases did so.

2    *Metzler*, 540 F.3d at 1063.  In *Oracle*, the Ninth Circuit affirmed summary judgment based on the

3    plaintiffs' inability to show loss causation:

> Plaintiffs are unable to create a triable dispute that Oracle's share price dropped as a
> result of the market learning of and reacting to Defendants' purported fraud, as opposed
> to Oracle's poor financial health generally.  Plaintiffs allege a fraud that consisted of
> statements misrepresenting the quality and success of Oracle's Suite 11i product.  Even
> though Plaintiffs acknowledge that the market was already aware of initial rollout issues
> with Suite 11i, Plaintiffs allege that Defendants' misrepresentations downplayed defects
> in the product.  The alleged fraud in this case, therefore, concealed a purported "truth"
> about Suite 11i.  According to the Plaintiffs, the March 1, 2001 earnings miss revealed
> this "truth": Suite 11i was defective and customers had not bought it as a result of the
> defects.  Thus, Plaintiffs argue, the truth regarding Suite 11i "[became] generally
> known" on March 1 and the stock price dropped as result.
>
>     Plaintiffs' theory is unsupported by the record.  The overwhelming evidence
> produced during discovery indicates the market understood Oracle's earnings miss to be
> a result of several deals lost in the final weeks of the quarter due to concern over the
> declining economy. . . .  To be sure, the miss was caused by customers not buying
> Oracle's products.  But the market did not learn on March 1, 2001, that customers did
> not buy Suite 11i as a result of defects.  Instead, the market learned that customers did
> not buy Oracle's products in the final weeks of the quarter as a result of uncertainty in
> an economy that would slide into a recession within the next month.  In other words, the
> market reacted to reports of Oracle's "poor financial health generally."

15   *Oracle*, 627 F.3d at 392-93.

16       Although plaintiffs assert some persuasive arguments about why the loss causation framework

17   as articulated in *Oracle* should not apply here because the bond market was inefficient, *Oracle* is

18   controlling and plaintiffs have not cited any Ninth Circuit or Supreme Court authority adopting a

19   different loss causation analysis for inefficient markets.  Moreover, the PSLRA does not state that loss

20   causation need not be proven where the market on which the security trades is inefficient, and Nuveen

21   does not cite any case law in support of its position.

22       Here, as in *Metzler* and *Oracle*, plaintiffs have failed to show that the price that Comcast paid

23   for the System was the result of the market learning about and reacting to defendants' alleged fraud.

24   The June 19, 2008 "corrective disclosure" that the System would be sold to Comcast did not reveal any

25   "truth" about the alleged fraud, and instead simply revealed that the System would be sold to Comcast

26   for $15 million.  To be corrective, the disclosure must "relate back to the misrepresentation and not to

27   some other negative information about the company."  *In re Williams Sec. Litig. – WCG Subclass*

28   (*"Williams II"*), 558 F.3d 1130, 1139-40 (10th Cir. 2009) (affirming summary judgment and holding

United States District Court
For the Northern District of California

13

that plaintiffs failed to establish loss causation when plaintiffs failed to show that losses following public disclosures could be "reliably attributed to the revelation of fraud rather than to other factors."). Here, the disclosure did not relate back to any alleged misrepresentation, but rather to negative information about how the System was performing. It is undisputed that by June 2008, the System had been performing poorly for a while. The System was losing subscribers, and the 2007-2008 APT Comprehensive Annual Financial Report stated that the System had suffered multi-million dollar operating losses. Docket No. 163-1, Ex. L in C 08-4575 SI (Blair Depo. at 409:16-24, testifying about subscriber losses); *Id*. at Ex. M at 18 (2007-2008 APT Annual Financial Report). Plaintiffs' position is similar to the theory unsuccessfully advanced by the *Oracle* plaintiffs. In *Oracle*, the court wrote, "Plaintiffs take issue with our opinion in *Metzler*. Specifically, they assert that they should be able to prove loss causation by showing that the market reacted to the purported 'impact' of the alleged fraud – the earnings miss – rather than the fraudulent acts themselves. We reject that assertion." *Oracle*, 627 F.3d at 692.

Plaintiffs' reliance on a "materialization of the risk" theory is also unavailing. As an initial matter, the Ninth Circuit has not endorsed this theory. Further, *Charles Schwab* is distinguishable on numerous grounds: *Schwab* involved a Section 11 claim, not a section 10b-5 claim, and it was decided on a motion to dismiss, not summary judgment. While loss causation is an element of a plaintiff's claim for relief in a section 10b-05 claim, loss causation is an affirmative defense to a Section 11 claim. *Compare* 15 U.S.C. 77k(e) *with* 15 U.S.C. § 78u-4(b)(4).

More importantly, however, under the materialization of the risk theory, plaintiffs must still demonstrate that their losses were proximately caused by defendants' fraud and not some intervening event. *See Lentell*, 396 F.3d at 172-77 (requiring that the event reveal that the defendant's "misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security"); *see also In re Vivendi Universal, S.A. Sec. Litig.*, 605 F. Supp. 2d 586, 598-600 (S.D.N.Y. 2009) ("To demonstrate the connection between the statements and the events – termed 'materializations of the concealed risk' – plaintiffs must show: (1) that these events were foreseeable consequences of the alleged fraud; and (2) that these events revealed new information previously concealed by defendants' alleged fraud. To demonstrate the connection between the events

and the share price declines, plaintiffs must: (1) show a correlation between news of the event and the declines; and (2) disaggregate the declines or some rough percentage of the declines from losses resulting from other, non-fraud-related events.").

Here, plaintiffs have not presented any evidence of a causal relationship between the allegedly unrealistic projections in 2004 and the sale of the System for less than the par value of the Notes in 2008. Plaintiffs have not submitted any evidence of the "true value" of the Notes (or System) in 2004. As defendants note, to the extent that plaintiffs argue that the sale of the System revealed that the projections could not be achieved, the System's failure to perform consistent with the projections had been widely known for years prior to the sale, and had been reported in newspaper articles as early as 2006. This case is similar to *Williams II*, where the plaintiffs alleged that they were misled about a company's prospects and that "the views expressed privately by members of senior management . . . belied their rosy public statements about WCG's prospects." *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1202 (N.D. Okla. 2007). The plaintiffs relied on a materialization of the risk theory, arguing that the fraud was revealed when the Williams Companies ("WMB") announced that it would be spinning off its telecommunications subsidiary, WCG, in a move that it described as "the best way to ensure that both our energy and communications businesses have the efficient and effective access to the capital necessary to pursue the substantial growth that each enjoys." *Id*. at 1211. Two years later, WCG filed for bankruptcy.

The district court granted summary judgment in favor of the defendants on loss causation grounds, and the Tenth Circuit affirmed. The Tenth Circuit held, "[t]he causal connection between false statements about a company's prospects and that same company's eventual bankruptcy years later is too remote to constitute a corrective disclosure." *Williams II*, 558 F.3d at 1142.

> . . . Bankruptcy might have been a possibility from the moment of the spinoff, and might even have been a likely possibility, but there are simply too many potential intervening causes to say that bankruptcy was WCG's legally foreseeable destiny such that its trading price at bankruptcy equaled its true value on the day the spinoff was announced. The alleged misstatements involved the risks of defaulting on debt and the true reasons that WCG was spun off from WMB; they did not involve the certainty of a bankruptcy. There are too many intervening factors at play – including the total meltdown of the telecommunications industry – to allow [the plaintiffs' expert] Dr. Nye to reliably equate bankruptcy with the risks that the original misstatements concealed. To do so would transform the securities laws into the kind of downside insurance policy that *Dura* warned against.

**United States District Court**
For the Northern District of California

*Id.* at 1143.  The court held that the plaintiffs "fail[ed] to identify the mechanism by which fraud was revealed to the market," and thus that there was no triable issue of fact as to loss causation.  *Id.*

Here, similar to *Williams*, plaintiffs argue that they have demonstrated loss causation by showing that actual performance failed to live up to allegedly fraudulent projections.  However, there are four years of intervening events between the time the projections were published in the OS and the time the System was sold to Comcast.  Plaintiffs have not submitted any evidence linking their losses – caused by the November 2008 sale *price* to Comcast, and not simply the sale – to the allegedly fraudulent 2004 projections.  *Cf. Dura*, 544 U.S. at 343 ("Other things being equal, the longer the time between the purchase and sale, the more likely that . . . other factors caused the loss.").

Accordingly, the Court GRANTS defendants' motions for summary judgment on plaintiffs' 10b-5 claims.[8]

## II.    Defendants' motions for summary judgment on Nuveen's state claims

In addition to the federal claims, Nuveen's FACC alleges the following claims under state law: (1) violations of Sections 25400 and 25500 of the California Corporate Securities Act, against both defendants; (2) violations of Sections 25401 and 25501 of the California Corporate Securities Act, against S&Y; (3) violation of Section 255401.1 of the California Corporate Securities Act, against both defendants; (4) violation of the Illinois Securities Act, against both defendants; (5) common law fraud, against S&Y; (6) aiding and abetting common law fraud, against S&Y; and (7) negligent misrepresentation, against S&Y.

---

[8]  Defendants raise a number of other arguments about the 10b-5 claims.  The Court finds that there are disputes of fact as to scienter and materiality, and thus that summary judgment on those grounds is inappropriate.  In light of the resolution of the 10b-5 claims on loss causation grounds, the Court does not reach the parties' arguments about the PSLRA damages cap.

Defendants have separately moved for summary judgment on Osher's 10b-5 claim on the basis that Osher cannot establish reliance.  In response to defendants' motions, Osher urges the Court to adopt a "fraud created the market" theory of reliance.  In light of the Court's ruling on loss causation, the Court need not decide whether this theory of reliance is viable or whether Osher has evidence in support of such a theory.

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### A.       Statute of limitations

Nuveen filed its counterclaim on October 16, 2008.  The statute of limitations on plaintiffs' California Corporations Code Securities Act and negligent misrepresentation claims is two years.  Cal. Corp. Code § 25506(b); Cal. Civ. Proc. Code § 339.  The statute of imitations for fraud, aiding and abetting fraud, and the Illinois Securities Act claims is three years.  Cal. Civ. Proc. § 338(d); *Klein v. George G. Kerasotes Corp.*, 500 F.3d 669, 671 (7th Cir. 2007).

S&Y contends that Nuveen's claims are untimely because Nuveen knew that the System was missing projections by no later than April 12, 2005, as reflected in Nuveen's "Surveillance Report" of that date.  S&Y notes that after Nuveen's initial purchase, Nuveen received monthly, quarterly and annual reports showing that the System was not performing in accordance with projections.  In addition, both defendants argue that various news articles put Nuveen on notice of its claims.  Defendants cite a March 9, 2006 Contra Costa Times article that stated that APT was cutting its revenue forecast. Defendants have submitted evidence showing that Nuveen Portfolio Manager John Miller admitted that S&Y provided him with a copy of this article, that he read it, and that he was aware of the reduced projections in 2006.  Docket 163-1, Ex. M (Miller Depo. at 357:11-358:22) in C 08-4575 SI. Defendants also cite a front-page article in the Alameda Journal, published September 26, 2006, which discusses the Alameda telecom system's financial woes in detail and quotes City Councilmember Kerr as saying, "I believe that APT has lied to the public and has lied to the City Council . . . . I think someone deserves jail time for this mess."  *Id.* at Docket No. 163-5, Ex. DD.  Nuveen's Portfolio Manager and Rule 30(b)(6) corporate designee, John Wilhelm, admitted that S&Y sent him a copy of this article in September 2006.  *Id.* at Docket No. 163-2, Ex. R (Wilhelm Depo. at 329:11-14).

Nuveen responds that neither the "surveillance" reports nor the newspapers articles discussed anything related to the fraud alleged in the FACC, namely that, from its inception, APT's marketing and business plans and then subsequent system performance confirmed that APT could never reasonably expect the System to perform as represented in the OS.

The Court concludes that there are factual issues as to whether the information available to Nuveen put it on notice of its claims, and thus that summary judgment on statute of limitations grounds is inappropriate.

United States District Court
For the Northern District of California

**B.      Cal. Gov't Code § 818.8**

Alameda contends that Nuveen's California Corporate Securities Act claims are barred by California Government Code § 818.8.  That section states that "[a] public entity is not liable for an injury caused by misrepresentation by an employee of the public entity, whether or not such misrepresentation be negligent or intentional."  Cal. Gov't Code § 818.8.  The Legislative Committee Comments to § 818.8 state that "[t]his section provides public entities with an absolute immunity from liability for negligent or intentional misrepresentation."  Cal. Law Revision Com., Comment, Deerings Ann. Gov. Code (1982 ed.) § 818.8, p. 174.  Alameda argues that the immunity is absolute, and that the inclusion of a governmental entity in the definition of "person" in California Corporate Securities Act, Cal. Corp. Code § 25013, is insufficient to circumvent Section 818.8's immunity.

Alameda previously raised these arguments in a motion to dismiss in the *Osher* case.[9]  In an order filed on August 11, 2009, the Court denied Alameda's motion.  The Court noted that the application of § 818.8 to the California Corporate Securities Act was a novel question, and that neither party had thoroughly briefed the issue.  The Court held, *inter alia*, that this case was distinguishable from those where California courts have applied § 818.8 to render government entities immune from alleged misrepresentation by their employees, because here the alleged fraud was committed by the City itself.  The Court also noted that the language in the Corporate Securities Act imposing liability on governmental entities would be rendered nugatory if § 818.8 immunity applied.  *See* Docket No. 25 at 8-9 in 09-1437.

In the present motions for summary judgment, Alameda has supplemented its earlier arguments by submitting portions of the file in an unpublished Los Angeles Superior Court case, *BNY Western Trust v. City of Los Angeles et al.* (Los Angeles Sup. Ct. Case No. BC 161090).  In *BNY Western Trust*, the plaintiffs alleged that the City of Los Angeles and various city departments defrauded investors in connection with municipal bonds backed by a low-income housing project.  Docket No. 120, Ex. C in

---

[9] Although Alameda moved to dismiss the *Nuveen* complaint, Alameda did not raise immunity as a basis for dismissal.

18

**United States District Court**
For the Northern District of California

C 09-1437 SI.[10]  Similar to the plaintiffs here, the *BNY* plaintiffs alleged that the Official Statement accompanying the bonds made material misrepresentations about potential cash flows by understating expenses and overstating attainable rents and the value of section 8 subsidies.  *Id.*  The trial court sustained a demurrer without leave to amend in an unpublished decision.  *Id.*, Ex. B.  The court dismissed the Corporate Securities Act claims against the City defendants "because they are subject to the immunity provisions Govt. Code Section 818.8 and are barred."  *Id.*  The California Court of Appeal denied a writ after full briefing by the parties, and the California Supreme Court denied review.  *Id.* Ex. G-I.

Alameda has also cited additional cases for the proposition that Section 818.8 immunity is absolute, and is not limited to a situation where an employee is acting contrary to official policy or outside the scope of his employment.  In *Universal By-Products, Inc. v. City of Modesto*, 43 Cal. App. 3d 145 (1974), the plaintiff was an unsuccessful low bidder for a contract to provide garbage collection services for the City of Modesto.  The plaintiff sued the City of Modesto, alleging that the City's representation that it would consider the bids in good faith was false and that the City never intended to award the license.  *Id.* at 150.  The trial court sustained a demurrer without leave to amend, and the Court of Appeals affirmed, holding "Under Government Code section 818.8, respondent is immune from liability for the alleged misrepresentations by its employees."  *Id.* at 154.  Other courts have similarly held that public entities are immune from tort liability under § 818.8 where the plaintiffs alleged that the fraud was committed with the entity's imprimatur.  *See e.g.*, *Janis v. California State Lottery Comm'n*, 68 Cal. App. 4th 824, 830 (1998), *rev. denied* (1999) (holding California State Lottery Commission immune under § 818.8 from fraud claims alleging that Commission misrepresented legality of the game of Keno).

The party seeking to circumvent an immunity bears the burden of proving "a clear indication of legislative intent that statutory immunity is withheld or withdrawn."  *Caldwell v. Montoya*, 10 Cal. 4th 972, 986 (1995).  In *Caldwell*, the plaintiff sued several public employees under the Fair Employment and Housing Act.  The defendant employees argued that they were immune under Cal. Gov't Code

---

[10]  Alameda's motion for summary judgment against Nuveen incorporated the § 818.8 briefing filed in the *Osher* case.

United States District Court
For the Northern District of California

§ 820.2, which provides immunity for discretionary acts.  The California Supreme Court held that the individual defendants were immune, and that the inclusion of a governmental defendant in the definition of potentially liable persons was insufficient to overcome immunity:

> . . . To paraphrase the Senate legislative committee, public employees are immune for their discretionary acts, even those which constitute breaches of actionable duty, unless a statute otherwise provides.  It follows that where the immunity provided by section 820.2 would otherwise apply, that immunity cannot be abrogated by a statute which simply imposes a general legal duty or liability on persons, including public employees.  Such a statute may indeed render the employee liable for his violations unless a specific immunity applies, but it does not remove the immunity.  This further effect can only be achieved by a clear indication of legislative intent that statutory immunity is withheld or withdrawn in the particular case.
>
> FEHA does not meet this test.  It generally prohibits employment discrimination by both public and private "employer[s]" and provides civil remedies when its provisions are violated.  But even if those remedies extend to individuals, including public employees, as "agents" or "aiders and abetters" of culpable "employer[s]" (see fn. 3, ante), FEHA contains no indicia of an additional intent that individual public officials or employees may be sued despite a specific statutory immunity that would otherwise apply in a particular case.  Hence, FEHA does not abrogate section 820.2's specific grant of immunity to public employees for their discretionary acts.

*Caldwell*, 10 Cal. 4th at 986.  Thus, under *Caldwell*, the fact that the California Corporate Securities Act defines "person" as including a political subdivision of a government, *see* Cal. Corp. Code § 25013, does not abrogate the specific grant of immunity contained in § 818.8.  Nuveen has not identified any language in the California Corporate Securities Act or its legislative history showing an "additional intent" that public entities may be sued despite the § 818.8 immunity that would otherwise apply.

The Ninth Circuit has applied this same reasoning to bar claims asserted against governmental entities for federal securities violations.  In *Safeway Portland Employees' Fed. Credit Union v. Federal Deposit Ins. Corp.*, 506 F.2d 1213 (9th Cir. 1974), the court held,

> . . . The Credit Union further contends that the Securities Act of 1933 itself constitutes a waiver of sovereign immunity and supports jurisdiction.  It points out that the anti-fraud section, 15 U.S.C. § 77q, applies to "any person" and that the Act defines "person" to include "a government or political subdivision thereof." 15 U.S.C. § 77b(2).  The Securities Act makes no reference to a specific waiver of immunity by the sovereign United States and we have been cited to nothing in the legislative history which would indicate such a purpose.  Express statutory consent to suit is essential and will not be implied from statutes that omit all reference to the sovereign. *Danning v. United States*, 259 F.2d 305, 309 (9th Cir., 1958), *cert. denied* 359 U.S. 911 (1959).  Moreover, statutes which are claimed to be waivers of sovereign immunity are to be strictly construed against such surrender.  *Bat Rentals, Inc. v. United States*, 479 F.2d 43, 45 (9th Cir., 1973).  *See United States v. Sherwood*, 312 U.S. 584, 590 (1941).  Mere mention of "a government" in the definitional section of the Securities Act does not suffice as consent to suit.

*Id.* at 1216.  The California Corporate Securities Act was modeled after the federal securities statutes. *See Moreland v. Dep't of Corporations*, 194 Cal. App. 3d 506, 512 (1987).  "[W]hen a state law is patterned after a federal law, the two are construed together. . . . In these situations, the federal cases interpreting the federal law offer *persuasive* rather than controlling authority in construing the state law." *Id.* (emphasis in original).

The Court concludes that Nuveen has not met its burden to show that Alameda is not immune from claims under the California Corporate Securities Act.  Although the Court is troubled by the policy implications of holding a public entity immune from state claims of securities fraud where the plaintiffs allege that the municipality itself has engaged in fraud with regard to the issuance of municipal bonds, the weight of authority strongly indicates that California courts would hold that Alameda is immune under § 818.8.  Accordingly, the Court GRANTS Alameda's motion for summary judgment and holds the California Corporate Securities Act does not abrogate Alameda's immunity under § 818.8.[11]

### C.   Illinois Securities Act claim

Nuveen's FACC alleges that defendants sold the Notes to Nuveen in violation of the Illinois Securities Act, 815 Ill. Comp. Stat. 5/12 and 5/13.  The FACC alleges that defendants violated 815 Ill. Comp. Stat. 5/12(F), (G), and (I).  FACC ¶ 364.  Those provisions provide:

It shall be a violation of the provisions of this Act for any person:

F.   To engage in any transaction, practice or course of business in connection with the sale or purchase of securities which works or tends to work a fraud or deceit upon the purchaser or seller thereof.

G.   To obtain money or property through the sale of securities by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances

---

[11]   Pursuant to the PSLRA and Rule 37, Alameda has filed a motion to exclude specific evidence from trial and from consideration in connection with Alameda's motion for summary judgment against the Nuveen plaintiffs.  Because the Court has granted summary judgment in favor of Alameda on all of Nuveen's claims, the Court DENIES the motion as moot.

Although Alameda has not filed a separate motion to exclude in the *Osher* case, Alameda's motion for summary judgment against Osher contends that the PSLRA requires exclusion of Osher's "unpled" theory based on the 2005-2009 Alameda Business Plan.  Because the Court is granting summary judgment on Osher's 10b-5 claim for failure to show loss causation, the Court need not address the parties' arguments on this point, including those raised in Osher's supplemental brief filed after the summary judgment hearing.

United States District Court
For the Northern District of California

1  under which they were made, not misleading.

2  . . .

3  I.  To employ any device, scheme or artifice to defraud in connection with the sale
    or purchase of any security, directly or indirectly.

4  815 Ill. Compl Stat. 5/12(F), (G), (I).

5

6  Defendants move for summary judgment on Nuveen's Illinois Securities Act claim on numerous

7  grounds. Alameda contends that the claim is barred by immunity, under either Cal. Gov't Code § 818.8

8  or under Illinois immunity law. Nuveen responds that "[t]his argument fails because Nuveen has shown

9  that APT does not have immunity under California law. As for APT's argument that Illinois immunity

10 law bars Nuveen's claim, it also fails because the Illinois Government Immunity Statute applies only

11 to local public entities located in Illinois." Docket No. 179 at 83:15-19 in C 08-4575 SI. For the

12 reasons set forth above, the Court concludes that Alameda does have immunity under California law,

13 and accordingly GRANTS Alameda's motion for summary judgment on this claim.

14 The Court has directed further briefing on Nuveen's Illinois Securities Act claim against S&Y,

15 and will issue a separate order once those briefs are filed.

16

17 **D.  Other claims against S&Y**

18 S&Y moves for summary judgment on Nuveen's California Corporate Securities Act, common

19 law fraud, aiding and abetting fraud, and negligent misrepresentation claims on the ground that Nuveen

20 cannot show a material misstatement or omission. The Court finds there are disputed issues of fact as

21 to materiality and DENIES S&Y's motion to this extent.

22

23 **III.  Defendants' motions for summary judgment on Osher's state law claims**

24 Osher's complaint alleges the following state law claims: (1) California Corporate Securities Act

25 §§ 24500 and 25500, against both defendants, (2) California Corporate Securities Act § 25504.1, against

26 both defendants, (3) common law fraud, against S&Y, (4) aiding and abetting common law fraud,

27 against S&Y, (5) negligent misrepresentation, against S&Y, and (6) breach of fiduciary duty, against

28 S&Y.

### A.    Government Claims Act - defendant Alameda

Alameda contends that Osher's California Corporate Securities Act claims are barred by Osher's failure to comply with the Government Claims Act.  The California Government Code requires that all claims for money or damages against a public entity be served on the entity in writing, within the applicable statutory time limit, and acted upon, before any lawsuit is filed against the public agency. Cal. Gov't Code §§ 905, 911.2, 945.2; *City of Stockton v. Superior Court*, 42 Cal. 4th 730, 737-38 (2007).

Osher does not dispute that he did not file a written claim prior to filing suit.  Osher argues that no written claim was required prior to filing this action because plaintiff's claims are expressly exempted from the pre-filing requirement by Section 905(g), which applies to "claims for principal or interest upon any bonds, notes, warrants, or other evidences of indebtedness."  Cal. Gov't Code § 905(g).  Alameda responds that this argument is without merit because Osher's state law claims against the City are for securities fraud, not to collect the payments due on a bond.

Plaintiff bears the burden of establishing that an action is within an exception to the claims presentation requirements.  *See Hanson v. Garden Grove Unified School Dist.*,129 Cal. App. 3d 942, 948 (1982) (upholding dismissal of tort action based on the plaintiff's failure to establish it was within Gov. Code, § 905 exceptions to claims requirement); *see also State v. Superior Court (Bodde)*, 32 Cal. 4th 1234, 1244 (2004).   "[T]he statutory exceptions specified in section 905 are given a strict construction."  *Dalton v. East Bay Mun. Util. Dist.*, 18 Cal. App. 4th 1566, 1573 (1993).  In *Dalton*, the court examined the legislative history of § 905:

> The legislative history of section 905 indicates the scope of the enumerated exceptions to filing claims was intended to be extremely limited.  The study upon which legislation on the filing of claims against public entities was based provides: "In most of [the subdivisions to section 905] the basic objectives of early investigation to prevent litigation and discourage false claims which support a uniform procedure for tort and inverse condemnation claims are not applicable; and orderly administration of the substantive policies governing the enumerated types of claims strongly suggests that claims procedure should be closely and directly integrated into such substantive policies. Obvious and compelling reasons appear for . . .  providing an uncomplicated routine procedure for processing the tremendous volume of salary, [and] pension . . . claims; . . . " (Recommendation and Study Relating to the Presentation of Claims Against Public Entities (Jan. 1959) 2 Cal. Law Revision Com. Rep. (1959) p. A-117.)

*Dalton*, 18 Cal. App. 4th at 1573.  In *Dalton*, the plaintiffs were former and retired employees of the

defendant who brought a class action alleging claims for breach of fiduciary duty and denial of equal protection with regard to defendant's administration of retirement benefits. *Id.* at 1570. The court held that while "[a]t first blush plaintiffs' claims appear to fall squarely within the subdivision (f) exception; that is, they are claims "for money or benefits under [a] public retirement or pension system," the exception did not apply:

> . . . [C]ommentators have construed the section 905 exceptions as essentially nontortious claims "for which some other adequate claims procedure has already been devised or for which the procedural protection of the Tort Claims Act is believed to be unnecessary." (Cal. Government Tort Liability Practice, op. cit. supra, ¶. 651-652.)
>
> The instant action is not such a case. Plaintiffs are basically alleging tortious wrongdoing by defendants. They do not seek money due to them under the terms of the existing pension system; rather, they claim defendants treated them unfairly in administrating the system and seek to change the 1989 administrative decisions. Consequently, we conclude plaintiffs were required to file a claim pursuant to section 905. Having failed to file their claim, plaintiffs' suit is barred by section 911.2.

*Id.* at 1574; *see also Hanson*, 129 Cal. App. 3d at 947-48 (employee's claims for damages flowing from school district's refusal to reemploy him were tort damages, and thus did not fall within the § 905 exceptions for "salaries," "benefits" or wages").

The Court agrees with Alameda that Osher's state law claims against Alameda do not fall within the exception set forth in Cal. Gov't Code § 905(g) because the claims are for securities fraud under the California Corporate Securities Act, and are not "claims for principal or interest upon any bonds, notes, warrants, or other evidences of indebtedness." Cal. Gov't Code § 905(g). As in *Dalton*, Osher is essentially alleging tortious wrongdoing by Alameda, and Osher's claims are not the type "for which some other adequate claims procedure has already been devised or for which the procedural protection of the Tort Claims Act is believed to be unnecessary." *Dalton*, 18 Cal. App. 4th at 1574. Osher has not met his burden of showing that the instant claims fall within an exception to the claims presentation requirement.

Osher also argues that it was not required to file a written claim because this case was filed months after the City filed its own declaratory relief action against Nuveen based on the same claims asserted here. For support, Osher cites *People ex rel. Dep't of Parks & Recreation v. Wes-A-Rama, Inc.*, 35 Cal. App. 3d 786 (1973). However, that case holds only that "when the state has filed suit on a contract, the defendant should be permitted to cross-complain for damages on the same contract without

United States District Court
For the Northern District of California

complying with the claim statutes." *Id.* at 794. Osher does not cite any authority for the proposition that the City's separate lawsuit against the Nuveen Funds excuses Osher's obligation to comply with the claims presentment requirement. Moreover, as noted above, Osher's claims against Alameda sound in tort, not contract.

Accordingly, the Court GRANTS Alameda's motion for summary judgment based on Osher's failure to comply with the claims presentment requirement. In addition, for the reasons stated in Section II.B *supra*, the Court holds that Osher's state securities fraud claims against Alameda are barred by § 818.8 immunity.

### B.      Statute of limitations - defendant S&Y

S&Y contends that all of Osher's claims are time-barred. Osher filed this lawsuit on April 1, 2009. S&Y argues that Osher's California Corporate Securities Act and negligent misrepresentation claims, which have a two year statute of limitations, are untimely because Osher should have been aware of the facts constituting these claims when he purchased the Notes, because of the contradictions between the purported "assurances" of Jeffrey Green, a manager at S&Y with whom Osher had dealt for many years, and the statements in the OS.[12] S&Y argues that even if the contradictions between the OS and Green's alleged assurances did not start the clock running, Osher should have discovered S&Y's allegedly fraudulent conduct at the latest on November 17, 2006, when he received a news article titled "Static Over Cable TV in Alameda" that referred to the System as a "failing venture." S&Y argues that at the least, the article put Osher on notice that Mr. Green's purported assurance that the System had been meeting projections was inaccurate, and that the price reflected on his account statements may not have been available in the market.

Osher responds that his claims are not time-barred because his claims are not based on any discrepancy between the OS and Green's assurances. Instead, Osher argues that his claims are based

---

[12] The statute of limitations for fraud and aiding and abetting fraud is three years, and the statute of limitations for breach of fiduciary duty is four years. S&Y argues that the statute of limitations has run on these claims with respect to Osher's April 21, 2004, June 14, 2004, March 30, 2005, and June 14, 2005 (for the three year claims) purchases because Osher was on notice of these claims upon receiving the allegedly contradictory information from Mr. Green.

on the allegedly false or misleading representations and/or nondisclosed facts as to the feasibility of the Notes in light of the facts known to defendants about the performance of the System and APT's business plans, which Osher did not learn until long after April 1, 2007. With regard to the November 16, 2006 news article, Osher argues that the article does not provide any facts indicating that, at the time of plaintiff's purchases of the Notes, S&Y's conduct had been reckless. Osher contends that the article provides no facts that would support an allegation of scienter, and instead refers to the System's problems as having been caused by recent setbacks. Docket No. 119-5 in C 09-1437 SI. Osher also notes that the article quotes the Public Utilities Board present as saying that "the utility is financially stable and capable of remaining solvent" and that "the utility has the financial wherewithal to take the hit [of the debt]. It will hurt, but it won't sink the agency." *Id.*

The Court concludes that there are questions of fact as to when Osher was on notice of his claims, and thus that summary judgment on statute of limitations grounds is inappropriate.

### C.   Common law fraud and negligent misrepresentation - defendant S&Y

#### 1.   Misstatements and omissions in the OS

Reliance is an element of Osher's claims for common law fraud and negligent misrepresentation. *See Paracor Fin. Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996). S&Y argues that Osher cannot prove reliance on the OS because Osher admitted that he did not rely on any of the specific alleged misrepresentations or omissions pled in the FAC. The FAC alleges that defendants made the following material misrepresentations and omissions in the OS: (1) failing to disclose historical cost overruns, (2) failing to disclose that the System had originally been projected to achieve a profit in 2002, but that it did not, (3) falsely representing that the reason for omitting historical operating information was that the System was in a developmental stage, (4) falsely representing that the City was willing to raise rates in subsequent years, (5) falsely representing that programming costs "stood a reasonable chance" of decreasing as a percentage of total revenue, (6) falsely stating that satellite competitors were continuing to experience technical difficulties, when in fact those difficulties had been resolved, (7) falsely representing that the System "could reasonably be expected to compete with Comcast, (8) falsely representing that APT's business plan for future operations included serving

multiple-dwelling units ("MDUs"), and (9) falsely representing that households not presently subscribing to cable TV "were viable potential customers" of the System.  FAC ¶¶ 26-34.

At his deposition, Mr. Osher testified that with respect to each of these alleged misrepresentations, he did not read the section of the OS in which it was purportedly made.  *See* Osher Depo.[13] at 236:4-7, 236:8-11, 186:9-14 (historical cost overruns); *id*. at 210:11-16, 211:-1-22 (failed prior projections); *id*. at 182:20-22, 197:14-23 (historical operations/System in developmental stage); *id*. at 183:23-184:25, 234:3-11, 185:1-4 (APT's willingness to raise rates); *id*. at 204:2-5, 208:13-21, 235:1-5 (projected programming costs); *id*. at 201:14-25, 236:12-18 (satellite competition); *id*. at 200:15-20, 201:1-13 (competition with Comcast); *id*. at 234:16-25, 208:22-109:8 (MDUs); and *id*. at 201:14-25, 236:19-237:1 (households not currently cable TV subscribers).  Similarly, with regard to the alleged omissions, Osher testified that he was not interested in the allegedly omitted information and did not ask about it because he did not consider it important.  *Id*.

Osher's opposition to S&Y's motion does not address any of these specific alleged misrepresentations or omissions.  Instead, Osher argues that he relied on the OS's representation that, if projections were met, the Notes could be refinanced and his principal would be repaid.  Osher testified that he read the portions of the OS relating to repayment of the principal.  Although Osher testified at his deposition that he never saw the OS projections in the form of the Uptown Report attached to the OS, *see* Osher Depo. at 199:18-200:5, 171:13-18 (Docket No. 144-1, Ex. D in C 09-1437 SI), Osher has submitted evidence suggesting that he was aware about the projections and relied on them in the context of his discussions with S&Y's Jeffrey Green.  Osher testified at his deposition that it was his understanding based on his conversations with Green that if the System "got up to 16,000 subscribers that there would be no problem refinancing and paying off the principal notes."  Osher Depo. at 165:14-16 (Docket No. 164-1 in C 09-1437 SI).[14]  Osher has also submitted evidence showing that Green

---

[13] Docket No. 144-1, Ex. D in C 09-1437 SI.

[14] Green denies that he told Osher that 16,000 subscribers was APT's subscriber goal, but as Osher notes, APT's General Manager told the City Council that 16,000 subscribers was the "breakeven point" for the System.  Docket No. 118-1 at SY026547 (Oct. 1, 2003 City Council minutes).  According to the minutes of a subsequent City Council meeting, the APT General Manager told the City Council that 16,000 subscribers was the system buildout target for 2008.  Docket No. 118-2 at SY026562 in C

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    attended a February 2004 presentation by APT and S&Y to investors on behalf of Osher, and that Green

2    received materials from APT which he went over with Osher.  Green Depo. at 45:5-13; 51:20-52:6;

3    53:10-20 (Docket No. 164-2 in C 09-1437 SI).[15]  Those materials contained projections stating that

4    "Based upon customer acquisition targets, cash flow is positive at June 2007 and $3.9 MM at June

5    2008."  Docket No. 152-1 in C 09-1437 SI at SY 043789 (citing Uptown Report, Section 3). Osher

6    argues that through his agent Green, he relied on the representations as to revenue projections, in

7    addition to the general representation in the OS that its business plan supported refinancing.  Osher

8    argues that the overarching theory of liability alleged in the complaint is that defendants failed to

9    disclose a number of key facts that demonstrated that the System was not in fact economically feasible

10   at the time the Notes were marketed, and that defendants knew that the System was never going to

11   achieve the results needed to obtain the new financing in 2009.

12        The Court finds that it is a very close call whether Osher has raised a triable issue of fact

13   regarding reliance.  S&Y correctly notes that Osher has essentially abandoned his claims regarding the

14   specific misrepresentations and omissions in the OS that were alleged in the complaint (FAC ¶¶ 26-34).

15   The Court GRANTS summary judgment in favor of S&Y on those specific allegations, because the

16   record shows that Osher did not read the relevant portions of the OS or find the alleged omissions

17   important, and therefore did not rely to his detriment.

18        With regard to Osher's more general theory that Osher relied on the OS's representation that,

19   if projections were met, the Notes could be refinanced and his principal would be repaid, the evidence

20   is just barely sufficient to defeat summary judgment.  Viewing the evidence in the light most favorable

21   to Osher, as this Court is required to do on summary judgment, the evidence shows that (1) the OS

22   contained projections that had been repeatedly and aggressively ramped up, (2) the OS contained

23   projections that were at odds with contemporaneous projections contained in the 2005-2009 Alameda

24   Business Plan, (3) the Notes could not have been sold if the 2005-2009 Business Plan projections had

26   09-1437 SI.

27        [15] Osher also testified, somewhat inconsistently, that he was not aware of any APT site visit for
     investors and that he did not know that Green went to the site visit.  Osher Depo. at 148:21-149:11
28   (Docket No. 59, Tab 11 in C 09-1437 SI).

been included in the OS, (4) S&Y knew, or was reckless in not knowing, that the OS projections were unrealistic and could never be achieved, and (5) Osher purchased the Notes with the understanding that refinancing was feasible if the System was successfully built out and projections were met.  Under this view of the evidence, a jury could find that Osher relied on material misstatements and/or omissions.

### 2. Alleged oral assurances by Jeffrey Green and S&Y brokerage statements

The complaint alleges that Jeffrey Green orally assured Osher that the "City Defendants intend[ed] to honor the Notes" in the event that the System was unable to do so, and later, that APT was "meeting projections."  FAC ¶¶ 19-20.[16]

S&Y contends that Osher's reliance on Green's alleged oral assurances was unjustified as a matter of law.  S&Y argues that Osher's reliance was unreasonable because he is a sophisticated and experienced investor, and that he acted recklessly by failing to undertake any due diligence with respect to his investment, and by relying on oral assurances that are contradicted by the offering documents. With regard to Green's alleged assurances that the City would honor the Notes, S&Y argues that Osher signed the Investor Letter in which he attested to having been given access to information and having had the opportunity to receive answers to his questions, and represented that he had made his own inquiry.  Docket No. 68, Ex. F in C 09-1437 SI (Investor Letter).  S&Y also emphasizes that the OS explained that repayment of the Notes was dependent upon a refinancing at the Notes' maturing in June 2009, OS at CITY 000499-500, 000505-506, that a refinancing could be secured only by the System's revenues, and that APT had no obligation to repay the Notes if revenues were insufficient.  OS at CITY 000493 ("[N]o revenues or assets of Alameda P&T other than those of the Telecom System (*i.e.*, no revenues or assets of Alameda P&T related to its electric utility facilities . . .) are pledged to the payment of the Notes or any obligation securing the Notes."); *see also id.* at CITY 000494 ("Security for the Notes" section).  Osher attested to understanding this when he signed the Investor Letter, which

---

[16] The complaint also alleges that in making subsequent decisions to buy the Notes, Osher relied on his S&Y brokerage statements showing valuations for the Notes at or above par value.  *Id.* ¶ 19. S&Y asserts that Osher's purported reliance on the price stated on his account statements was unjustified.  Osher does not address this claim in his opposition, and the Court concludes that Osher has abandoned this claim.

United States District Court
For the Northern District of California

acknowledged:

> 6.  The Investor acknowledges that the obligation of Alameda P&T to make the Installment Payments is secured by a pledge of Net Revenues . . . of the Telecom System, and Alameda P&T shall not be directly or indirectly or contingently or morally obligated to use any other moneys or assets of Alameda P&T (including revenues or assets of Alameda P&T related to its electric utility facilities or distribution system) to make the Installment Payments. . . .

Docket No. 68, Ex. F at 2 in C 09-1437 SI.  In addition, the inside cover of the OS explicitly instructs investors not to rely on any representations made by anyone outside of the OS:

> No dealer, broker, salesperson or other person has been authorized by the Authority, the Corporation, Alameda P&T or the Underwriter to give any information or to make any representations other than those contained herein and, if given or made, such other information or representations must not be relied upon as having been authorized by any of the foregoing.

OS at CITY 000494.

Osher's opposition does not address the allegation that Osher relied on Green's alleged assurances that the City intended to honor the Notes, and thus it appears that Osher has abandoned this claim.  The Court agrees with S&Y that it is entitled to summary judgment on this claim as any reliance by Osher, a sophisticated and experienced investor, on Green's oral assurances that the City would repay the Notes was unreasonable the face of the numerous warnings in the OS.  *See Kennedy v. Josephthal & Co.*, 814 F.2d 798, 801, 804-05 (1st Cir. 1987) (affirming summary judgment against investor plaintiff who relied on broker's oral assurances where, *inter alia*, plaintiff was sophisticated investor, oral representations were "completely at odds" with offering memorandum, and offering memorandum warned investors that only general partner was authorized to provide information to investors).

However, with respect to Osher's claim that Green provided him with inaccurate and misleading updates regarding the System's performance, and that Osher relied on those updates when he purchased additional Notes, the Court finds that there are disputes of fact sufficient to defeat summary judgment.

## C.    California Corporate Securities Act claims

Osher alleges claims against S&Y under Sections 25400, 25000 and 25504.1 of the California Corporate Securities Act. Section 25400 prohibits false and misleading statements designed to manipulate the securities markets.  That section provides,

It is unlawful for any person, directly or indirectly, in this state:

(a) For the purpose of creating a false or misleading appearance of active trading in any security or a false or misleading appearance with respect to the market for any security, (1) to effect any transaction in a security which involves no change in the beneficial ownership thereof, or (2) to enter an order or orders for the purchase of any security with the knowledge that an order or orders of substantially the same size, at substantially the same time and at substantially the same price, for the sale of any such security, has been or will be entered by or for the same or different parties, or (3) to enter an order or orders for the sale of any security with the knowledge that an order or orders of substantially the same size, at substantially the same time and at substantially the same price, for the purchase of any such security, has been or will be entered by or for the same or different parties.

(b) To effect, alone or with one or more other persons, a series of transactions in any security creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

(c) If such person is a broker-dealer or other person selling or offering for sale or purchasing or offering to purchase the security, to induce the purchase or sale of any security by the circulation or dissemination of information to the effect that the price of any such security will or is likely to rise or fall because of market operations of any one or more persons conducted for the purpose of raising or depressing the price of such security.

(d) If such person is a broker-dealer or other person selling or offering for sale or purchasing or offering to purchase the security, to make, for the purpose of inducing the purchase or sale of such security by others, any statement which was, at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, or which omitted to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and which he knew or had reasonable ground to believe was so false or misleading.

(e) For a consideration, received directly or indirectly from a broker-dealer or other person selling or offering for sale or purchasing or offering to purchase the security, to induce the purchase or sale of any security by the circulation or dissemination of information to the effect that the price of such security will or is likely to rise or fall because of the market operations of any one or more persons conducted for the purpose of raising or depressing the price of such security.

Cal. Corp. Code § 25400.  "Section 25500 creates the private remedy for violations of section 25400 and extends liability to all persons affected by market manipulation without requiring reliance or privity. But, section 25500 is limited to intentional misrepresentations."  *California Amplifier Inc. v. RLI Ins. Co.*, 94 Cal. App. 4th 102, 109 (2001).  Section 25504.1 imposes joint and several liability on persons who materially assist in the violation of state securities laws.

S&Y moves for summary judgment on the California Corporate Securities Act claims on the

United States District Court
For the Northern District of California

ground that Osher cannot raise triable issues of fact as to scienter and materiality.  Regarding scienter, S&Y argues that it performed extensive due diligence by investigating and analyzing the System, hiring underwriter's counsel, and ensuring that APT hired the feasibility consultant, Uptown.  S&Y also argues that its reliance on the Uptown report was reasonable.

Osher argues that there are questions of fact about scienter because S&Y acted recklessly by abdicating its due diligence function to Uptown.  "By assigning Uptown, who was working for APT, the task of creating the financial models that supported the BANs, declining to take part in that effort, and disclaiming any responsibility for the end result, S&Y deliberately closed its eyes and elected to 'see no evil' and 'hear no evil' with respect to the process of inflating APT's financials."  Docket No. 105 at 18:25-28 in C 09-1437 SI.  Osher argues that S&Y's due diligence consisted of (1) conversations between Thomas Lockard, S&Y's senior investment banker working on the project, with the City, during which Mr. Lockard essentially accepted whatever the City employees told him; and (2) blind acceptance of the Uptown report.  Osher argues that Mr. Lockard did not vet the Uptown report, and that he did not investigate the basis for Uptown's two "benchmarks" for APT, nor did he realize or have concern that one of the two benchmarks was a major system with no competition, and the other was a non-existent system (Palo Alto) whose business plan was still in draft form and being prepared by Uptown itself.  The Court agrees with Osher that there are questions of fact about whether S&Y acted recklessly in conducting its due diligence, and thus DENIES summary judgment as to scienter on these claims.

With regard to materiality, S&Y argues that Osher's testimony demonstrates that the alleged misstatements and omissions were not material to his investment because Osher testified that he did not read the relevant portions of the OS and testified that he did not have any interest in the purportedly omitted information.  To the extent that the Court has granted summary judgment on the specific misrepresentations/omissions asserted at FAC ¶¶ 26-34 for lack of Osher's reliance, the Court also grants summary judgment for lack of materiality.  However, to the extent that Osher's claims are based on the theory that the OS projections were inflated in order to secure financing and that S&Y knew or should have known that the OS projections could never be achieved, the Court finds there are questions of fact on materiality sufficient to defeat summary judgment.

**D.      Breach of fiduciary duty**

S&Y moves for summary judgment on Osher's claim for breach of fiduciary duty on the ground that as a matter of law, S&Y did not owe plaintiff a fiduciary duty.  Citing *Caravan Mobile Home Sales, Inc. v. Lehman Brothers Kuhn Loeb, Inc.*, 769 F.2d 561, 568 (9th Cir. 1985), and *Leboce, S.A. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 709 F.2d 605, 607 (9th Cir. 1983), S&Y argues that in the absence of discretionary authority over a client's account, the broker's duty is only to faithfully execute a client's desired transactions and does not include any fiduciary obligations for investment decisions or suggestions.

However, as plaintiff notes, in *Duffy v. Cavalier*, 215 Cal. App. 3d 1517 (1989), the California Court of Appeal expressly rejected that view of *Caravan* and *Leboce*:

> Contrary to appellants' formulation, the existence of a stockbroker's fiduciary duty to a customer does not depend on a showing of "special facts," including whether or not the stockbroker serves as an investment adviser or controls the account. Stockbrokers act as agents for buyers and sellers of securities.  Any agent is also a fiduciary, whose obligation of diligent and faithful service is the same as that of a trustee. (Civ. Code, § 2322, subd. (c); Rest.2d Agency, § 13; *Twomey, supra*, 262 Cal.App.2d at p. 709; 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, §§ 41, 287, ¶. 53, 284-285.)  As repeatedly stated in *Twomey* and the many subsequent cases following it, the relationship between any stockbroker and his or her customer is fiduciary in nature, imposing on the former the duty to act in the highest good faith toward the customer. (*Twomey, supra*, 262 Cal.App.2d at p. 709; *Hobbs v. Bateman Eichler, Hill Richards, Inc.* (1985) 164 Cal.App.3d 174, 201 [210 Cal.Rptr. 387]; 2 Witkin, *op. cit. supra*, at § 287, p. 285.)

> Appellants insist that recent federal cases have limited the scope of a stockbroker's fiduciary duty to instances in which it can be proven that the broker actually controlled the account.  We disagree.  In our opinion, appellants have misread these cases, which are not in conflict with *Twomey* and its progeny. The question is not whether there is a fiduciary duty, which there is in every broker-customer relationship; rather, it is the scope or extent of the fiduciary obligation, which depends on the facts of the case.

> Thus, in *Leboce, S.A. v. Merrill Lynch, Pierce, Fenner*, etc. (9th Cir. 1983) 709 F.2d 605, the plaintiff (Leboce) was a foreign investment holding company which placed an unsolicited order with the defendant stockbrokerage to sell its extensive shares of an over-the-counter stock.  The stockbrokerage itself purchased the stock and then began to resell the shares to other purchasers at a small profit.  Leboce sued for the subsequent profits earned on resale of the stock, claiming that the stockbrokerage had a fiduciary duty to disclose its intent to purchase the shares prior to acting on the customer's order to sell.  The following facts were controlling: Leboce did not rely on the brokerage in making its decision to sell; the sale was unsolicited; the brokerage fully disclosed to Leboce the fact that it had purchased the shares; Leboce's investments were managed by a professional investment consultant who dealt on Leboce's behalf with all the various brokerages with which Leboce maintained accounts; and the brokerage had no authority to make trades on Leboce's account. The federal court of appeals affirmed the

United States District Court
For the Northern District of California

district court's judgment for the brokerage, holding that the brokerage's duties to its customer "were limited by the narrow extent of its agency," which was "strictly limited" to selling the stock on the customer's order at the best available price and for a reasonable commission. (*Id*., at ¶. 607-608.)

      Similarly, in *Caravan Mobile Home Sales v. Lehman Bros. Kuhn Loeb* (9th Cir. 1985) 769 F.2d 561, the federal court of appeals found that the stockbroker's agency was relatively narrow. The plaintiff customer in *Caravan* had a nondiscretionary account with the defendant stockbroker. On the stockbroker's recommendation, the customer invested funds in securities which subsequently declined in value; the customer then sued to recover its losses, claiming that the stockbroker violated a fiduciary duty by not advising the customer of adverse information about the security after it had been purchased. The federal appeals court held that, under the circumstances presented, where there was a nondiscretionary account with no showing that the defendant stockbroker had any control over the account whatsoever or acted as an investment counselor to the plaintiff, the stockbroker was only a limited agent of the customer. "Normally the agency relationship created by a non-discretionary account arises when the client places an order and terminates when the transaction ordered is complete. [Citation.] The stockbroker [in such a situation] assumes no continuing obligation to advise his [or her] clients of information that affects their securities. [Citation.]" ( *Id*., at p. 567.)

*Duffy*, 215 Cal. App. 3d at 1534-36 (internal footnote omitted).

      The Court concludes that S&Y is not entitled to summary judgment on plaintiff's claim for breach of fiduciary duty. The elements of a claim for breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) its breach, and (3) damage proximately caused by that breach. *Mendoza v. Rast Produce Co.*, 140 Cal. App. 4th 1395, 1405 (2006). There is evidence raising a triable issue of fact on this claim: S&Y was Osher's agent in connection with the purchase of the Notes; for over 25 years, S&Y (through Jeffrey Green, and earlier through his father, Morris Green) gave Osher advice on bond purchases; and Osher followed Jeffrey Green's advice on the purchase and sale of bonds. With regard to this specific investment, Osher claims that prior to the initial purchase, Green attended the investor tour and gave him a report on what had been presented, as well as the presentation materials. Mr. Osher also alleges that Green participated in the "investor calls" with APT on Osher's behalf. In connection with Osher's later purchases of Notes, Green received and read the quarterly reports from the Trustee for Osher; he did not send Osher the quarterly reports, but read them on his behalf and communicated the "relevant parts" to him. Green also received updates from APT management through Mr. Lockard, which he purported to convey to Osher. Viewing these facts in the light most favorable to plaintiff, a jury could find that S&Y breached its fiduciary duty to Osher. The fact that Osher is a sophisticated investor, and that Green did not have discretionary authority over the Trust's account, may limit the

United States District Court
For the Northern District of California

1  scope of the fiduciary duty that S&Y owed to Osher, but it does not eliminate that duty as a matter of

2  law.

3          Accordingly, the Court DENIES S&Y's motion for summary judgment on the breach of

4  fiduciary duty claim.

5

6  **IV.     S&Y's motion to exclude plaintiffs' expert David Sosa**

7          **A.     Out of pocket damages**

8          S&Y has moved to exclude the expert report and testimony of David Sosa.  For the reasons

9  stated *supra*, the Court agrees with S&Y that Sosa's opinion on loss causation with respect to the federal

10  claims is unreliable because Sosa fails to show defendants' alleged fraud caused plaintiffs' investment

11  losses.  S&Y argues, and the Court agrees, that the problems with Sosa's damages opinion apply equally

12  to plaintiffs' claims for out-of-pocket damages under the California Corporate Securities Act.  California

13  Corporations Code § 25500 provides that "damages [for violations for section 25400] shall be the

14  difference between the price at which such other person purchased or sold securities and the market

15  value which such securities *would have had at the time of his purchase or sale in the absence of such*

16  *act or transaction*, plus interest at the legal rate."  Cal. Corp. Code § 25500 (emphasis added); *see also*

17  *OCM Principal Opportunities Fund v. CIBC World Mkts Corp.*, 157 Cal. App. 4th 835, 874 (2007)

18  ("[F]or purposes of the out-of-pocket rule, the basic measure of the actual value of a security is 'the

19  price at which it could be resold in an open market . . . if its quality or other characteristics that affect

20  its value were known.' (Rest.2d. Torts, § 549, com. c, p. 110, italics added.) Because this hypothetical

21  price may be difficult to assess, the defrauded investor is permitted to establish the actual value of a

22  security at the time of purchase by reference to its market price when the misrepresented or concealed

23  'matter' becomes publicly known, provided this underlying 'matter' played a causal role in the decrease

24  in the market price.").

25          As discussed *supra*, Sosa did not evaluate or calculate the value of the Notes (or the System) at

26  the time of plaintiffs' purchase, and instead simply assumed that the entire difference between the price

27  paid and the proceeds from the sale to Comcast constituted the inflation due to defendants' alleged

28  fraud.  For the reasons stated *supra*, the Court GRANTS S&Y's motion to exclude Sosa's opinion

United States District Court
For the Northern District of California

1   regarding plaintiffs' damages under the federal and California securities acts.

2

3          **B.       Rescissory damages**

4          California Corporations Code § 25501 provides that a plaintiff who proves a violation of § 25401

5   is entitled to either rescission, or, if the plaintiff no longer holds the security, damages. "Under true

6   rescission, the plaintiff returns to the defendant the subject of the transaction, plus any other benefit

7   received under the contract, and the defendant returns to the plaintiff the consideration furnished, plus

8   interest." *Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1031 (9th Cir. 1999). "If true

9   rescission is no longer possible (perhaps because the plaintiff no longer owns the subject of the sale),

10  the court may order its monetary equivalent. This remedy entitles the plaintiff to the return of the

11  consideration paid less any value received on the investment." *Id.*

12         S&Y contends that Sosa's calculations of "cash losses" improperly inflates plaintiffs' losses by

13  failing to account for the coupon payments that plaintiffs received. Nuveen responds that rescission is

14  an equitable remedy, not a legal one, and thus that the amount of Nuveen's rescissory recovery is a

15  calculation to be performed by the Court after the jury has entered its verdict on the legal issue of

16  liability. Nuveen also asserts that the rescissory calculation is a simple mathematical calculation, the

17  inputs of which are defined by statute. *See* Cal. Corp. Code § 25501 ("Upon rescission, a purchaser may

18  recover the consideration paid for the security, plus interest at the legal rate, less the amount of any

19  income received on the security, upon tender of the security."). Accordingly, Nuveen states that Sosa

20  would not be offering any testimony on rescissory damages at trial.[17]

21         In its reply, S&Y argues that Nuveen is incorrect about the Court's (or a jury's) ability to

22  perform a mechanical calculation of rescissory damages based on the calculations Sosa performed

23  because Sosa did not calculate the value of the Notes or the System for any date prior to the sale of the

24  System. S&Y argues that to determine the appropriate rescissory measure, a court compares the price

25  paid for the security to its value on the date the purchaser would have been entitled to rescind the

26

27         [17] In opposition to defendant's motion, Nuveen has also submitted a declaration from Mr. Sosa
    which contains, at Exhibit D, calculations of Nuveen's rescissory damages that deduct the coupon
28  payments.

36

transaction. As support, S&Y cites Judge Sneed's concurring opinion in *Green v. Occidental Petroleum Corporation*, 541 F.2d 1335, 1342 (9th Cir. 1976). In *Green*, the Ninth Circuit denied the defendants' petition of writ of mandamus challenging a district court's order certifying a class in a federal securities fraud action. Judge Sneed's concurring opinion does not address rescission under the California Corporate Securities Act, and S&Y has not cited any authority for the proposition that rescission under the California statute requires an analysis of the *value* of the security on the purchase date.

The Court is not persuaded by S&Y's arguments about rescission. Furthermore, based upon Nuveen's representation that it will not be offering testimony about rescissory damages at trial, the Court DENIES S&Y's motion to strike Sosa's opinions about rescissory damages as moot.

## V.    Objections to evidence

The parties have raised a number of evidentiary objections. In granting Alameda's motions for summary judgment, this order does not rely on any evidence to which Alameda, Osher or Nuveen have objected, and accordingly the Court does not rule on those objections.

With regard to S&Y's motions for summary judgment, the Court has not relied any evidence to which the parties have objected to conclude that there are issues of fact. The parties may renew specific objections to evidence at the time of trial.

///

///

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court hereby GRANTS IN PART and DENIES IN PART defendants' motions for summary judgment.  Docket Nos. 157 & 163 in 08-4575; Docket Nos. 61, 144 & 145 in 09-1437.  The Court GRANTS Osher's motion for leave to submit additional evidence.  Docket No. 135 in 09-1437.  The Court DENIES AS MOOT Alameda's motion to exclude evidence.  Docket No. 156 in 08-4575.  The Court GRANTS IN PART and DENIES IN PART S&Y's motion to exclude the expert report and testimony of David Sosa.  Docket No. 164 in 08-4575; Docket No. 148 in 09-1437.  The Court GRANTS Alameda's motion to strike Osher's supplemental brief.  Docket No. 195 in 09-1437.

**IT IS SO ORDERED.**

Dated: May 16, 2011

_____
SUSAN ILLSTON
United States District Judge