IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VECTREN COMMUNICATIONS SERVICES,<br><br>        Plaintiff,<br><br>  v.<br><br>CITY OF ALAMEDA,<br><br>        Defendant.<br>_____/ | No. C 08-3137 SI<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

On December 20, 2013, the Court heard argument on the parties' cross-motions for summary judgment and plaintiff's motion in limine. For the reasons set forth below, the motions are GRANTED in part and DENIED in part.

**BACKGROUND**

In June 1999, defendant the City of Alameda and Sigcorp Communication Services, Inc., the predecessor to plaintiff Vectren Communication Services ("Vectren"), entered into an agreement ("the 1999 Agreement") pursuant to which Sigcorp, and later Vectren, agreed to build and manage a telecommunications system offering cable TV and internet services in Alameda. Under the terms of the 1999 Agreement, Sigcorp agreed to design and build the telecom system for $14.8 million, and to manage the system for five years in exchange for a management fee of ten percent of the system's revenues plus expenses and a potential bonus. Docket No. 285-2 at 6-9 & Ex. C (1999 Agreement).

In early 2002, the City and Vectren agreed to terminate their relationship, with the City taking over full responsibility for completing the construction of the telecom system and operating the cable TV and internet business. Alameda operated the system through its department, Alameda Power &

Telecom ("Alameda P&T"). The City agreed to buy out Vectren's right to manage the system in exchange for installment payments totaling no more than $6.3 million (plus 5% interest) over a five year period starting in 2005. Alameda's payment obligations were set forth in an Installment Sale Agreement (the "ISA"), entered into in 2002 and amended in 2004. *See* Docket No. 285-2 at 63-90 (ISA).

Under the ISA, Vectren would be paid "Installment Payments" from the "Net Series 2002A Revenues" generated by the telecom system. Docket No. 285-2 at 74-75 (§§ 4.1, 4.2 and Ex. B of the ISA). Section 4.1(a) of the ISA states that "the Installment Payments shall be payable solely from Net Series 2002A Revenues" 2002 ISA § 4.1(a). Section 4.2(a) of the ISA provides,

> (a) <u>Net Series 2002A Revenues only</u>. Alameda P&T's obligation to pay the Installment Payments shall be a special obligation limited solely to Net Series 2002A Revenues. Under no circumstances shall Alameda P&T be required to advance any moneys derived from any source of income other than the Net Series 2002A Revenues and other sources specifically identified herein for the payment of the Installment Payments, nor shall any other funds or property of Alameda P&T be liable for the payment of the Installment Payments.

*Id.* § 4.2(a). The ISA and related Intercreditor Agreement specified how the Net Series 2002A Revenues were to be computed, and specified that revenues were to be "properly accounted for in accordance with generally accepted accounting principles." *See id.* at §§ 1.1, 5.1(a)(v) & Docket No. 290 at 4 (Intercreditor Agreement).

Following Vectren's departure in early 2002, the City completed construction of the remaining portions of the telecom system and assumed all responsibility for telecom system operations. The City began operating the telecom system on a limited basis in July 2002, and completed construction of the entire system in 2005. The City reported no net telecom revenues for the first installment period ending March 31, 2005, with the system generating a large net loss. Docket No. 290 at 56 (Trial Ex. 179D). Alameda reported losses in each of the following four years (2006-2009), and no net telecom revenues except in 2008, when Alameda reported net telecom revenues of $38,666. *Id*.

In 2004, as the original construction financing for the telecom system was approaching the end of its term, the City explored various options for replacement financing. The City eventually decided to issue to private investors $33 million in revenue bond anticipation notes (the "Notes"). The ISA and the Intercreditor Agreement detailed the parties' relative priorities with respect to payment. Under the Intercreditor Agreement, Vectren had first priority to receive payment out of net telecom revenues up

2

to May 31, 2009, after which the Noteholders had the priority right to net telecom revenues until such time as they were paid in full. Docket No. 290 at § 6(a). The Intercreditor Agreement also provided that upon a refinance or sale of the telecom system at any time, the proceeds would be applied first to the Notes, and then second to Vectren's Installment Payments. *Id*. § 6(b).

In early 2008, with the maturity of the 2004 Notes approaching, the City began investigating several options, including refinancing the Notes, continuing operation of the system beyond June 2009 when the Notes became due, and sale of the system to another operator. The City ultimately decided to sell the system, and in November 2008, the City sold the system to Comcast for $15 million. All of the proceeds of the sale went to the Noteholders,[1] and both the City and Vectren received nothing. At the time of the sale, the City had paid a total of $193,665 in Installment Payments to Vectren – $100,000 in April 2004, $55,000 in June 2004, and $38,665 in May 2008. Docket No. 285-1 at 107-108 (Witte trial testimony).

In June 2008 Vectren filed this lawsuit against the City, alleging claims for breach of contract and breach of the covenant of good faith and fair dealing, declaratory relief, and an accounting. Vectren's first amended and supplemental complaint alleged that the City breached the ISA in two main ways. Docket No. 48. First, Vectren alleged that the City failed to perform the performance covenants of the ISA with respect to the rates it charged customers, the manner in which it staffed its operation of the system, and by failing to install voice capability. *Id*. ¶¶ 58-59. Second, Vectren alleged that the City breached the ISA by selling the telecom system to Comcast without Vectren's permission. *Id*. ¶ 60. The accounting claim alleged that the City's financial statements related to the telecom system's costs raised "unresolved questions regarding the bases and accounting for Net Series 2002A Revenues." *Id*. ¶ 74.

On March 8, 2010, after a four-week trial, the jury returned its verdict. Docket No. 215. The jury rejected Vectren's claims that Alameda had breached the ISA by setting its rates too low and in the way it staffed its operation. *Id*. at 2. The jury found that Alameda had breached the ISA by not offering voice services, but that the claim had accrued before August 29, 2006, and was thus barred by the statute

---

[1] Two of the Noteholders filed suit against the City seeking to recover their losses on the notes. The City prevailed in both lawsuits. *Nuveen Municipal High Income Opportunity Fund et al. v. City of Alameda*, C 08-4575 SI, and *Bernard Osher Trust v. City of Alameda*, C 09-1437 SI.

3

of limitations. *Id.* at 3. The jury also found a breach of the ISA based on Alameda's sale of the telecom system to Comcast, but found that the claim was barred by the statute of limitations and as a result of Vectren's conduct waiving the claim. *Id.* at 5, 6. As to Vectren's "accounting claim" – which was framed as a claim for breach of the ISA based on improper accounting – the jury found that Alameda had "breached the [ISA] by improperly accounting for Net Series 2002 A Revenues." *Id.* at 4. At trial, Vectren's theory on its accounting claim was that the City should have accounted for its net telecom revenues differently by excluding depreciation from its operating expenses and by capitalizing its service drop and customer premise equipment costs, and thus that the net telecom revenues were actually greater than the City had reported. The jury awarded $1,948,129 in damages for this breach. *Id.*

Both sides appealed. Vectren appealed the judgment on three grounds. Vectren first argued that its claims should have been governed by the four-year statute of limitations for breach of contract, rather than the one-year claim presentation statute under the Government Code, and thus that its voice claim was not untimely. Second, Vectren argued that there was not substantial evidence to support the jury's finding that Vectren had waived its sale claim. Third, Vectren contended that its sale claim was not barred by the statute of limitations. As to both its voice and sale claims, Vectren argued that it was entitled to "all sums due and payable under the [ISA] at Section 9.2(a)," which Vectren claimed was a "liquidated damages" provision.

Alameda cross-appealed, arguing that Vectren's claim for improper accounting practices – including the treatment of depreciation, service drops and customer premise equipment – was barred as a matter of law because Vectren had never presented a pre-litigation claim with respect to its allegations of improper accounting practices as required by the Government Claims Act. In addition, Alameda argued that the Ninth Circuit should reverse the verdict on Vectren's accounting claim because Alameda was entitled to a jury trial on the issue of Claims Act compliance, and because the jury should have been instructed that Alameda was contractually required to compute net telecom revenues "in accordance with GAAP."

By a memorandum decision filed on August 2, 2013, the Ninth Circuit affirmed in part and reversed in part. Docket No. 272. With respect to Vectren's voice claim, the Court of Appeals found

4

that this Court properly applied the one-year Government Code statute of limitations, and thus that the voice claim was untimely. In so finding, the Ninth Circuit rejected Vectren's argument that Article 9 of the ISA set forth a claims procedure that preempted the Government Code, holding that Article 9 "was not a claims procedure at all," but rather that it set forth a "notice and cure" procedure required by the contract to establish a default. "It is only once there is an Event of Default – which sometimes requires notice and a cure period and sometimes does not – that Vectren has a claim." *Id*. at 3. "At that point, the contract defers to background law, including the [Government Claims] Act – providing that Vectren may 'take whatever action at law or in equity' is necessary to resolve the Event of the Default – rather than setting forth a claims procedure." *Id*.

As to Vectren's sale claim, the Ninth Circuit found a lack of substantial evidence to support the jury's verdict that Vectren waived its sale claim or that the claim was barred by the statute of limitations. The Ninth Circuit remanded Vectren's sale claim to this Court for "further proceedings on damages only." *Id*. at 5.

Finally, the Ninth Circuit determined as a matter of law that Vectren had failed to present a written pre-litigation claim in support of its accounting claim. "[W]e hold that the accounting claim was not adequately presented and should have been rejected as a matter of law." *Id*. at 6. Accordingly, the Court of Appeals "reverse[d] the jury's verdict against the City" on Vectren's accounting claim and remanded the claim "for entry of judgment as a matter of law in the City's favor." *Id*. at 7.

Now before the Court are the parties' cross-motions for summary judgment regarding Vectren's claim for damages, as well as Vectren's motion in limine to preclude the City from raising certain arguments and presenting certain evidence on remand.

**LEGAL STANDARD**

Summary adjudication is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

In a motion for summary judgment, "[if] the moving party for summary judgment meets its

5

1  initial burden of identifying for the court those portions of the materials on file that it believes
2  demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so
3  that the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts
4  showing that there is a genuine issue for trial." *See T.W. Elec. Service, Inc., v. Pac. Elec. Contractors*
5  *Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  In
6  judging evidence at the summary judgment stage, the Court does not make credibility determinations
7  or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving
8  party. *See T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*
9  *Corp.*, 475 U.S. 574 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence
10 presented by the parties must be admissible. Fed. R. Civ. P. 56(e).  Conclusory, speculative testimony
11 in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary
12 judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

### I.   Rates, staffing, voice, and accounting claims

The City seeks a ruling that Vectren is precluded from seeking damages based on (1) the City's failure to raise rates to levels which would have generated Net Series 2002A Revenues (the "rate" claim), (2) the City employing excessive numbers of staff (the "staff" claim), (3) the City's failure to add voice service to the system (the "voice" claim), and (4) the City improperly accounting for net telecom revenues by including depreciation in its operating expenses and by failing to capitalize certain expenses (the "accounting" claim).  The City argues that each of these claims is barred by the Ninth Circuit's decision on appeal and accompanying mandate.

Vectren does not dispute that the Ninth Circuit's order bars it from seeking damages based on its rates, staffing and voice claims. However, Vectren contends that in seeking damages flowing from the sale of the system, Vectren may seek "properly calculated Net Series 2002A" revenues.  Vectren argues that "Alameda is conflating two distinct concepts – a claim versus damages recoverable for that claim." Docket No. 292 at 1:18-19.  Vectren argues that "[w]hile the Ninth Circuit found Article 9 of the IS Agreement was not an alternative claims procedure and Vectren failed to 'present' a separate

accounting claim, this does not mean Vectren cannot recover unpaid Net Series 2002A Revenues for the sale claim." *Id*. at 2:15-17.

The Court agrees with Alameda that Vectren may not include its accounting claim in computing sale damages. "The law of the case doctrine states that the decision of an appellate court on a legal issue must be followed in all subsequent proceedings in the same case." *Maag v. Wessler*, 993 F.2d 718, 720 n. 2 (9th Cir. 1993) (citations and internal quotation omitted). The doctrine

> is a judicial invention designed to aid in the efficient operation of court affairs. Under the doctrine, a court is generally precluded from reconsidering an issue previously decided by the same court, or a higher court in the identical case. For the doctrine to apply, the issue in question must have been decided explicitly or by necessary implication in [the] previous disposition.

*Milgard Tempering, Inc. v. Selas Corp. of America*, 902 F.2d 703, 715 (9th Cir. 1990). Here, the Ninth Circuit explicitly held that Vectren's accounting claim was barred as a matter of law and directed the Court to enter judgment against Vectren on that claim. Specifically, the Ninth Circuit held,

> Though Vectren requested accounting figures and documents and raised questions related to accounting prior to litigation, these requests were made in the context of Vectren questioning the City's operation of the telecommunications system, not in the context of any discussion of the propriety of the accounting methods used in calculating telecommunications system financial figures. These requests did not "give[] adequate information" such that a "reasonable investigation of [the] claim" would encompass the accounting claim raised by Vectren during the litigation.

Docket No. 272 at 6. Vectren may not repackage its accounting claim as a claim for damages flowing from the sale of the telecom system because the Ninth Circuit expressly held that Vectren did not present its accounting claim to the City as required by the Government Code. *Cf. Herrington v. County of Sonoma*, 12 F.3d 901, 904-05 (9th Cir. 1993) (holding under the law of the case doctrine that Court of Appeals' rejection of a $810,000 damage award as "grossly excessive" set an upper limit on recoverable damages and precluded consideration of a subsequent appraisal supporting damages in excess of $810,000).

## II.    Damages from sale

### A.    Claims presentment

Both parties seek partial summary judgment on Vectren's claim for damages flowing from the sale of the telecom system to Comcast. As a preliminary matter, Alameda contends that Vectren failed

7

to present a pre-litigation claim for breach of contract based on the sale of the system, and thus that the claim is barred. Citing *Tapia v. County of San Bernadino*, 29 Cal. App. 4th 375 (1994), Alameda argues that Vectren's claim for breach did not accrue until after the sale occurred on November 21, 2008. Alameda contends Vectren did not comply with the Government Claims Act with respect to the sale claim because all of the letters Vectren sent to Alameda claiming that the sale would constitute a breach of the ISA were sent before the November 21, 2008 sale.

Vectren responds, *inter alia*, that Alameda's claims presentment argument is outside of the scope of the Ninth Circuit's mandate to this Court. The Court agrees. The jury found that the sale of the system breached the parties' contract. The Ninth Circuit affirmed that finding, reversed the jury's findings on Alameda's waiver and notice defenses, and "remand[ed] that claim for further proceedings *on damages only*." Docket No. 272 at 5 (emphasis added). As Vectren notes, claims presentment is an element of a plaintiff's claim and a condition precedent to suit. *See Shirk v. Vista Unified Sch. Dist.*, 42 Cal. 4th 201, 209 (2007). As such, the Court finds that claims presentment issues, which go to liability and not damages, are beyond the scope of the Ninth Circuit's remand.

### B.     Liquidated damages and limitation to net revenues[2]

Vectren seeks a ruling that Section 9.2 of the ISA is an enforceable liquidated damages clause, and that Vectren is entitled to recover all of the unpaid Installment Payments ($6.1 million in principal

---

[2] Each party contends that the other is precluded from asserting various arguments regarding damages as a result of the law of the case, the Ninth Circuit's mandate, and/or the jury's verdict. The Court only addresses these arguments to the extent that the Court reaches the issues that the parties contend are foreclosed.
  The Court finds that the law of the case does not preclude Alameda from arguing that the ISA limits Vectren's sale damages to net telecom revenues that were actually earned, as the Court never decided this question. Alameda raised this issue as one of many in a summary judgment motion; Alameda presented this argument in half a page and Vectren responded to it in two sentences. Docket Nos. 68 at 15 and 69 at 22:22-27. The Court denied Alameda's motion for summary judgment, finding *inter alia* that "the City's argument assumes both that the sale of the system was not a breach of the contract, and that the City was not in breach of its performance covenants (which affected the net revenues)." Docket No. 84 at 13:21-23. Thus, the Court did not decide this issue against Alameda, but rather found that the question could not be resolved based upon the disputed record then before the Court. Now, after the jury's verdict and the Ninth Circuit's decision, Vectren cannot pursue its claims for breach of the performance covenants nor can Vectren pursue its accounting claim, and thus the issue is ripe for decision.

8

and accrued interest of over $4.2 million).[3]   Section 9.2, titled "Remedies of Default," provides,

> Whenever any Event of Default referred to in Section 9.1[4] of this Installment Sale Agreement shall have happened and be continuing, VCS shall have the right, at its option and without any further demand or notice, but subject to the prior written consent of the requisite Series 2004 Holders, if and to the extent (if any) required under the Intercreditor Agreement, to:
>
> (a) declare all principal components of the unpaid Installment Payments, together with accrued interest at the rate or rates specified in the respective Outstanding Series 2002 Certificates from the immediately preceding Payment Date on which payment was made, to be immediately due and payable, whereupon the same shall become due and payable;
>
> (b) take whatever action at law or in equity may appear necessary or desirable to collect the Installment Payments then due or thereafter to become due during the Term of this Installment Sale Agreement, or enforce performance and observance of any obligation, agreement or covenant of Alameda P&T under this Installment Sale Agreement; and
>
> (c) require Alameda P&T, subject to applicable requirements and restrictions of law, and subject to the provisions of the Intercreditor Agreement and the Series 2004 Security Agreement, to sell the Telecom System and apply the net proceeds of such sale to the repayment of the Installment Payments.

ISA § 9.2. Vectren argues that pursuant to Section 9.2, it has the right to demand "all unpaid Installment Payments" due to Alameda's breach of the ISA by selling the system without Vectren's consent.

Alameda contends that Section 9.2 is a simple acceleration clause, not a liquidated damages clause. Alameda further contends that if Section 9.2 is a liquidated damages clause, it is unenforceable because it operates as a penalty. Finally, Alameda argues that Vectren's damages – liquidated damages or otherwise[5] – are barred by the terms of the ISA and the Intercreditor Agreement because those contracts provide that Vectren was to be paid Installment Payments solely out of Net Series 2002A

---

[3] At trial, Vectren sought liquidated damages of $10.3 million, which consisted of $6.1 in unpaid principal and $4.2 in accrued interest as of the time of trial. Vectren's motion for summary judgment seeks additional interest that has accrued since the time of trial, although Vectren's papers do not specify that amount.

[4] Section 9.1 specifies eight "events of default," including "(a) Any failure by Alameda P&T to pay any Installment Payment by the Payment Date or failure to make any other payment required to be paid hereunder at the time specified herein, except the extent that such failure is due to insufficiency of Net Series 2002 Revenues."

[5] At trial, Vectren argued that it was entitled to two forms of damages as a result of the sale: first, that if Alameda had not sold the system and continued to operate it, the system would have earned net revenues, which its expert estimated as $1.8 million, and second, liquidated damages of over $10 million.

9

Revenues that were actually earned. The City argues that Vectren does not have any damages because whatever net telecom revenues existed were paid to Vectren, and it is undisputed that no future net telecom revenues will come into existence as the telecom system was sold to Comcast and the sale proceeds were applied as required by the ISA and the Intercreditor Agreement.

The Court concludes that the ISA limits Vectren's damages recovery to net telecom revenues that were actually earned, and thus that Vectren's claims for damages as a result of the sale are barred.[6] In the event of a default, Section 9.2 allows Vectren to recover damages in three ways: (1) declare "principal components of the unpaid Installment Payments" due and payable; (2) "take whatever action in law or equity may appear necessary or desirable to collect the Installment Payments then due . . . ," or (3) require Alameda "to sell the Telecom System and apply the net proceeds to the prepayment of Installment Payments." Section 9.2 does not authorize Vectren to seek payment of anything but "Installment Payments" as that term is defined in the ISA. The ISA defines "Installment Payment" to mean "any payment required to be paid by Alameda P&T to VCS pursuant to Section 4.1 of this Installment Sale Agreement . . . ." Section 4.1, in turn, states that Installment Payments are payable "solely from Net Series 2002A Revenues." Section 4.2(a) reinforces this limitation:

> <u>Net Series 2002A Revenues only</u>. Alameda P&T's obligation to pay the Installment Payments shall be a special obligation limited solely to Net Series 2002A Revenues. Under no circumstances shall Alameda P&T be required to advance any moneys derived from any source of income other than the Net Series 2002A Revenues and other sources specifically identified herein for the payment of the Installment Payments, nor shall any other funds or property of Alameda P&T be liable for the payment of the Installment Payments.

§ 4.2(a). Thus, Sections 4.1 and 4.2 make clear that Vectren was entitled to receive money solely out of Net Series 2002A Revenues, and if those revenues were insufficient, Vectren agreed to bear the risk that it would not get paid.

In addition, the ISA's definition of "Net Series 2002A Revenues" shows that only money actually earned by the telecom system constitutes "operating revenue." By reference to the Intercreditor Agreement, the ISA defines "Net Series 2002A Revenues" as "Telecom System Revenues for each Net

---

[6] As such, the Court need not resolve the question of whether Section 9.2 is an enforceable liquidated damages clause because even if it is, the damages recoverable are subject to Section 4.2 of the ISA, which, as explained *infra,* bars Alameda's damages claim under the facts here.

1  Revenue Period," less certain operating and other expenses. Docket No. 290 at 37 (Intercreditor
2  Agreement). The term "Telecom System Revenues" is defined to include "Operating Revenues,"[7]
3  which are specifically restricted to "income and revenue *received or receivable* by Alameda P&T from
4  the ownership or operation of the Telecom System . . . ." *Id*. at 38. Thus, in the foregoing provisions
5  the parties explicitly agreed that Vectren was entitled to receive money solely out of Net Series 2002A
6  Revenues that were actually received or receivable.

7  Vectren argues that Section 4.2 only imposes contractual limitations on performance while
8  Section 9.2 provides for damages remedies in the event of default. However, Vectren does not cite the
9  ISA or any other evidence in support of this interpretation of the ISA. The Court finds that language
10 of Section 4.2 – which unequivocally states that "*[u]nder no circumstances* shall Alameda P&T be
11 required to advance any moneys derived from any source of income other than the Net Series 2002A
12 Revenues and other sources specifically identified herein for the payment of the Installment Payments,
13 nor shall any other funds or property of Alameda P&T be liable for the payment of the Installment
14 Payments" – applies in all circumstances, including a breach or a default.

15 Thus, in order to recover damages under the ISA, Vectren must show that the money it seeks is
16 derived from either Net Series 2002A Revenues or some other source "specifically identified herein for
17 the payment of the Installment Payments," and that "other funds or property of Alameda P&T" will not
18 be used to pay the damages Vectren seeks. However, Vectren does not dispute that its claim for
19 damages is not tied to Net Series 2002A Revenues or any other source specifically identified in the ISA
20 for the payment of Installment Payments. To the contrary, in order to satisfy a judgment for the damages
21 Vectren seeks, Alameda would be required to use electric utility funds or general fund monies, which
22 are "other funds or property of Alameda P&T" and explicitly protected by Section 4.2.

23 "Limitation of liability provisions have long been recognized as valid in California."
24 *Markborough California, Inc., v. Superior Court*, 227 Cal. App. 3d 705, 714 (1991); *see also CAZA*
25 *Drilling, Inc. v. TEG Oil & Gas U.S.A., Inc*., 142 Cal. App. 4th 453, 466 (2006) ("There is nothing
26 inherently inconsistent in a party to a contract agreeing to do 'X,' but stating that if it does not, the other

---

[7] "Telecom System Revenues" also include the proceeds of refinancing or sale of the telecom system.

11

party may not recover consequential damages or stating that if negligence occurs during the performance of 'X,' liability will be limited."). Vectren argues that "if § 4.2 were deemed a limitation of liability clause applicable to § 9.2, Alameda would evade any consequences for unauthorized sale, other than what Alameda would have owed had it not breached the IS Agreement at all." Docket No. 292 at 22. However, Vectren ignores the fact that in addition to being paid from operating revenues, the ISA provided that Vectren had the right to proceeds from a sale or refinance of the telecom system. As Alameda notes, if the telecom system had sold for $40 million instead of $15 million, Vectren would have been fully paid. Similarly, if Vectren had negotiated for a senior right to sale proceeds and a junior right to operating revenue, Vectren would have been paid in full after the $15 million sale of the system to Comcast.

Vectren also contends that Section 4.2 cannot limit Alameda's liability because "a clause limiting liability will not be enforceable 'where circumstances cause [the] remedy to fail of its essential purpose." Docket No. 292 at 23:7-9 (citing Cal. Comm. Code § 2-719(2)). Vectren argues that the "essential purpose" in evaluating changed circumstances turns on the purpose of the limited remedy clause itself. However, as Alameda notes, Section 2-719(2) is found within Division 2 of the Commercial Code, which applies to sales of "goods" and thus does not apply to the ISA. *See* Cal. Comm. Code §§ 2101, 2102. Moreover, even if this section applied to the ISA, Section 4.2 shows that the parties intended to limit Vectren's recovery to Net Series 2002A Revenues, and thus the limitation of liability fulfills its essential purpose rather than contradicting it.

In light of Court's resolution of the pending motions, the Court finds it unnecessary to reach the parties' remaining arguments on summary judgment or in Vectren's motion in limine.

**CONCLUSION**

For the foregoing reasons, the parties' motions for summary judgment are GRANTED IN PART and DENIED IN PART. Vectren's motion in limine is DENIED as to Vectren's argument regarding § 4.2 of the ISA, and the balance of that motion is DENIED AS MOOT. This order resolves Docket Nos. 284, 287 & 289.

The parties are directed to meet and confer regarding the need, if any, for further proceedings

in this case. If all that remains to be done is the entry of judgment, the parties shall meet and confer regarding the form of the proposed judgment. The parties shall file a joint letter to the Court regarding what further proceedings, if any, are necessary in this case, along with a proposed judgment if appropriate, no later than **February 21, 2014**.

**IT IS SO ORDERED.**

Dated: February 7, 20014

SUSAN ILLSTON
United States District Judge